UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

ROCKWELL MINING, LLC and
BLACKHAWK LAND AND RESOURCES,
LLC,

      Plaintiffs,

v.                        Civil Action No. 2:20-cv-00487

POCAHONTAS LAND LLC,

      Defendant.

MEMORANDUM OPINION AND ORDER

Pending are Defendant Pocahontas Land LLC's ("Pocahontas Land") Motion for Partial Summary Judgment (ECF No. 102) and Plaintiffs Rockwell Mining, LLC ("Rockwell") and Blackhawk Land and Resources, LLC's ("Blackhawk Land") (collectively, "plaintiffs") Motion for Summary Judgment (ECF No. 105), both filed November 22, 2021.

The parties are before the court pursuant to the court's diversity jurisdiction.

I. BACKGROUND

As this matter primarily concerns the history and current status of a 1937 coal lease and the rights and duties of

the parties thereunder, it is necessary to first recount the history of the lease.

A.    1937 Lease

On July 1, 1937, Loup Creek Colliery Company ("Loup Creek Colliery") leased approximately ten thousand acres for coal mining purposes in Wyoming County, West Virginia, and Boone County, West Virginia, to The Koppers Coal Company ("Koppers Coal") via an Indenture of Lease ("1937 Lease").[1]  Compl. ¶ 9; Counterclaim ¶ 20; see also Indenture of Lease, July 1, 1937, Pls.' Mot. Summ. J. Ex. A, ECF No. 105-2 (hereinafter "1937 Lease").

The three critical provisions in the 1937 Lease are: (1) Article Twenty-Three, which provides for unilateral twenty-year renewals of the lease term by the lessee; (2) Articles Three and Four, which provide for flat-rate royalties for mined coal and a minimum annual rental fee; and (3) Article Sixteen, which prohibits the assignment or mortgaging of the lease without the consent of the lessor.

The initial lease term began July 1, 1937, and lasted twenty years; it has been continuously renewed since.

_____

[1] Pocahontas Land asserts that the lease now covers approximately 32,208 acres.  See Def.'s Mem. Supp. 2.

Counterclaim ¶¶ 21–22.  Article Twenty-Three of the lease provides that the lease term can be unilaterally renewed by the lessee in twenty-year increments "on the same terms and conditions . . . until all the merchantable coal in said lands shall have been mined or removed."  1937 Lease at 18.  Most recently, on September 6, 2016, Rockwell renewed the lease for another twenty-year term, which began on July 1, 2017, and extends to June 30, 2037.  <u>See</u> Notice of Acceptance & Renewal, Def.'s Mot. to File Under Seal Ex. 2, ECF No. 104-1.

Article Three of the 1937 Lease provides a flat-rate royalty per ton of coal mined and sold by the lessee, to be paid to the lessor.  <u>See</u> 1937 Lease at 7.  The royalty rate is set at ten cents per ton of coal for the first 500,000 tons mined or shipped in a year; nine cents per ton for the second 500,000 tons; eight cents per ton for the third 500,000 tons; and seven cents per ton for all additional tons.  Counterclaim ¶ 23; 1937 Lease at 7.  Article Four establishes an annual minimum rental rate of $100,000 (after a wrap-up period) to be paid regardless of the quantity of coal mined.  1937 Lease at 8–9.

Critically, Article Sixteen prohibits the assignment, mortgage, conveyance, sublet, or underlet of the lease without the consent of the lessor.  The key language reads:

> The Lessee further covenants and agrees that it will not mortgage, nor will it assign,

> convey, lease, under-let, sublet, or set over
> any of its estate, interest or term, in whole
> or in part, in the hereby leased premises or
> their appurtenances, or any part thereof to
> any person or persons whatsoever, or
> corporation whatsoever, without the license or
> consent of the Lessor, its successors or
> assigns in writing under seal for that purpose
> being first had and obtained; and in case of
> such assignment or transfer, the transferee
> shall assume in writing all obligations of the
> Lessee hereunder in a form satisfactory to the
> Lessor.  Any transfer by option or process of
> law shall be deemed an assignment by the
> Lessee within the meaning of this provision
> and a violation of this covenant.

1937 Lease at 15.

B.   <u>Leasehold History</u>

The only notable change in the lessor under the 1937 Lease has occurred only once when, in 1965, Loup Creek Colliery (which at that point had become the Loup Creek Company) merged with Pocahontas Land Corporation and The Wandle Company. Counterclaim ¶ 13.  Pocahontas Land Corporation was the surviving entity and became the lessor under the 1937 Lease. <u>See</u> Pls.' Mem. Supp.; Def.'s Resp.  Notably, Pocahontas Land and Loup Creek are legally the same entity, per the dictates of the West Virginia Business Corporation Act that was in force at the time of the merger.  <u>See</u> Letter from M. Ferguson to B. Glasser, Oct. 7, 2021, at 4-7, Pls.' Mot. Summ. J. Ex. D, ECF No. 105-5

(hereinafter "Ferguson Letter").[2]  Thus, the lessor entity under
the 1937 Lease has not changed from its inception.  See id.
Pocahontas Land Corporation subsequently became Pocahontas Land
LLC (plaintiff) and remains the current lessor.[3]  See Compl. ¶
11.

Prior to the events at issue, the 1937 Lease had been
assigned three times, first in 1941, then in 1966, and finally
in 2015.  In 1941, Koppers Coal assigned its interests in the
lease to Eastern Gas and Fuel Associates ("Eastern Gas").
Def.'s Mem. Supp. 2.  That assignment was done with the consent
of Loup Creek Colliery by a deed of assignment and consent.
Counterclaim ¶ 12.

Then, in 1966, Eastern Gas assigned its interests to
an affiliated company, Eastern Associated Coal Corporation
("Eastern Associated").  Def.'s Mem. Supp. 2.  This assignment
was also made by a deed of assignment and consent and was
consented to by Pocahontas Land.  Counterclaim ¶ 14.

---

[2] "[F]or all purposes of this discussion, including any analysis
of the equities involving the status and negotiation of the 1937
Lease, Poca[hontas Land] . . . is legally the same entity as
Loup Creek, the original Lessor."  Ferguson Letter at 7.

[3] In 2020, Pocahontas Land converted to Poca Land.  Counterclaim
¶ 19.  The parties use "Pocahontas Land" and "Poca Land"
somewhat interchangeably, and that entity is styled in this case
as the former.  For consistency, the court refers to "Pocahontas
Land."

Subsequently, in 1987, Eastern Associated was purchased by
Peabody Coal Company ("Peabody Coal"), and in 2005, Eastern
Associated converted into a limited liability company dubbed
Eastern Associated Coal, LLC ("Eastern LLC").  Pls.' Mem. Supp.
6; Def.'s Resp. 6—7.

Next, in 2015, the third assignment resulted from the
Patriot Coal Corporation ("Patriot Coal") bankruptcy.  Def.'s
Mem. Supp. 2.  Eastern LLC was then a subsidiary of Patriot
Coal, which was a subsidiary of Peabody Coal, when Patriot Coal
filed Chapter 11 bankruptcy in 2011.  See Counterclaim ¶ 16.  As
a result of that proceeding, in 2015 the assets of Eastern LLC,
including the 1937 Lease, were sold under an asset purchase
agreement with Blackhawk Mining LLC ("Blackhawk Mining") to
Rockwell, a subsidiary of Blackhawk Mining, pursuant to a lease
assignment and assumption agreement effective October 26, 2015.
Counterclaim ¶ 16; see Lease Assignment & Assumption Agreement,
Def.'s Resp. Ex. 10, ECF No. 110-10) (hereinafter "2015
Assignment & Assumption").

The asset purchase was pursuant to Patriot's court-
approved bankruptcy reorganization plan to liquidate Patriot's
assets.  See Debtors' Fourth Amended Joint Plan of
Reorganization Pursuant to Chapter 11 of the Bankruptcy Code, In
re Patriot Coal Corp., No. 15-32450 (KLP) (E.D. Va. Bankr. Oct.

9, 2015).  This was a transfer by process of law, as ordered by the bankruptcy court.  See Confirmation Order, In re Patriot Coal Corp., No. 15-32450 (KLP), at *38 (E.D. Va. Bankr. Oct. 9, 2015) ("neither the Debtors nor Blackhawk shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate and implement the provisions of this Confirmation Order").

On December 21, 2015, Pocahontas Land, Rockwell, and Blackhawk Land, another subsidiary of Blackhawk Mining, entered into a Consent and Amendment Agreement ("2015 Consent and Amendment") whereby Pocahontas Land consented to Rockwell's subleasing of a portion of the 1937 Lease property, consisting of a portion of a single coal seam known as the "Powellton A" seam, to its affiliate Blackhawk Land, and consented to Blackhawk Land's sub-subleasing of that same portion of the Powellton A seam[4] to a third party, Coronado Coal II, LLC ("Coronado").  Counterclaim ¶¶ 17-18; Compl. ¶¶ 14-15.  Of prime significance, the parties disagree as to whether the 2015 Consent and Amendment amended the 1937 Lease only with respect to the Powellton A seam, or in its entirety.  The 2015 Consent

---

[4] Hereinafter, that portion is at times referred to simply as the Powellton A seam.

and Amendment pertinently provided that Article Sixteen was

amended to expand the prohibition against assignment, stating:

> With respect to Article Sixteen of the
> Pocahontas Land Lease, Poca[hontas] Land,
> [Blackhawk Land] and Rockwell agree that the
> Pocahontas Land Lease is amended hereby to
> provide that a transfer of control of the
> lessee therein shall be an event of assignment
> requiring Poca[hontas] Land's consent, and
> shall be deemed to have occurred whenever
> 50.1% or more of the lessee's capital stock or
> membership interests shall become subject to
> the direct or indirect control of persons or
> entities, some or all of whom are different
> than those persons or entities which directly
> or indirectly control that portion of the
> lessee's capital stock or membership interests
> as of the effective date of this Consent.
> Notwithstanding this amendment to the
> Pocahontas Land Lease, Poca[hontas] Land
> hereby acknowledges and agrees that it shall
> not unreasonably withhold its consent to an
> assignment of the Pocahontas Land Lease or the
> [Blackhawk Land]-Coronado Sub-Sublease where
> a transfer of control as set forth above
> occurs provided the assignee has reasonable
> coal mining experience and reasonable
> financial standing.

2015 Consent & Amend. 7, Pls.'s Mot. Summ. J. Ex. B, ECF No.

105-3; see also Compl. ¶ 15.

Then, on March 16, 2016, by agreement between

Pocahontas Land, Blackhawk Mining, and Deutsche Bank AG New York

Branch ("Deutsche Bank"), Pocahontas Land consented to Blackhawk

Mining's mortgaging of the leasehold to Deutsche Bank (as

collateral agent for certain creditors).[5]  Consent to Leasehold
Mortgages, Mar. 16, 2016, Def.'s Mot. Partial Summ. J. Ex. 7,
ECF No. 102-6 (hereinafter "2016 Consent to Mortgages").

        In July of 2019, Blackhawk Mining — parent company of
both plaintiffs, Rockwell and Blackhawk Land — and substantially
all of its wholly-owned subsidiaries filed a voluntary petition
for reorganization under Chapter 11.  Def.'s Mem. Supp. 5; see
also Compl. ¶ 18.  Pursuant to this bankruptcy, Blackhawk Mining
was reorganized, satisfying prior lien loans, where each lien
lender received a pro rata share of 100% of the stock of a new
ultimate parent company, being the newly reorganized Blackhawk
Mining.  Compl. ¶ 18.  As far as the court is able to ascertain,
this included the creditors secured by the Deutsche Bank
mortgage in the 2016 Consent to Leasehold Mortgages.[6]

---

[5] The Deed of Trust secured by Deutsche Bank was for the benefit
of parties known as First Lien Term Secured Parties (pursuant to
the First Lien Term Loan Credit Agreement), ABL Credit Secured
Parties (pursuant to the ABL Credit Agreement), and Second Lien
Term Loan Secured Parties (pursuant to the Second Lien Term Loan
Agreement).  Those three agreements were all entered into and
dated October 28, 2015.  See 2016 Consent to Mortgages at 1, 3.

[6] See Debtors' First Amended Joint Prepackaged Chapter 11 Plan of
Reorganization, In re Blackhawk Mining LLC, No. 19-11595-LSS (D.
Del. Bankr. Oct. 10, 2019).  On the effective date of the
bankruptcy plan, "the obligations of the Debtors or the
Reorganized Debtors . . . shall be discharged and deemed
satisfied in full."  Id. at 27.

As a result, the Deutsche Bank indebtedness was satisfied and all persons and entities who had voting interests in the old Blackhawk Mining ceased to own any membership interest in the new Blackhawk Mining.  Compl. ¶ 18. Subsidiaries, including Rockwell, remained owned by Blackhawk Mining after the reorganization.  See Debtors' Modified Joint Prepackaged Chapter 11 Plan of Reorganization, In re Blackhawk Mining LLC, No. 19-11595 (LSS), at *22 (D. Del. Bankr. Aug. 26, 2019).[7]  As with the 2015 Patriot Bankruptcy, this assignment was pursuant to the order of the bankruptcy court and did not require Pocahontas Land's consent.  See Confirmation Order, In re Blackhawk Mining LLC, No. 19-11595 (LSS), at *36 (D. Del. Bankr. August. 29, 2019) ("This Confirmation Order shall constitute all approvals and consents required . . . .").

As part of the exit financing, Blackhawk Mining in January 2020, entered into two credit agreements and Rockwell pledged the 1937 Lease as collateral under two different Leasehold Credit Line Deeds of Trust – one for the benefit of Cantor Fitzgerald Securities, LLC ("Cantor Fitzgerald"), a

---

[7] "For the avoidance of any doubt, any Interest in non-Debtor subsidiaries owned by a Debtor shall continue to be owned by the applicable Reorganized Debtor."  Debtors' Modified Joint Prepackaged Chapter 11 Plan of Reorganization, In re Blackhawk Mining LLC, No. 19-11595 (LSS), at *22 (D. Del. Bankr. Aug. 26, 2019).

collateral agent on behalf of certain secured parties, in the amount of $85,000,000, and the other for the benefit of MidCap Funding IV Trust ("MidCap Funding"), the agent on behalf of secured creditors, in the amount of $90,000,000. See Compl. ¶ 18; Counterclaim ¶¶ 64–69; Leasehold Credit Line Deed of Trust by Rockwell to Cantor Fitzgerald at 7–8, Def.'s Mot. Partial Summ. J. Ex. 9, ECF No. 102-8 (hereinafter "Cantor Fitzgerald Deed of Trust"); Leasehold Credit Line Deed of Trust by Rockwell to MidCap Funding at 7–8, Def.'s Mot. Partial Summ. J. Ex. 10, ECF No. 102-9 (hereinafter "MidCap Funding Deed of Trust"). The two deeds of trust were dated January 22, 2020.[8] See Counterclaim ¶¶ 65–66, 68–69; Cantor Fitzgerald Deed of Trust at 1; Midcap Funding Deed of Trust at 1. Pocahontas Land contends that no party requested its consent to either credit agreement before recording the deeds of trust. See Counterclaim ¶ 73. Rockwell does not dispute that it did not seek Pocahontas Land's consent prior to this mortgaging or that the new mortgage significantly increased the indebtedness.

On March 11, 2020, Pocahontas Land sent Rockwell a notice of default, asserting that Rockwell's mortgaging of the

---

[8] The provided deeds of trust are copies of those recorded in Boone County, per the stamp on the front page of each dating the recording in Boone County on February 19, 2020. The parties do not state when the deeds of trust were recorded in Wyoming County.

leasehold under the two deeds of trust, occurring as it did without the consent of Pocahontas Land, triggered a default of Rockwell's rights under the 1937 Lease.  Notice of Default, Mar. 11, 2020, at 1–2, Def.'s Mot. to File Under Seal Ex. 11, ECF No. 104-2.  Blackhawk Mining responded by email to the March 11 Notice of Default on May 5, 2020, denying that the deeds of trust violated the 1937 Lease on several grounds more fully set forth below, _infra_ section III.C.  Email from C. Salyer to G. Wooten et al., May 5, 2020, Def.'s Mot. to File Under Seal Ex. 12, ECF No. 104-3.

On June 1, 2020, Blackhawk Mining merged with BH Mining Merger Sub, LLC ("BH Mining Merger"), a wholly-owned subsidiary of Sev.en US Met Coal Inc. ("Sev.en Energy")[9] (this event hereinafter, "Sev.en Energy Merger").  Compl. ¶ 16.  At the time of the merger, Rockwell and Blackhawk Land were each wholly-owned subsidiaries of Blackhawk Sub, LLC, which was a wholly-owned subsidiary of Blackhawk DRE, LLC, which was a wholly-owned subsidiary of Blackhawk Mining.  Compl. ¶ 18.  The transaction, which the plaintiffs claim was structured as a reverse-triangular merger, resulted in Blackhawk Mining, the

---

[9] The complaint refers to BH Mining Merger as a subsidiary of "Sev.en US Met Coal Inc.," while the counterclaim says BH Mining Merger was formed by "Sev.en Energy AG."  _See_ Compl. ¶ 16; Counterclaim ¶ 58.  The court will refer to the company as "Sev.en Energy."

surviving entity, being wholly-owned by Sev.en Energy.  Compl. ¶
16.  Pocahontas Land argues that this transaction resulted in a
transfer of control of Blackhawk Mining which, because it
occurred without Pocahontas Land's consent, breached the 1937
Lease as amended.  See Counterclaim ¶ 61.  Neither party
provides a sufficient explanation of how this merger occurred,
each referring to it as a "reverse triangular merger" without a
full explanation of how that complex corporate process was
executed by these parties.  However, as Pocahontas Land does not
contend that the merger was ineffective and as both parties
agree that the ultimate corporate control over those
subsidiaries, Rockwell and Blackhawk Land, changed at that time
from the first and second lienholders who were awarded control
of Reorganized Blackhawk Mining to Sev.en Energy, the limited
explanation still provides the court sufficient information to
decide this issue.

Blackhawk Mining notified Pocahontas Land, once again
by email, on May 23, 2020, of the planned transaction with
Sev.en Energy, which was signed the next day, May 24, 2020, and
closed on June 1.  Email from C. Salyer to K. Xia & J. Jeffries,
May 23, 2020, Def.'s Resp. Ex. 13, ECF No. 110-11; Pls.' Mem.
Supp. 3, 8, 28.[10]  Compl. ¶ 20.  The email stated that the

---

[10] Plaintiff's memorandum in support dates the transaction May
24, 2020, and later says the date of closing was June 1, 2020.

transaction would cause an ownership change but no direct assignment, and included a "draft form change in control consent" (not included in the record).  See id.

On June 11, 2020, ten days after the Sev.en Energy Merger, Pocahontas Land sent a notice of default to both Blackhawk Mining and Rockwell regarding the transaction.  Notice of Default, June 11, 2020, Def.'s Resp. Ex. 17, ECF No. 110-13. The notice stated that the transaction required the written consent of Pocahontas Land and, since it was not received, Blackhawk Land and Rockwell were in default under the 1937 Lease.  Id. at 1.

On July 17, 2020, plaintiffs Rockwell and Blackhawk Land initiated this action.  Pocahontas Land filed its answer and counterclaim on October 2, 2020, seeking a declaratory judgment that the flat-rate royalty is unenforceable; the Sev.en Energy Merger was a transfer of control for which consent was required; the lease's prohibition on mortgages is enforceable and plaintiffs' failure to obtain consent when pledging the lease as security in the Cantor Fitzgerald and MidCap Funding deeds of trust was a breach; and plaintiffs must obtain Pocahontas Land's consent to pledge the lease as security or, in

---

Pls.' Mem. Supp. 3, 8, 28.  There is no corroborating or contrary evidence in the record.

the alternative, obtain the release of all liens granted by plaintiffs against the 1937 Lease. Counterclaim 30–31.

On September 20, 2023, Pocahontas Land notified the court that, on November 12, 2021, Rockwell again pledged the leasehold under three deeds of trust. See Def.'s Supplemental Mem. Supp. 1, ECF No. 153. Rockwell characterizes this event as an amendment and restatement of the deed of trust securing Cantor Fitzgerald, rather than a new lien. Pls.' Resp. to Supplemental Mem. 5, ECF No. 154. These three deeds of trust appear to replace the original deed of trust securing Cantor Fitzgerald, are each titled "Amended and Restated Leasehold Credit Line Deed of Trust," are all for the benefit of Cantor Fitzgerald, and increase the total debt to it from the original amount of $85,000,000 to $350,000,000. See Def.'s Supplemental Mem. Supp. Exs. 1–3. They are all dated November 21, 2021; the first was recorded in Boone County on February 9, 2022, and the second and third were recorded in Boone and Wyoming Counties on January 25, 2022. Id. The original deed of trust to MidCap Funding remains unaltered.

The amended deeds of trust state that their purpose is to "amend and restate the Existing Mortgage to, among other things, give notice of the modification reflected in the Collateral Trust Agreement and to confirm that the Existing

Mortgage remains in full force and effect, except only to the extent expressly modified herein." Amended & Restated Deed of Trust 1 at Recital M. In relation to this event, Pocahontas Land sent Rockwell a third notice of default on September 15, 2023, reasserting its claims from the March 11, 2020 notice of default. Id.; Notice of Default, Sept. 15, 2023, Def.'s Supplemental Mem. Ex. 4, ECF No. 153-4. Rockwell does not say when they learned that the deed of trust had been amended.

From the time of the January 22, 2020 mortgaging of the 1937 Lease and the Sev.en Energy Merger on June 1, 2020, up to the instigation of this action, Pocahontas Land accepted seventeen monthly royalty payments from Rockwell. Pls.' Mem. Supp. 8, 26, 28.

At present, Rockwell and Blackhawk Land are the current lessees under the 1937 Lease, operating six coal mines and related units in Boone and Wyoming Counties on the leased premises. See Compl. ¶¶ 12–13; Counterclaim ¶ 17.

C.   The Claims

Plaintiffs Rockwell and Blackhawk Land filed their single-count complaint (ECF No. 1) on July 17, 2020, seeking a declaratory judgment that "the 1937 Lease is still valid and Poca[hontas] Land does not have the right to terminate the 1937 Lease because of the transaction between two entities not party

to the 1937 Lease, namely Sev.en Energy and Blackhawk Mining, LLC." Compl. ¶ 42.  In the alternative, plaintiffs argue that "even if consent was required under the 1937 Lease, as amended by the [2015] Consent [and Amendment], there was no reasonable basis for Poca[hontas] Land to withhold that consent." Compl. ¶ 49.

Pocahontas Land filed its answer and counterclaim (and a third-party complaint against Hampden Coal, LLC) (ECF No. 11), on October 2, 2020, denying plaintiffs' material allegations, asserting a number of defenses to plaintiffs' claim, and seeking a declaratory judgment.  Its now three-count counterclaim asserts: the 1937 Lease's flat-rate royalty provision is unconscionable and subject to reformation or termination of the lease (Count I); the 1937 Lease's consent provision is enforceable and Rockwell's failure to obtain consent to the Sev.en Energy Merger breached the lease (Count II); and the 1937 Lease's prohibition against mortgages is enforceable and Rockwell's failure to obtain defendant's consent when mortgaging the leasehold for the benefit of Cantor Fitzgerald and MidCap Funding breached the lease (Count III).  Counterclaim ¶¶ 75, 90, 102.  The counterclaim also contained a fourth count regarding another entity, Hampden Coal, LLC, but Pocahontas Land has since voluntarily dismissed this count and the third-party claim.  See

Counterclaim ¶ 109; Stipulation of Voluntary Dismissal, ECF No. 29.

The complaint and counterclaim were brought pursuant to the United States Declaratory Judgment Act, 28 U.S.C. section 2201, et seq.

Pocahontas Land moved for partial summary judgment ("Def.'s Mot. Partial Summ. J.," ECF No. 102) on November 22, 2021, as to Count III of its counterclaim regarding the January 2020 mortgaging of the leasehold.  On that same day, plaintiffs Rockwell and Blackhawk Land moved for summary judgment ("Pls.' Mot. Summ. J.," ECF No. 105) on all outstanding claims, consisting of all three of the Pocahontas Land counterclaims (unconscionability, the merger, and the 2020 mortgage) and their single-count complaint for declaratory judgment that the Sev.en Energy Merger did not require Pocahontas Land's consent and did not breach the lease.

As to its motion for partial summary judgment, Pocahontas Land filed a memorandum in support ("Def.'s Mem. Supp.," ECF No. 103), Rockwell filed a response in opposition ("Pls.' Resp.," ECF No. 108), and Pocahontas Land filed a reply in support ("Def.'s Reply," ECF No. 112).  As to plaintiffs' motion for summary judgment, plaintiffs filed a memorandum in support ("Pls.' Mem. Supp.," ECF No. 106), Pocahontas Land filed

a response in opposition ("Def.'s Resp.," ECF No. 111), and
plaintiffs filed a reply in support ("Pls.' Reply," ECF No.
113).  Thus, there are cross-motions for summary judgment as to
Count III of the counterclaim (the mortgaging) and plaintiffs'
motion for summary judgment as to Count I (unconscionability) of
the counterclaim and Count II of the counterclaim/Count I of the
complaint (the merger).

## II. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows
that there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law."  Fed. R.
Civ. P. 56(a).  Courts at this stage do not resolve disputed
facts, weigh evidence, or make determinations of credibility.
See Russell v. Microdyne Corp., 65 F.3d 1229, 1239 (4th Cir.
1995); Sosebee v. Murphy, 797, F.2d 179, 182 (4th Cir. 1986).
"Material" facts are those necessary to establish the elements
of a party's cause of action.  See Anderson v. Liberty Lobby,
Inc., 477 U.S. 242, 248 (1986); see also The News & Observer
Publ'g Co. v. Raleigh-Durham Airport Auth., 597 F.3d 570, 576
(4th Cir. 2010).  A dispute of material facts is "genuine" if,
in viewing the record and all reasonable inferences drawn
therefrom in the light most favorable to the non-moving party, a
reasonable fact-finder could return a verdict for the non-moving

party.  See Anderson, 477 U.S. at 248.  The moving party is
entitled to summary judgment if the record, as a whole, could
not lead a trier of fact to find for the non-moving party.  See
Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).

        "[T]he mere existence of some alleged factual dispute
between the parties will not defeat an otherwise properly
supported motion for summary judgment; the requirement is that
there be no genuine issue of material fact."  Anderson, 477 U.S.
at 247–48 (emphasis in original).  "[A] party opposing a
properly supported motion for summary judgment '"may not rest
upon the mere allegations or denials of his pleading, but . . .
must set forth specific facts showing that there is a genuine
issue for trial."'"  Id. at 248 (quoting First Nat'l Bank of
Ariz. v. City Servs. Co., 391 U.S. 253 (1968) (quoting Fed. R.
Civ. P. 56(e))) (ellipses in original); see also Matsushita
Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 584 (1986)
(the non-movant "must do more than simply show that there is
some metaphysical doubt as to the material facts").  A non-
movant who "fails to make a showing sufficient to establish the
existence of an element essential to that party's case, and on
which that party will bear the burden of proof at trial" will
lose at summary judgment because "the nonmoving party has failed
to make a sufficient showing on an essential element of her case

with respect to which she has the burden of proof." <u>Celotex</u>
<u>Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).

"When faced with cross-motions for summary judgment,
the court must review each motion separately on its own merits
'to determine whether either of the parties deserves judgment as
a matter of law.'" <u>Rossignol v. Voorhaar</u>, 316 F.3d 516, 523
(4th Cir. 2003) (quoting <u>Philip Morris Inc. v. Harshbarger</u>, 122
F.3d 58, 62 n. 4 (1st Cir. 1997)).  Additionally, under West
Virginia law "it is well recognized that '[t]he interpretation
of [a] contract, including the question of whether the contract
is ambiguous, is a legal determination . . . .'" <u>Bruce McDonald</u>
<u>Holding Co. v. Addington, Inc.</u>, 825 S.E.2d 779, 784 (W. Va.
2019) (alterations in original) (quoting Syl. Pt. 2, <u>Riffe v.</u>
<u>Home Finders Assocs. Inc.</u>, 517 S.E.2d 313 (W. Va. 1999)).

<u>III. DISCUSSION</u>

A.   <u>Unconscionability of the 1937 Lease</u>

The first count in Pocahontas Land's counterclaim
seeks a declaration that the flat-rate royalty in Article Three
of the 1937 Lease is unconscionable and is subject either to
reformation or a termination of the lease.  Counterclaim ¶ 75,
88.

### 1.   Defendant's Claims

Pocahontas Land's counterclaim uses a variety of legal terms when asserting that the royalty clause of the 1937 Lease is unenforceable, saying that the lease "is subject to reformation," Counterclaim ¶ 78; "is unconscionable," Counterclaim ¶ 79; "Rockwell is unjustly enriched," Counterclaim ¶ 81; "[c]ontinued enforcement . . . caus[es] an absurd result," Counterclaim ¶ 85; the consequences were "not foreseen when the lease was first made," Counterclaim ¶ 86; continued enforcement "is unfair, oppressive, and works an unjust hardship," Counterclaim ¶ 87; and the royalty clause is "subject either to reformation and an equitable adjustment . . . or termination of the 1937 Lease," Counterclaim ¶ 88.

Despite all the claims made in relation to the unconscionability count, the only true claim is unconscionability.  As the plaintiffs detail, the doctrines of unjust enrichment and reformation based on mistake (either unilateral or bilateral), are not colorable.  See Pls.' Mem. Supp. 9–10.

### 2.   Legal Standard

West Virginia "law regarding the doctrine of unconscionability is well-established." Horizon Ventures of W. Va., Inc. v. Am. Bituminous Power Partners, L.P., 857 S.E.2d 33,

39 (W. Va. 2021). Unconscionability is an equitable principle defined as "an overall and gross imbalance, one-sidedness or lop-sidedness in a contract," which may justify a court "in refusing to enforce the contract as written. The concept of unconscionability must be applied in a flexible manner, taking into consideration all of the facts and circumstances of a particular case." Id. (quoting Syl. Pt. 4, Brown v. Genesis Healthcare Corp. (Brown II), 729 S.E.2d 217 (W. Va. 2012)).

> If a court, as a matter of law, finds a contract or any clause of a contract to be unconscionable, the court may refuse to enforce the contract, enforce the remainder of the contract without the unconscionable clause, or limit the application of any unconscionable clause to avoid any unconscionable result.

Syl. Pt. 8, Brown II, 729 S.E.2d 221 (quoting Syl. Pt. 16, Brown ex rel. Brown v. Genesis Healthcare Corp. (Brown I), 724 S.E.2d 250, 284 (W. Va. 2011), judgment vacated sub nom. Marmet Health Care Ctr., Inc. v. Brown, 565 U.S. 530 (2012).[11] Whether a contract or provision therein is unconscionable is a question of law to be determined by the court. Syl. Pt. 7, Brown II, 729 S.E.2d 221 (quoting Syl. Pt. 16, Brown I, 724 S.E.2d 250).

---

[11] The West Virginia Supreme Court of Appeals subsequently reaffirmed all but one syllabus point of Brown I in Brown II, the omitted point not being at issue in this action. Brown II, 729 S.E.2d at 225.

Under West Virginia law, unconscionability is analyzed in "two component parts: procedural unconscionability and substantive unconscionability." Dan Ryan Builders, Inc. v. Nelson, 737 S.E.2d 550, 558 (W. Va. 2012) (quoting Brown I, 724 S.E.2d at 285) (quotation marks omitted). "Procedural unconscionability is concerned with inequities, improprieties, or unfairness in the bargaining process and formation of the contract." Horizon Ventures, 857 S.E.2d at 42 (quoting Syl. Pt. 10, Brown II, 729 S.E.2d 217). The West Virginia Supreme Court of Appeals has explained:

> Procedural unconscionability involves a variety of inadequacies that results in the lack of a real and voluntary meeting of the minds of the parties, considering all the circumstances surrounding the transaction. These inadequacies include, but are not limited to, the age, literacy, or lack of sophistication of a party; hidden or unduly complex contract terms; the adhesive nature of the contract; and the manner and setting in which the contract was formed, including whether each party had a reasonable opportunity to understand the terms of the contract.

Id. (quoting Syl. Pt. 10, Brown II, 729 S.E.2d 217) (internal quotation marks omitted). In considering such factors, "courts are more likely to find unconscionability in consumer transactions and employment agreements than in contracts arising in purely commercial settings involving experienced parties."

Brown II, 729 S.E.2d at 227-28 (quoting Brown I, 724 S.E.2d at 285) (internal quotation marks omitted).

"Substantive unconscionability involves unfairness in the contract itself and whether the contract term is one-sided and will have an overly harsh effect on the disadvantaged party." Syl. Pt. 12, id. (quoting Brown I, 724 S.E.2d at 285) (quotation marks omitted). In determining the existence of substantive unconscionability, courts consider factors such as "the commercial reasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and public policy concerns." Id. (quoting Brown I, 724 S.E.2d at 285) (internal quotation marks omitted).

"To be unenforceable, a contract term must — 'at least in some small measure' — be both procedurally and substantively unconscionable." Dan Ryan Builders, 737 S.E.2d at 558 (citing Syl. Pt. 20, Brown I, 724 S.E.2d 250); see also State ex rel. Johnson Controls, Inc. v. Tucker, 729 S.E.2d 808, 820-21 (W. Va. 2012) (unconscionability requires "a showing of both procedural and substantive unconscionability, at least in some small measure").[12]   Both forms of unconscionability, however, "need not

_____

[12] But see Horizon Ventures, 857 S.E.2d at 50 (Hutchinson, J., concurring) (advocating for a new rule stating that "a claim of unconscionability can be supported by proving unfairness in the

be present to the same degree.  Courts should apply a 'sliding scale' in making this determination: the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the clause is unenforceable, and vice versa."  Syl. Pt. 9, Brown II, 729 S.E.2d 221.  "The burden of proving that the contract term is unconscionable rests with the party attacking the contract." Brown I, 724 S.E.2d at 284.

"Dealings between corporations controlled by common officers and directors are not unlawful, but such transactions require close scrutiny in a court of equity, and are voidable. If the appearance of fraud exists, equity will refuse its aid in the enforcement of the contract."  Wheeling Dollar Sav. & Tr. Co. v. Hoffman, 35 S.E.2d 84, 88–89 (W. Va. 1945) (citing Corsicana Nat'l Bank of Corsicana v. Johnson, 251 U.S. 68 (1919); Guthrie v. Huntington Chair Co., 76 S.E. 795 (W. Va. 1912)).  "It is well-settled law that '[a] contract between parent-subsidiary corporations, even with identical officers, is not void, but only voidable for fraud, or unfairness.'" Blackrock Cap. Inv. Corp. v. Fish, 799 S.E.2d 520, 530 (W. Va.

---

contract that is either procedural, substantive or a combination of both").

2017) (quoting <u>Am. Motors Corp. v. Wis. Dep't of Revenue</u>, 219
N.W.2d 300, 305 (Wis. 1974)).

    3.  <u>Background</u>

      Loup Creek was "formed in 1902 by railroad
industrialists and financiers." Def.'s Resp. 3. The
industrialists and financiers in question were William Page,
Loup Creek's director and a civil engineer with experience in
the mining and railway industries, and Henry Rogers, a New York
investor and partial owner of the Loup Creek Estate. Def.'s
Resp. 3 (citing Expert Report of Frank Scott at 8, Def.'s Resp.
Ex. 1, ECF No. 110-1 (hereinafter "Scott Rep.")). Page and
Rogers "set out to build the first railway to connect [the]
Southern West Virginia coal fields, including much of the land
owned by Loup Creek, to the shore in Norfolk, Virginia." Def.'s
Resp. 3 (citing Scott Rep. 8). The Virginian Railway was born,
and in 1907 Page was selected its first president. Def.'s Resp.
3 (citing Virginian Railway Ann. Rep. 1920 at 4, Def.'s Resp.
Ex. 2, ECF No. 110-2).

      In 1902 Loup Creek was formed as a West Virginia
corporation from the Loup Creek Estate, which owned 25,000 acres
of coal land in Fayette County, West Virginia. Def.'s Resp. 3;
Scott Rep. 7-8. It was created as a wholly-owned subsidiary of
The Virginian Railway, which owned all of Loup Creek's capital

stock.  Pls.' Mem. Supp. 5 (citing Ferguson Letter 1–2); Def.'s
Resp. 3.; Scott Rep. 8.

For many years prior to 1937, Loup Creek has "engaged
in the business of acquiring real estate in conjunction with
rail lines and rights of way" for The Virginian Railway.  Pls.'
Mem. Supp. 5 (citing Ferguson Letter 1–2).  Loup Creek acquired
the property that is the subject of the 1937 Lease on May 27,
1937, when it purchased the land from Pocahontas Coal & Coke
Company for the sum of $2,992,000, which plaintiffs assert
amounts to over fifty million dollars today.  Pls.' Mem. Supp. 5
(citing Ferguson Letter 1–2, 3 n. 8).

The first lessee, Koppers Coal, was formed as a
subsidiary of Eastern Gas, a Massachusetts business trust under
the control of The Koppers United Company ("Koppers United"),
which was largely controlled by the Andrew Mellon family.  See
Ferguson Letter; Scott Rep. 9.  During this time, railways
hauling coal from southern West Virginia to Virginia were making
a considerable profit.  Scott Rep. 9.  Koppers Coal and Koppers
United relied partly on The Virginian Railway to ship their
coal, and together they accounted for over thirty-eight percent
of the railway's revenue.  Id.

"[D]ue to government rate-setting, [Koppers Coal and
Koppers United] were unable to negotiate more favorable shipping

rates." Def.'s Resp. 3 (citing Scott Rep. 9). So, seeking to capitalize on the profits being earned by the railways shipping its coal, the Mellon family, through its control of Koppers United, "worked out a deal with the Rogers' heirs [for Koppers United] to acquire a majority of the common stock and forty percent of the voting interests of The Virginian Railway." Def.'s Resp. 3–4 (citing Scott Rep. 9–10; In re Koppers United Co., 12 S.E.C. 184, 19–20 (Sept. 28, 1942); Koppers Co. Ann. Rep. 1937 at 2, Def.'s Resp. Ex. 4, ECF No. 110-4). According to Pocahontas Land, Koppers United's ownership of the majority of The Virginian Railway's common stock "secured two[-]thirds of the dividends earned by the railway's stockholders." Def.'s Resp. 20 n. 8 (citing Investigation of Railroads, Holding Companies, and Affiliated Companies: Hearing Before Subcomm. of the S. Comm. on Interstate Commerce, 75th Cong. (1938), at 4194, Def.'s Resp. Ex. 5, ECF No. 110-5 (hereinafter "S. Subcomm. Hearing"). In exchange, Koppers Coal shifted much of its coal that had been transported on the C&O Railway to The Virginian Railway. Scott Rep. 9–10.

"The result of this deal was the vertical integration of Koppers' (Mellon) operations. Prior to the deal, Koppers was paying a non-negotiable shipping rate to railroad companies to haul its coal; after the deal, Koppers was recouping a portion of its expenses through the earnings of The Virginia[n

Railway].”  Def.’s Resp. 4 (citing S. Subcomm. Hearing).  A

Koppers executive testifying in 1937 before a U.S. Subcommittee

on Interstate Commerce described the deal thusly:

> The acquisition of the Virginian [Railway] was
> the logical completion of the Koppers’ whole
> picture.  We mine the coal in West Virginia.
> We ship it by our own steamers up the coast to
> our own coke plants, and a glance at the map
> will show the desirability of a complete
> integration by the acquisition of the
> Virginian [Railway].

S. Subcomm. Hearing at 4188–89.  Essentially, the transaction,

finalized in January 1937, allowed Koppers United to share in

the profits derived from the shipping of their coal on The

Virginian Railway.  Scott Rep. 9–10.  As a result, “[t]he

Koppers companies, with a majority of the common stock, legally

exercised 40% voting control over The Virginian Railway and its

subsidiary Loup Creek.”  Def.’s Resp. 5.

Six months after this transaction, the 1937 Lease was

entered into between Koppers Coal and Loup Creek.

4.   Procedural Unconscionability

The parties do not disagree as to the material facts

that form the basis of the procedural unconscionability

argument, but interpret them quite differently; plaintiffs argue

that the above history shows there was no unconscionability

during the formation of the 1937 Lease, and Pocahontas Land

counters that the formation of the lease was fraught with

procedural unconscionability.  Plaintiffs aver they are entitled
to summary judgment on Count I of Pocahontas Land's counterclaim
inasmuch as the 1937 Lease is not, as a matter of law,
procedurally unconscionable.  See Pls.' Mem. Supp. 17.

Specifically, plaintiffs contend Loup Creek and
Koppers Coal were both sophisticated entities capable of
bargaining with one another: "The 1937 Lease is not, as a matter
of law, procedurally unconscionable.  The original parties to
the 1937 Lease were both sophisticated and wealthy commercial
entities involved in large-scale railroad, real estate and coal
mining ventures."  Id.  Plaintiffs point to the fact that Loup
Creek and Koppers Coal were distinct entities, neither
exercising legal control over the other and no parent
corporation or family exercising control over both.  See id.
("Dr. Scott attempts to treat the original lessor, Loup Creek,
and the original lessee, Koppers [Coal], as essentially
identical entities with the same ownership. . . . But neither
Dr. Scott's report nor his testimony demonstrates such legal
control.").

Plaintiffs also aptly point to the form of the 1937
Lease itself as evidence that there was proper bargaining and
review of the agreement:

> The 1937 Lease is double-spaced, employs a
> uniform font, and contains clear and detailed

31

> headings . . . . Where the parties agreed to change the originally[-]typed language, there are clear annotations for same on the Lease itself.   [See, e.g., 1937 Lease at 4] (revising the date of 'June 17, 1937' to 'July 1, 1937').  The Lease was 'Approved as to Legal Form,' denoting the involvement of legal counsel.  And the Lease evidences negotiations between the parties over a roughly six-month period, from January 27, 1937 to the date of execution, July 1, 1937.

Pls.' Reply 12–13 (citations omitted).

Conversely, Pocahontas Land focuses on what it characterizes as the parties to the 1937 Lease's "common ownership, common management, and the common objective of maintaining and maximizing Koppers [Coal's] coal shipments on The Virginian Railway" and emphasizes that "[t]he Koppers companies, with a majority of the common stock, legally exercised forty percent voting control over The Virginian Railway and its subsidiary Loup Creek."  Def.'s Resp. 5, 16.  It says plaintiffs ignore the fact that "[t]he lessee, Koppers Coal, through its parent company exercised significant influence over Loup Creek, the lessor and subsidiary of The Virginian Railway," id. at 16, that "the success of The Virginian Railway was dependent on Koppers' business," id. at 5, and that looming overhead was "[t]he potential for Koppers to divert its business to competing railways to keep The Virginian in its indirect control," id.

32

According to Pocahontas Land, this commonality of ownership resulted in "a lease that locked a royalty rate with no provision for adjustment," id., and that, "had the 1937 Lease been an arms-length transaction contract between two unrelated parties each acting in its own self-interest, the terms of the Lease would have given the lessor [Loup Creek] more power over its land," id. at 16.  Pocahontas Land thus claims that "The Virginian Railway and Loup Creek lacked a reasonable alternative to entering into a long-term coal lease favoring the Koppers entities," and "Koppers took advantage of The Virginian's vulnerability with respect to Koppers' coal shipping traffic." Id. at 18.

Pocahontas Land argues that the plaintiffs, by focusing on the absence of legal control, "completely discount the influence that the lessee exercised over the lessor."  Id. at 20.  Although it concedes that Koppers Coal held but forty percent of the voting share of The Virginian Railway stock, Pocahontas Land says Koppers Coal held a majority of the common stock and thus exercised significant control over Loup Creek. See id.  Pocahontas Land cites a hearing before the Senate Subcommittee on Interstate Commerce investigating possible violations of the commodities clause of federal railroad laws regulating transportation of commodities in which the railroad has a direct interest, writing "Chairman Wheeler of the

[Subcommittee] clearly recognized this possibility for undue influence absent technical legal ownership during Koppers' testimony in the 1937 hearing: 'Whether or not the letter of the law has been violated, the record clearly demonstrates a close and unwholesome interdependence between shipper and carrier, in violation of the spirit of the commodities clause . . . .'" Id. at 21 (quoting S. Subcomm. Hearing at 4210).

In support of its contention that there was procedural unconscionability, Pocahontas Land primarily relies on Blackrock Capital Investment Corporation v. Fish, in which a processing plant explosion caused the deaths of three workers. 799 S.E.2d 520, 524 (W. Va. 2017).[13] In Blackrock,

> The circuit court found it undisputed that . . . no lawyer was hired to represent the interests of AL Solutions [the subsidiary] in the negotiation or the execution of the agreements [and] . . . at the time the parties executed the management agreements, the board of directors for AL Solutions was comprised solely of principals from Blackrock and Tremont [the parents]. . . . Put simply, AL Solutions did not bargain for the indemnification and no-liability clauses. The circuit court found the clauses were a result of Blackrock and Tremont "effectively contracting with themselves through their exclusive control, authority, and dominion"

---

[13] The court notes that Blackrock applies New York, and not West Virginia, contract law. Nonetheless, as stated by the West Virginia Supreme Court of Appeals in Blackrock, "New York's unconscionability jurisprudence is structured almost identically to West Virginia's," rendering the distinction null. 799 S.E.2d at 527.

> over AL Solutions, primarily to "insulate
> themselves from any and all liability."

Id. at 531.  The court concluded:

> This was not an arms-length negotiation
> between competent, independent business-
> persons.  No individual or attorney
> represented AL Solutions in the negotiation or
> drafting of the indemnification or no-
> liability clauses; no attorney was present to
> protect the interests of AL Solutions; AL
> Solutions was forced to pay the attorney fees
> for Tremont; and the person who signed on
> behalf of AL Solutions . . . admitted he did
> not know all the terms of the agreements.

Id.  Ultimately, the court "d[id] not think AL Solutions would

have approved the two clauses in the agreements if AL Solutions

had been an independent company" and upheld the lower court's

determination that the clauses were adopted in a procedurally

unconscionable manner.   Id.

        Although recognizing that Loup Creek "was not a direct

subsidiary of Koppers Coal," Pocahontas Land contends the

instant matter "is analogous to Blackrock because Koppers

exercised significant control and influence over Loup Creek and

its parent company[,] The Virginian Railway[,] through the

acquisition of common stock, voting shares, and business

dealings." Def.'s Resp. 18 (emphasis in original).  Plaintiffs,

on the other hand, distinguish Blackrock on the grounds that (1)

Blackhawk was a wrongful death action and not about profit

margins; (2) Loup Creek was never a subsidiary of Koppers Coal;

and (3) the procedural irregularities in <u>Blackrock</u> were
"demonstrable," rather than "potential or speculative."  Pls.'
Reply 14.

Pocahontas Land's contentions about the undue
influence Koppers Coal supposedly had over Loup Creek during the
negotiations of the 1937 Lease are unconvincing.  <u>Blackrock</u> is
factually inapposite to, and thus distinguishable from, the case
at bar.  Indeed, none of the procedural irregularities therein
are present here.  As conceded by Pocahontas Land, Loup Creek
was not a subsidiary of Koppers Coal at the time the 1937 Lease
was executed.  While Pocahontas Land is correct that some shared
ownership existed between the parties through their mutual
interests in The Virginian Railway and its profitability, this
alone is not indicative of the existence of inequity,
impropriety, or unfairness, in the bargaining process
surrounding the 1937 Lease that would support a finding of
procedural unconscionability.

With only forty percent of the voting interest in The
Virginian Railway, Koppers Coal, through its parent, did not
possess unilateral authority over both sides of the transaction
that would, in turn, render Loup Creek's bargaining strength
non-existent.  While Koppers United, through a holding company,
owned a majority of the common stock of The Virginian Railway

entitling it to two-thirds of the dividends earned by the railway's stockholders, it only retained forty percent of the voting interests therein.  With only forty percent of the voting rights, Koppers United could not have dictated and controlled the decisions ultimately made by The Virginian Railway and/or its subsidiaries.  Indeed, when Pocahontas Land's expert, Dr. Scott, was asked during his deposition whether he had "concluded in any way that Koppers Company by itself through the exercise of its own power or ownership could control [T]he Virginian Corporation," he responded, "No, I've not concluded that." Scott Dep. 64.

Further, even if the Koppers companies had legal control over Loup Creek, that in itself is still insufficient to show unconscionability.  See  Wheeling Dollar Sav. & Tr. Co., 35 S.E.2d at 88–89; Blackrock, 799 S.E.2d at 530.  While Pocahontas Land is correct that "[p]rocedural unconscionability is not limited to a survey of corporate formalities and 'legal control,'" Def.'s Resp. 20, it is also true that companies can contract without procedural unconscionability even when one is directly owned by the other.  The presence or absence of legal control does not dictate whether there was procedural unconscionability.  Parents can contract with their subsidiaries in a manner that is free of unconscionability, just as there is the potential for unrelated companies to contract in a manner

that is unconscionable.  Even were Pocahontas Land correct in
its assumption that Koppers Coal had some degree of influence
over Loup Creek given "[t]he potential for Koppers to divert its
business to competing railways," the court is unconvinced that
such influence amounts to an inadequacy in the bargaining
process surrounding the 1937 Lease, resulting in a "lack of a
real and voluntary meeting of the minds of the parties."  Syl.
Pt. 10, Brown II, 729 S.E.2d at 221 (quoting Syl. Pt. 17, Brown
I, 724 S.E.2d 285) (internal quotation marks omitted).

Unlike Blackrock, there is no indication  that the
execution of the 1937 Lease between Loup Creek and Koppers Coal
"was not an arms-length negotiation between competent,
independent business-persons" or that there was no "businessman
acting in an arms-length manner" on Loup Creek's behalf at the
time of the transaction.  To the contrary, both Loup Creek and
Koppers Coal were highly sophisticated commercial entities, both
of which possessed skill and competence in endeavors related to
the production of coal.  The evidence on the face of the lease,
as described by the plaintiffs, also shows that the parties
understood and bargained for the terms of the lease.

Additionally, the expert reports supplied by both
parties highlight the difficulty in starting up a new coal
operation in the region.  Great investment was required before

any return would be realized.  "Before the first ton of coal could be extracted and shipped to market, both the mining company and the railroad had to make sizeable up-front investments that were both specific to this particular transaction and irreversible.  In other words, both had to incur large sunk costs that could not be recovered if for some reason the transaction went sour."  Scott Rep. 5.  The parties seem to have addressed this sunk-cost problem by working together to ensure some return on investment and to distribute the risks.

The court is thus unpersuaded by the contention that Loup Creek was essentially strong-armed by Koppers Coal to forego the inclusion of a provision requiring the renegotiation of royalties at the time of renewal.  Both parties were sophisticated entities and Loup Creek was free to negotiate for future adjustments to the royalty rate as it saw fit.  Parties are free to agree to more or less advantageous contract terms in return for greater certainty on the return of investment without those terms being deemed unconscionable.  As Pocahontas Land Executive Vice President Greg Wooten stated, "I don't think you had unsophisticated parties at the table and they made the deal that they made."  Wooten Dep. at 37.

Finally, and also unlike Blackrock, the evidence suggests that Loup Creek was adequately represented.  While

there is nothing in the record that explicitly states whether Loup Creek was represented by counsel, the evidence suggests that it was.  The negotiations and drafting of the 1937 Lease appears to have taken place over a six-month period.  <u>See</u> 1937 Lease at 1.  The 1937 Lease is signed by both the president of Loup Creek and the president of Koppers Coal — two separate entities — and was "approved as to legal form."  <u>Id.</u> at 19.  Additionally, written notations appear on the lease itself where representatives of both the lessor and lessee initialed and agreed to certain changes therein.  <u>See</u>, <u>e.g.</u>, <u>id.</u> at 4.

Simply put, the evidence on the record fails to support the conclusion that Koppers Coal was "effectively contracting with [itself]" through its purported indirect "control, authority, and dominion" over Loup Creek.  <u>See</u> <u>Blackrock</u>, 799 S.E.2d at 529.  While the Mellon family may have had some degree of high-level control over some part of the various parties, there is no evidence that any control was exerted during the contracting or that the lease was not fairly bargained into.  Accordingly, the court concludes that the circumstances surrounding the bargaining process and formation of the 1937 Lease are not indicative of procedural unconscionability.  While "contract law 'permits courts to protect parties from grossly unfair, unconscionable bargains[,] it does not permit courts to protect commercial litigants from

stupid or inefficient bargains willingly and deliberately entered into.'"  Id. at 532–33 (quoting State ex rel. Johnson Controls, 729 S.E.2d at 819).

In the absence of any procedural unconscionability in the bargaining process, Pocahontas Land's unconscionability claim fails, and the court need not reach the matter of substantive unconscionability.  The court thus finds summary judgment is appropriate in favor of plaintiffs as to Count I of Pocahontas Land's counterclaim.  Inasmuch as the court finds the 1937 Lease is not unconscionable as a matter of law, the court need not address plaintiffs' contentions regarding laches, waiver, and unclean hands insofar as those contentions relate to unconscionability.

B.   Breach by the Sev.en Energy Merger

Count I of the plaintiffs' single-count complaint, initiating this action on July 17, 2020, and Count II of Pocahontas Land's counterclaim, filed October 2, 2020, concern whether the Sev.en Energy Merger of June 1, 2020, was a transfer of control of the lessee that required the consent of the lessor (Pocahontas Land).

Plaintiffs say that they "seek a declaration . . . that the 1937 Lease is still valid and Poca[hontas] Land does not have the right to terminate the 1937 Lease because of the

transaction between two entities not party to the 1937 Lease, namely Sev.en Energy and Blackhawk Mining[]."  Compl. ¶ 42. Pocahontas Land requests a "declar[ation] that a direct or indirect transfer of control of Rockwell occurred as a result of the transaction . . . requiring Poca[hontas] Land's consent under the 1937 Lease."  Counterclaim ¶ 90.

First, the court must determine whether any of the affirmative defenses asserted by the plaintiffs (waiver, ratification, reverse triangular merger) preclude any potential consent requirement.  If not, the court then must determine whether the 2015 Consent and Amendment pertains to the entirety of the 1937 Lease or only the Powellton A seam (the Subleased Premises) of the leasehold.  If it applies only to the Subleased Premises, then the inquiry ends.  Finally, if the Consent and Amendment applies to the entire 1937 Lease, the court must carefully apply the lease and amendment to the undisputed facts of the transaction to determine if there was a breach.  As an initial matter, it is appropriate to recount the facts of the transaction.

## 1.   Background

The 2015 Patriot Coal bankruptcy resulted in Eastern LCC, a subsidiary of Patriot Coal, assigning its interest in the 1937 Lease to Rockwell, executed by way of the 2015 Assignment

42

and Assumption Agreement, in October 2015.  See Counterclaim ¶ 16; 2015 Assign. & Assump.  Rockwell then assigned its interest in the Powellton A seam to its affiliate, Blackhawk Land, which sub-subleased its interest to Coronado, to which Pocahontas Land consented in the 2015 Consent and Amendment, dated December 21, 2015.  See Counterclaim ¶¶ 17–18; 2015 Consent & Amend.

On December 21, 2015 — the date the 2015 Consent and Amendment was executed — Rockwell's capital stock was entirely owned by Blackhawk Mining.  Counterclaim ¶ 93.  Jesse Parrish, Chief Executive Officer of Blackhawk Mining, detailed the entities controlling Blackhawk Mining prior to the 2019 bankruptcy as follows:

> As of December 21, 2015, plurality control of the voting interests in Old Blackhawk was held by entities controlled by John Mitchell Potter.  Specifically, John Mitchel[l] Potter affiliate JMP Blackhawk held 43.35% of the voting interests, John Mitchell Potter affiliate JMP Coal Holdings, LLC held 22.75% of the voting interests, and John Mitchell Potter affiliate JMP Holdings, LLC held 17.26% of the voting interests, for aggregate voting control by John Mitchell Potter of 83.36%.  Two parties unrelated to John Mitchell Potter held the remaining 16.64% [o]f voting control.

Parrish Aff. ¶ 7; see also Pls.' Mem. Supp. 37–38.

This control group changed with the 2019 Blackhawk bankruptcy and reorganization.  Pls.' Mem. Supp. 37–38; see In re Blackhawk Mining LLC, No. 19-11595; Parrish Aff. ¶ 8.

Plaintiffs describe the effect of the bankruptcy on the controlling entities thusly:

> Pursuant to the Debtors' First Amended Joint Prepackaged Chapter 11 Plan of Reorganization, as supplemented, on October 31, 2019, a series of transactions were consummated pursuant to which, inter alia, 100% of the ownership interests in Rockwell and [Blackhawk Land] became vested in and owned by Blackhawk Sub, LLC, a Delaware limited liability company wholly-owned by Blackhawk DRE, LLC, a Delaware limited liability company wholly-owned by Reorganized Blackhawk . . . .
>
> Upon consummation of the Reorganization, 100% of the membership interests in Reorganized Blackhawk were owned by applicable first lien and second lien creditors of Old Blackhawk, none of whom were John Mitchell Potter, any entity controlled by John Mitchell Potter, or any other entity or person that controlled voting interests in Old Blackhawk as of December 21, 2015.

Parrish Aff. ¶¶ 9-10.

By way of an Agreement and Plan of Merger dated May 24, 2020, Blackhawk Mining merged on June 1, 2020, with BH Mining Merger, a wholly-owned subsidiary of Sev.en Energy, with Blackhawk Mining being the surviving entity.  Compl. ¶ 16; see Parrish Aff. ¶ 11.  Blackhawk Mining became wholly-owned by Sev.en Energy, which acquired all of Blackhawk Mining's capital stock.  Compl. ¶ 16; Counterclaim ¶ 94.  Pocahontas Land and plaintiffs agree that this was a "reverse triangular merger" that resulted in a change in ultimate control of Rockwell from the post-bankruptcy lien holders to Sev.en Energy.  "Neither

Rockwell nor Blackhawk Land were parties to the Merger Agreement." Parrish Aff. ¶ 11.

Prior to the transaction, Blackhawk Mining had owned all of Rockwell's capital stock. Counterclaim ¶ 93. As Blackhawk Land and Rockwell are both wholly-owned subsidiaries of Blackhawk Sub, LLC, which is a wholly-owned subsidiary of Blackhawk DRE, LLC, which is a wholly-owned subsidiary of Blackhawk Mining, Blackhawk Land and Rockwell became wholly-owned by Sev.en Energy as a result. Compl. ¶ 17. Essentially, prior to the transaction, Blackhawk Mining as an independent entity owned all of Rockwell's capital stock, and after the transaction, Sev.en Energy owned all of Rockwell's capital stock, as it acquired complete control of the hitherto independent Blackhawk Mining.[14] See Counterclaim ¶¶ 93–95. While the parties fail to adequately detail how this reverse triangular merger was carried out between these corporate entities, the court accepts the parties' undisputed statements that the merger resulted in a change in the ultimate control of Blackhawk Mining (and thus Rockwell) from the post-bankruptcy Blackhawk Mining first and second lien holders to Sev.en Energy.

---

[14] In Pocahontas Land's estimation, "[f]ollowing the 2020 transaction with Sev.en Energy, Blackhawk Mining ceased to exist as an autonomous entity." Counterclaim ¶ 96.

On May 23, 2020, Blackhawk Mining emailed Pocahontas Land to notify it of the transaction.  See Email from C. Salyer to K. Xia & J. Jeffries, ECF No. 110-11; Compl. ¶ 20.  The email stated that "[t]he transaction will entail a change in ownership of Blackhawk's ultimate parent, but will not entail direct assignment of any leases."  Id.  It did not explicitly request Pocahontas Land's consent to the transaction, but included a "draft form change in control consent" (not included in the record).  See id.  Attached to the email are documents that, although not themselves included in the record, appear to contain information on the new entities.  See id.

On June 11, 2020, ten days after the Sev.en Energy Merger, Pocahontas Land sent a notice of default to both Blackhawk Mining and Rockwell regarding the transaction.  June 11, 2020 Notice of Default, ECF No. 110-13.  The notice stated that the transaction required the written consent of Pocahontas Land and, since it was not received, Blackhawk Land and Rockwell were in default under the 1937 Lease.  Id. at 1.  Pocahontas Land acknowledged that Blackhawk Mining requested consent, but said "the request was made with insufficient time for Poca[hontas] Land to obtain and consider relevant information."  Id.  It also stated that it "expressly reserves its right to reasonably withhold consent and reserves all rights and remedies under the Rockwell Lease at law and in equity as a result of

such breach of Blackhawk [Land] and Rockwell, including termination."  Id. at 2.

According to the complaint, on June 22, 2020, Pocahontas Land offered to provide its consent to the assignment if Blackhawk Mining agreed to renegotiate certain terms in the lease, including a higher royalty provision.  Compl. ¶ 35.  This action was commenced on July 17, 2020.

"From June 1, 2020, through the date of this affidavit [notarized Nov. 21, 2021], Rockwell has paid to Lessor and Lessor has received and accepted from Rockwell monthly royalty payments under the Lease totaling One Hundred Ninety-Seven Thousand Two Hundred Forty-One Dollars and Eighty-Two Cents (197,241.82)," in the form of seventeen payments.[15]  Parrish Aff. ¶ 15.

### 2.   Plaintiffs' Affirmative Defenses: Waiver and Ratification

Plaintiffs raise three affirmative defenses to the breach of contract claim concerning the Sev.en Energy Merger. First, plaintiffs argue that Pocahontas Land waived all contentions surrounding the consent provisions at issue, and second, they assert Pocahontas Land ratified the 1937 Lease by

---

[15] The court is unaware of the current status of the royalty payments from Rockwell to Pocahontas Land.

electing to treat the contract as continuing following the alleged breaches.  Plaintiffs also contend that the structure of the merger, as a reverse triangular merger, failed to implicate any consent right of Pocahontas Land as a matter of law.  The court here addresses the first two contentions (waiver and ratification); the third contention is addressed in Section III.B.4.a, <u>infra</u>.

      a.   <u>Waiver</u>

The West Virginia Supreme Court of Appeals has decided a number of cases involving waiver in the last decade.  In <u>Parsons v. Halliburton Energy Services, Inc.</u>, 785 S.E.2d 844 (W. Va. 2016), the court summarized the state's waiver doctrine thusly:

> It is a well-established principle of contract law that contract rights can be waived.  Under West Virginia contract law (and the contract law of most other states), the "waiver" of a contract right is "defined as the voluntary, intentional relinquishment of a known right." <u>Hoffman v. Wheeling Sav. & Loan Ass'n</u>, 57 S.E.2d 725, 735 (W. Va. 1950)).  "To effect a waiver, there must be evidence which demonstrates that a party has intentionally relinquished a known right."  Syl. Pt. 2, in part, <u>Ara v. Erie Ins. Co.</u>, 387 S.E.2d 320 (W. Va. 1989).  "There must be first, the existence of the right; second, knowledge of the existence of such right; and third, voluntary intention to relinquish." <u>Hoffman</u>, 57 S.E.2d at 735.  Once a right has been waived, it is forever gone and cannot be reclaimed.  "The contractual doctrine of waiver, whether express or implied, seems . .

48

> . to rest on an idea no more complicated than
> that any competent adult can abandon a legal
> right and if he does so then he has lost it
> forever." <u>McElroy v. B.F. Goodrich Co.</u>, 73
> F.3d 722, 724 (7th Cir. 1996).

<u>Id.</u> at 850; <u>see</u> <u>also</u> <u>Bruce McDonald</u>, 825 S.E.2d at 787–88.

The West Virginia Supreme Court of Appeals subsequently stated "[t]he essential elements of the doctrine of waiver are: "(1) the existence of a right, advantage, or benefit at the time of the waiver; (2) actual or constructive knowledge of the existence of the right, advantage, or benefit; and (3) intentional relinquishment of such right, advantage, or benefit." Syl. Pt. 4, <u>Bruce McDonald</u>, 825 S.E.2d 779. "Most states, including West Virginia, find that constructive knowledge is sufficient for the waiver of a contractual right . . . ." <u>Parsons</u>, 785 S.E.2d at 853 (citing <u>Hoffman</u>, 57 S.E.2d at 735).

"'[I]n general, the law ministers to the vigilant, not to those who sleep on their rights.'" <u>Bruce McDonald</u>, 825 S.E.2d at 789 (quoting <u>State v. Blickenstaff</u>, 804 S.E.2d 877, 880 (W. Va. 2017)).  Waiver thus "focuses on the conduct of the party against whom waiver is sought . . . . A waiver may be express or may be inferred from actions or conduct, but all of the attendant facts, taken together, must amount to an intentional relinquishment of a known right."  Syl. Pt. 2, in

part, Parsons, 785 S.E.2d 844; see also Blue v. Hazel-Atlas
Glass Co., 147 S.E. 22, 25–26 (W. Va. 1929); Ara, 387 S.E.2d at
323 ("Waiver may be established by express conduct or impliedly,
through inconsistent actions.") (citing Creteau v. Phoenix
Assurance Co., 119 S.E.2d 336, 339 (Va. 1961)).

As to the possibility of waiver where the lessor
continues to accept rent from the party allegedly in breach, the
court in Dunbar Housing Authority v. Nesmith wrote the following
regarding decisions in other jurisdictions:

> In Jefpaul Garage Corp. v. Presbyterian
> Hospital of N.Y., 462 N.E.2d 1176 (N.Y. 1984),
> New York's highest court identified one
> obvious circumstance, stating that where the
> lease has a nonwaiver clause to the effect
> that the landlord does not waive a breach of
> the lease by accepting rent with knowledge of
> such breach, courts generally hold that the
> acceptance of rent is not a waiver.  The court
> in Jefpaul pointed out that to hold otherwise
> would "frustrate the reasonable expectations
> of the parties embodied in a lease[.]"  462
> N.E.2d at 1178.  See also Slater v. Krinsky,
> 416 N.E.2d 983 (Mass. App. 1981); Minneapolis
> Cmty. Dev. Agency v. Powell, 352 N.W.2d 532
> (Minn. App. 1984); First Union Mgmt., Inc. v.
> Slack, 679 P.2d 936 (Wash. App. 1984).
>
> Some courts have determined that where the
> tenant has refused to vacate the premises upon
> being given notice of breach of lease
> conditions, the landlord may accept rent for
> the holdover occupancy without waiving his
> claim of breach.  See T.H. Properties v.
> Sunshine Auto Rental, Inc., 728 P.2d 663
> (Ariz. App. 1986); Riverside Dev. Co. v.
> Ritchie, 650 P.2d 657 (Idaho 1982); Chertkof
> v. Southland Corp., 371 A.2d 124 (Md. 1977);
> Haack v. Great Atl. & Pac. Tea Co., 603 S.W.2d

> 645 (Mo. App. 1980).  See generally 49 Am.
> Jur. 2d Landlord & Tenant & 1071 (1970);
> Annot., 109 A.L.R. 1267 (1937).  Moreover, in
> recognition of the diverse facts that can
> exist in the landlord-tenant relationship, it
> is generally accepted that whether the
> landlord had waived a breach of the lease by
> accepting rent is a question of intent based
> on the particular facts of the case.

400 S.E.2d 296, 299–300 (W. Va. 1990) (alteration in original).

Although waiver, dependent as it is on intent, is usually a matter of fact, it can become a matter of law when the evidence is such that a reasonable fact-finder could not find otherwise.  See Bruce McDonald, 825 S.E.2d at 788 n. 21 (quoting Kossler v. Palm Springs Devs., Ltd., 101 Cal. App. 3d 88, 99 (1980)); Beall v. Morgantown, 190 S.E. 333, 336 (W. Va. 1937).

The issue of waiver in the instant action concerns the continued acceptance by Pocahontas Land of monthly royalty payments from Rockwell after the occurrence of the alleged breaches.  Central to both plaintiffs' and defendant's arguments as to whether there was waiver is the Kanawha-Gauley line of cases.  See Kanawha-Gauley Coal & Coke Co. v. Sharp, 80 S.E. 781 (W. Va. 1914).

Kanawha-Gauley proceeded as follows.  In 1901, the plaintiff, Kanawha-Gauley Coal & Coke Company leased one thousand acres of land to C.C. Sharp for coal mining purposes, with a set royalty to be paid quarterly.  Id. at 782.  Sharp

notified Kanawha-Gauley during the lease negotiations that he planned to form a new company to assume the lease, which he subsequently did, naming it the Raven Coal & Coke Company.  Id. According to Sharp, Kanawha-Gauley was aware of the plans to form a corporation pending lease negotiations, and Kanawha-Gauley assented by way of a stipulation in the lease.  Id.

During the next two years, Kanawha-Gauley charged and received royalty payments from the Raven Company, not Sharp. Id.  In 1903, Sharp and the Raven Company, with Kanawha-Gauley's consent, assigned the lease to another company.  Id.  Kanawha-Gauley thereafter sued Sharp – not the Raven Company – for a portion of the last year's royalty that had gone unpaid.  Id.

Kanawha-Gauley claimed that Sharp was liable for the payment because there was an anti-assignment clause in the lease and plaintiff did not authorize assignment of the lease from Sharp to the Raven Company.  Id.  The court did not, however, determine the outcome based on the anti-assignment clause, because it found that Kanawha-Gauley had acquiesced to the assignment to the Raven Company based on the language in the lease stipulating to the formation of the Raven Company, testimony from a director of Kanawha-Gauley that the Raven Company was formed under the lease, and "plaintiff's recognition of the Raven Company as the active operator under the lease by

its charge against that company and receiving from it payments of royalties." Id. The court resolved:

> [T]he conclusion is unavoidable that plaintiff knew, or had the means or source of information from which if pursued it would have ascertained, that the Raven [Company] had or claimed some right or claim of right from Sharp by assignment or otherwise, under which it had begun and thereafter continued mining operations under the lease, thus in any event indicating a breach by Sharp of the agreement not to assign, if indeed there was a breach under a proper construction of the clause quoted. The authorities hold that "if the lessor, with notice of a breach of the restriction against assigning, permits the assignee to remain in possession and accepts subsequently accruing rents from him, the breach is waived." 25 Cyc. 971. Even the fact that the lessor had refused to consent to an assignment does not conclusively disprove a consent by subsequent conduct, such as accepting rent of the new tenant.

Id. (internal citations omitted).

The Kanawha-Gauley doctrine has not frequently been applied by West Virginia courts in the century since it was decided. In fact, there are only two West Virginia cases that apply or expound upon the relevant Kanawha-Gauley doctrine: Fredeking v. Grimmett, 86 S.E.2d 554 (W. Va. 1955) and Dunbar Housing Authority, 400 S.E.2d 296.[16]

---

[16] There are cases discussing the other syllabus point in Kanawha-Gauley concerning the responsibility of paying rent after an unconsented-to assignment which are not relevant here. Additionally, Goldman v. Daniel Feder & Co., 100 S.E. 400 (W. Va. 1919) mentions the applicable Kanawha-Gauley doctrine but

The syllabus in <u>Fredeking</u> restates the relevant syllabus point from <u>Kanawha-Gauley</u>: "'If a lessor, with knowledge of a breach by the lessee of the restriction against the assignment of the lease, permits the assignee to remain in possession of the premises and accepts subsequently accruing rents from him, the breach is waived.'"  Syl. Pt. 2, <u>Fredeking</u>, 86 S.E.2d 554 (quoting Syl. Pt. 1, <u>Kanawha-Gauley</u>, 80 S.E. 781). In <u>Fredeking</u>, a lease assignment was made by the estate administrator of the deceased, who incorrectly believed that he had the authority to do so.  <u>Id.</u> at 557–58.  The decedent's widow continued to accept rent checks from the assignees for about two years before she further investigated the assignment and brought suit.[17]  <u>Id.</u>  The court concluded that the assignment

---

did not interpret or apply it as it was distinguishable from the case at bar.  Several other jurisdictions applying West Virginia law have mentioned <u>Kanawha-Gauley</u>, but these cases are not controlling, nor are they particularly informative.  <u>See</u>, <u>e.g.</u>, <u>In re A & A Energy Props., Ltd.</u>, 21 B.R. 73 (Bankr. E.D. Mich. 1982).

[17] The decedent, plaintiff's husband, died in 1945.  <u>Id.</u> at 556. In 1948, decedent's brother, acting as administrator of the estate and managing the lease under the mistaken belief that he had authority to do so, consented to a transfer of the lease. <u>Id.</u> at 557.  Plaintiff, who was the proper lessor under the lease, was not consulted about the assignment before it was made and learned of the assignment shortly thereafter in a local newspaper, whereupon she asked the decedent's brother about the transaction.  <u>Id.</u> at 558.  She continued to accept rent until September 1950.  <u>Id.</u>

would have been invalid if not for the subsequent actions of the widow in continuing to accept rent:

> Though she did not for some time learn the details of the transaction, she did learn, within two days after the assignment, that the lease had been assigned and that the defendant . . . had taken possession of the leased premises . . . . With this knowledge she accepted and received, individually and as guardian of the infants, rent which accrued subsequent to the assignment and was collected by [the decedent's brother], until sometime in 1950 when she refused to accept or receive any further rent. By her acceptance of such rent she waived her individual right to invoke and enforce the forfeiture provision of the lease because of its unauthorized assignment by the defendant . . . .

Id. at 562–63. While ultimately there remained the issue that the widow could not waive the right of the infants for whom she was the guardian, the court, on the issue of waiver on the widow's own behalf, stated:

> The well established general rule is that a lessor waives his right to forfeit a lease or is estopped from enforcing a forfeiture for a breach of covenant or condition in a lease when, after such breach of covenant or condition, he accepts subsequently accruing rent from his tenant with knowledge or full notice of such breach, unless there are circumstances to negative the presumption of his affirmance of the continuance of the lease which arises from his acceptance of rent; and such waiver or estoppel of the right of the lessor to insist upon a forfeiture of a lease which results from acceptance of rent occurs regardless of the person who pays the rent, if the payment is in fact received as rent and is made on behalf of the lessee.

55

Id. at 563 (citing 32 Am. Jur., Land. & Ten., § 883; 51 C.J.S, Land. & Ten., § 117(2)(a)) (emphasis added).

In Dunbar Housing Authority, the court investigated "what circumstances are sufficient, in the words of Fredeking, 'to negative the presumption of his affirmance of the continuation of the lease which arises from his acceptance of rent.'" 400 S.E.2d at 299. The court began by reviewing relevant caselaw from other jurisdictions (including New York in Jefpaul, as quoted above) before determining that "the trial court erred in holding that [Dunbar Housing Authority] waived its right as a matter of law." Id. at 300. Although it was unknown whether the lease contained a nonwaiver clause and although the housing authority "accepted rent for a considerable period of time after the initial notice to vacate," the court found that summary judgment was not appropriate where, "[e]ven in the absence of such a [nonwaiver] clause, with [Dunbar Housing Authority] vigorously pursuing its eviction remedies, the waiver by acceptance of rent would be a question of intent under all the surrounding facts." Id. at 300.

Plaintiffs assert that under Kanawha-Gauley, Pocahontas Land waived its right to object to the assignment resulting from the Sev.en Energy Merger by accepting royalties from Rockwell. Pocahontas Land responds that "(1) the 1937

Lease contains a non-waiver provision, and (2) the notice of defaults sent to Plaintiffs demonstrate that Poca[hontas] Land did not intend to relinquish its rights to object to the assignments" at issue.

The 1937 Lease and the 2015 Consent and Amendment[18] both contain non-waiver provisions.  Article Nineteen of the 1937 Lease states:

> [A] waiver by the Lessor of any particular cause or forfeiture shall not prevent the forfeiture and cancellation of this lease for any other cause of forfeiture or for the same cause occurring at any other time.  The remedies in this Article are merely cumulative, and shall not deprive the Lessor of any other of its legal or equitable remedies.

1937 Lease 16–17.  Section Nine of the 2015 Consent and Amendment Provides that:

> No waiver, at any time, of the terms, provisions or conditions of this Consent shall be construed as a waiver of any of the other terms, provisions or conditions, nor shall a waiver . . . be construed to confer a right to a subsequent waiver of the same provision or condition.

2015 Consent & Amend. at 8–9.

---

[18] As later discussed in section III.B.3.c, this part of the 2015 Consent and Amendment applies to the entirety of the 1937 Lease and is applicable here.

Here, the first two elements of waiver are easily satisfied — Pocahontas Land's right to declare default based on each of the January 22, 2020 mortgage and the June 1, 2020 transfer of control by merger, neither of which was consented-to, and its knowledge of that right. The primary issue is the third element: whether Pocahontas Land intentionally relinquished its right to default when it continued to accept royalty payments from Rockwell. Plaintiffs, arguing that the royalty payments evidence Pocahontas Land's waiver, center their argument on Kanawha-Gauley, while Pocahontas Land counters that it did not waive any rights as evidenced by its subsequent, prompt action.

Pocahontas Land is within the realm of waiver contemplated by Kanawha-Gauley as a result of its continued acceptance of royalty payments from the contested lessee after the assignment at issue. However, unlike Kanawha-Gauley, the 1937 Lease and the 2015 Consent and Amendment contain waiver provisions and Pocahontas Land gave notice of its objections. The question is whether these elements preclude a finding of waiver.

Pocahontas Land's contention that this matter is akin to Summit Community Bank, Inc. v. Southeastern Land, LLC, No. 2:19-cv-00794, 2020 WL 3130300 (S.D.W. Va. June 12, 2020), is

misplaced.  In <u>Summit</u>, the court distinguished <u>Kanawha-Gauley</u> inasmuch as the lease at issue in <u>Summit</u> contained a non-waiver provision specifically stating that "acceptance by [Summit Community Bank] of any payments after occurrence of a Default shall not constitute a waiver of any such Default . . . ." <u>Summit</u>, 2020 WL 3130300, at *3.  Moreover, Summit's letters to Southeastern Land requesting additional information regarding the challenged assignment[19] stated that without such information, the assignment would be opposed.  <u>Id.</u> at *3-4.  The decision in <u>Summit</u> is in harmony with <u>Dunbar Housing Authority</u>, which held that "[w]here a lease has a nonwaiver clause to the effect that the landlord does not waive a breach of the lease by accepting rent with knowledge of such breach, then the acceptance of such rent is not a waiver," further stating that "[w]hether the landlord has waived a breach of the lease by accepting rent is a question of intent based on the particular facts of the case." <u>Dunbar Housing Authority</u>, 400 S.E.3d at 297, 300.

       The non-waiver provisions in the 1937 Lease and the 2015 Consent and Amendment are more generalized than the

_____

[19] The original lessee, Southern West Virginia Energy, LLC, merged with Consol of Kentucky, the latter being the surviving company, which then sold the leasehold to Southeastern Land, LLC.  <u>Id.</u>  Consol never requested the lessor's consent, and consent was never granted, despite the fact that the lease required consent be obtained for any assignment thereof.

specific non-waiver clause in <u>Summit</u>.  Both documents contain a
waiver section stating that waiver of one provision shall not be
construed as waiver of that provision for all future
occurrences, but do not specifically detail waiver in the event
of continued royalty payments, as did the provision in <u>Summit</u>.

Yet, Pocahontas Land also sent three notice of default
letters asserting its rights, the second of which concerned the
Sev.en Energy Merger.  This notice of default and the timing of
the letter and subsequent initiation of this action strongly
support Pocahontas Land's contention that there was no waiver.
The Sev.en Energy Merger was effectuated on June 1, 2020.  Ten
days later, on June 11, Pocahontas Land sent Rockwell the
relevant notice of default.  On July 17, approximately one month
later and before the allotted sixty days to cure the default
provided in the notice had passed, plaintiffs initiated this
action and Pocahontas Land soon after filed its counterclaim
asserting that there was no waiver.  The issue has been
aggressively litigated since.

The court views this timeline as strong evidence that
Pocahontas Land did not intend to waive its rights to object to
the failure to obtain consent.  The only additional step
Pocahontas Land could have taken would have been to stop
accepting rent payments from Rockwell, cutting off a source of

income for Pocahontas Land and further depriving it of its
rights under the lease.  If they had done so, at present, they
would have lost more than three years' royalties.

As the court wrote in <u>Fredeking</u> and emphasized in
<u>Dunbar Housing Authority</u>, the presumption of waiver can be
negated by circumstantial evidence.  Indeed, in <u>Dunbar Housing
Authority</u> the West Virginia Supreme Court found that summary
judgment was not appropriate on the issue of waiver, despite the
continued acceptance of rent, where the rights of the lessor
were swiftly and strongly asserted.  Pocahontas Land has
similarly and vehemently asserted its rights under the lease;
indeed, it had already informed Rockwell three months prior to
the merger that it was in default for its mortgaging of the
leasehold under the deeds of trust, giving plaintiffs no reason
to expect that Pocahontas Land would have willingly waived its
rights on this matter.  Indeed, considering that Pocahontas Land
had already declared Rockwell in default for mortgaging the
lease, when coupled with Pocahontas Land's notice of default
immediately after the merger and, soon thereafter, the
commencement of this action in which Pocahontas Land has
vigorously pursued default in Counts II and III of its
counterclaim and in defending against plaintiff's complaint that
seeks to expunge its right to terminate the 1937 Lease, the
court finds no evidence of intent to waive, grounded on the

continued receipt of royalty payments for the coal extracted and sold by the plaintiffs while this litigation plays out.

Although normally a matter of fact, when the issue of intent to waive is so one-sided that no reasonable fact-finder could find otherwise, intent to waive becomes a matter of law. Based on the foregoing, plaintiffs' motion for summary judgment on their affirmative defense of waiver is denied.

### b.   Ratification

In addition to waiver, plaintiffs have also raised ratification as part of their second affirmative defense, and, relatedly, contend that Pocahontas Land ratified the alleged breaches of the 1937 Lease and 2015 Agreement by accepting seventeen monthly royalty payments after the closing of the Sev.en Energy Merger, thus electing to treat the lease as continuing.

"Ratification, in sense of affirmation of contract and waiver of defense to it, is a matter of intention. . . . One who has accepted benefits under a contract, or exercised dominion over property acquired thereunder after knowledge of facts warranting rescission, ratifies the agreement." Hamilton v. McCall Drilling Co., 50 S.E.2d 482, 484–85 (W. Va. 1948) (citing Union Tr. Co. of Rochester v. Allen, 268 N.Y.S. 437 (App. Div. 1934); Ebel v. Roller, 21 S.W.2d 214 (Mo. App. 1929)); see also

62

Tri-State Petroleum Corp. v. Coyne, 814 S.E.2d 205, 221 (W. Va. 2018). "As a general principal [sic], ratification takes place, and there is no breach justifying rescission, 'so long as the injured party elects to treat the contract as continuing.'" Wellman v. Bobcat Oil & Gas, Inc., Civ. No. 3:10-0147, 2011 WL 6415487, at *6 (S.D.W. Va. Dec. 21, 2011), aff'd Fed. App'x 26 (4th Cir. 2013) (quoting Atl. Bitulithic Co. v. Town of Edgewood, 137 S.E. 223, 225 (W. Va. 1927)). "[O]nly a party with the power to avoid a contractual duty can ratify a previously voidable contract." Summit, 2020 WL 3130300, at *5 (citing Hamilton, 50 S.E.2d at 484–85; Reece v. Yeager Ford Sales, Inc., 184 S.E.2d 727, 730 (W. Va. 1971); Wamsley v. Champlin Ref. & Chems., Inc., 11 F.3d 534, 538 (5th Cir. 1993)).

     Plaintiffs assert that even if the Sev.en Energy Merger breached the lease, Pocahontas Land ratified the assignment by continuing to accept royalty payments from the assignee. Pls.' Mem. Supp. 2, 26–27. Plaintiffs rely primarily on the case of Wellman v. Bobcat Oil & Gas, Inc. — which relies on a 1927 West Virginia case — wherein the plaintiffs' continued acceptance of royalty payments ratified any previous defective or missing payments. 2011 WL 6415487, at *6.

     Pocahontas Land counters that there cannot have been ratification in that, "[a]s a threshold matter, the doctrine of

ratification is inapplicable because Poca[hontas] Land was not a party to the Sev.en transaction or the Leasehold Deeds of Trust mortgaging the 1937 Lease." Def.'s Resp. 30. However, plaintiffs do not assert that Pocahontas Land ratified the Sev.en Energy Merger itself, but rather that Pocahontas Land's acceptance of royalty payments ratified any potential breach of the 1937 Lease.

Pocahontas Land further asserts that, as ratification is a matter of intent and the record shows they did not intend to relinquish any rights, there was no ratification. Id. at 31.

Because ratification, like waiver, is a matter of intent, the court finds for the reasons stated above that Pocahontas Land did not ratify any potential breach by continued acceptance of rent payments. The plaintiffs' motion for summary judgment on their affirmative defense of ratification is denied.

### 3.   Scope of the 2015 Consent and Amendment Agreement

Plaintiffs' motion for summary judgment seeks, in part, a declaratory judgment that the 1937 Lease was amended by the 2015 Consent and Amendment only insofar as the amendment relates to the sublease and sub-sublease of the Powellton A seam to Coronado.

Pocahontas Land's Count II counterclaim contends that the Sev.en Energy Merger resulted in a transfer of control that breached the 1937 Lease, as amended by the 2015 Consent and Amendment.  As a threshold matter, the court must determine whether the 2015 Consent and Amendment amended the entire 1937 Lease, as Pocahontas Land argues it does, or just a portion of the 1937 Lease as it relates to the Subleased Reserves consisting of a portion of the Powellton A seam, as plaintiffs contend.

    a.   <u>Legal Standard</u>

"A court faces a conceptually difficult task in deciding whether to grant summary judgment on a matter of contract interpretation." <u>World-Wide Rts. Ltd. P'ship v. Combe Inc.</u>, 955 F.2d 242, 245 (4th Cir. 1992).  "[S]ummary judgment is appropriate when the contract in question is unambiguous or when an ambiguity can be definitively resolved by reference to extrinsic evidence." <u>Wash. Metro. Area Transit Auth. v. Potomac Inv. Props., Inc.</u>, 476 F.3d 231, 235 (4th Cir. 2007).  If the contract is deemed unambiguous on the dispositive issue, summary judgment is proper.  <u>See</u> <u>id.</u>  If there is ambiguity, the court "may yet examine evidence extrinsic to the contract that is included in the summary judgment materials, and, if that evidence is, as a matter of law, dispositive of the interpretive

issue, grant summary judgment on that basis."  Id. (quoting

Goodman v. Resol. Tr. Corp., 7 F.3d 1123, 1126 (4th Cir. 1993)

(internal quotation marks omitted).

Under West Virginia law, "'[a] valid written

instrument which expresses the intent of the parties in plain

and unambiguous language is not subject to judicial construction

or interpretation but will be applied and enforced according to

such intent.'"  Syl. Pt. 6, Ascent Res. – Marcellus, LLC v.

Huffman, 851 S.E.2d 782 (W. Va. 2020) (quoting Syl. Pt. 1,

Cotiga Dev. Co. v. United Fuel Gas Co., 128 S.E.2d 626 (W. Va.

1962)).  "Whether a contract is ambiguous, or how a contract

should be interpreted, involves a question of law to be

determined by the court."  Isaacs v. Bonner, 694 S.E.2d 302, 307

(W. Va. 2010) (citing Berkeley Cnty. Pub. Serv. Dist., 162

S.E.2d at 200; Wood v. Acordia, 618 S.E.2d 415, 420 (W. Va.

2005)).

"Contract language is considered ambiguous where an

agreement's terms are inconsistent on their face or where the

phraseology can support reasonable differences of opinion as to

the meaning of words employed and obligations undertaken."  Syl.

Pt. 6, State ex rel. Frazier & Oxley, L.C. v. Cummings, 569

S.E.2d 796 (W. Va. 2002); see also Lee v. Lee, 721 S.E.2d 53, 56

(W. Va. 2011) ("Generally, whenever the language of a

contractual provision is reasonably susceptible of two different meanings or where reasonable minds might be uncertain or disagree as to its meaning, it is ambiguous." (citing Syl. Pt. 1, Shamblin v. Nationwide Mut. Ins. Co., 332 S.E.2d 639 (W. Va. 1985))).  Yet "[t]he mere fact that the parties do not agree to the construction of a contract does not render it ambiguous." Syl. Pt. 1, Berkeley Cnty. Pub. Serv. Dist. v. Vitro Corp. of Am., 162 S.E.2d 189 (W. Va. 1968).

The terms of a contract "are not to be construed in a vacuum, but are to be read in their context." Chesapeake Appalachia, L.L.C. v. Hickman, 781 S.E.2d 198, 213 (W. Va. 2015).  "'As with other contracts, the language of a lease agreement must be considered and construed as a whole, giving effect, if possible to all parts of the instrument. Accordingly, specific words or clauses of an agreement are not to be treated as meaningless, or to be discarded, if any reasonable meaning can be given them consistent with the whole contract.'"  Id. (quoting Syl. Pt. 3, Moore v. Johnson Serv. Co., 219 S.E.2d 315 (W. Va. 1975)); see also Ascent Res., 851 S.E.2d at 787 (A lease "is 'to be construed like any other contract.'" (quoting Chesapeake Appalachia, 781 S.E.2d at 211)).

b.  Analysis

The 2015 Consent and Amendment is dated and executed December 21, 2015.  It is an agreement between Pocahontas Land, Rockwell, and Rockwell's affiliate, Blackhawk Land.  It consists initially of twenty-five "whereas" clauses, the first twenty-two of which begin with the 1937 Lease and then trace its history with previous amendments, supplements, renewals, and assignments, at which point the twenty-third clause reads as follows:

> Whereas, the 1937 Lease, as previously amended, supplemented, renewed and assigned and further amended herein, applicable to the Subleased Reserves (as herein defined) is referred to herein as the "Pocahontas Land Lease" . . . .

2015 Consent & Amend. at 4 (emphasis in original).  That is followed by the final two whereas clauses, the first of which defines the "Subleased Reserves" as the portion of the Powellton A seam that Rockwell desires to sublease to Blackhawk Land, referred to therein as the Intercompany Sublease, and which Blackhawk Land desires to sub-sublease to Coronado Coal II, LLC ("Coronado").  The final whereas clause notes that Pocahontas Land "is willing to consent" to the sublease and sub-sublease "upon the terms and conditions" of this agreement.

In a strained interpretation based on the prefatory whereas clause quoted above, plaintiffs contend that the quoted

language created, in effect, a second Pocahontas Land Lease consisting of all of the 1937 Lease provisions and amendments, together with the terms contained within the body of the 2015 Consent and Amendment, but only insofar as they all relate to the portion of the Powellton A seam being subleased to Blackhawk Land and then sub-subleased to Coronado.

Had the parties to the 2015 Consent and Amendment intended to create a second Pocahontas Land Lease, they would have expressly so stated in explicit language in the body of that agreement – not merely in what is at most an anomalous statement in a prefatory whereas clause. Indeed, the 2015 Consent and Amendment is inconsistent with the plaintiff's interpretation in several respects.

In the provision under "Consent to Subleases" (Section 1.1), Pocahontas Land warrants that no other party need consent "to satisfy any provision or condition of the Pocahontas Land Lease with respect to the Subleased Premises." 2015 Consent & Amend. at 4. If the coal lands embraced within the term "Pocahontas Land Lease" consisted only of the "Subleased Premises," it would have been redundant to so state.

In the provision under "Poca[hontas] Land Further Agreement" (Section 4), if the term "Pocahontas Land Lease" consisted only of the "Subleased Reserves," it would have been

redundant to state that it is "applicable to the Subleased Reserves."  2015 Consent & Amend. at 6.

In the provision under "Estoppel" (Section 3), it is provided as follows: "Poca[hontas] Land declares that, as of the date hereof, (i) the Pocahontas Land Lease is in full force and effect, (ii) the Pocahontas Land Lease, as defined herein, and as herein amended, represents the entire agreement between Poca[hontas] Land and Rockwell . . . ."  2015 Consent & Amend. at 5.  The "entire agreement" between Pocahontas Land and Rockwell is the Pocahontas Land Lease that consists of the entirety of the 1937 Lease and all the coal lands it embraces, including the Powellton A seam, a portion of which comprises the Subleased Reserves or Premises.

In the two provisions under "Amendment" (Section 5), the contrast is sharp and distinct.  The first provision begins: "With respect to only the reserves actually included in the Intercompany Sublease and the [Blackhawk Land]-Coronado Sub-Sublease" it is agreed that the royalty rate specified in Article Three of the Pocahontas Land Lease is enhanced as there set forth.  2015 Consent & Amend. at 6.  The second provision begins: "With respect to Article Sixteen of the Pocahontas Land Lease" it is agreed that "a transfer of control of the lessee therein" — meaning Rockwell — "shall be an assignment requiring

Poca[hontas] Land's consent . . . whenever 50.1% or more of the lessee's capital stock or membership interests" fall under the control of others than those in control thereof "as of the effective date of this Consent."[20]  2015 Consent & Amend. at 7

Moreover, the Intercompany Sublease and Blackhawk Land-Coronado Sub-Sublease confirm this reading.  These two documents, along with the 2015 Consent and Amendment, constitute agreements that are all part and parcel of the same transaction. Indeed, in the 2015 Consent and Amendment, which is referred to therein as "'this' Consent," section 10 thereof specifically provides as follows:

> This Consent and the other documents referred to herein and therein constitute the entire agreement between and among the parties relating to the subject matter hereof, incorporate all prior agreements and understandings between and among the parties hereto relating to the subject matter hereof, and cannot be changed or terminated orally.

2015 Consent & Amend. at § 10.

---

[20] The provision under "Assumption of Lease Obligations" (Section 1.2) wherein Coronado "agrees to assume and perform all of the lessee's obligations and duties under the Pocahontas Land Lease" erroneously used the term "lessee's," which would refer to Rockwell, when "sublessee," which would refer to Blackhawk Land, was the correct term.  The error is effectively corrected in the Sublease at page 6, where Coronado adopts the lessor's responsibilities under the lease "with respect to the subleased premises."

Unfortunately, the Intercompany Sublease by Rockwell to Blackhawk Land has not been made part of the record in this case.  The court, however, takes judicial notice of a document filed in the Boone County Clerk's Office on January 27, 2016, that is entitled "Memorandum of Sublease" and is stated therein as

> made and effective as of the 21st day of December, 2015 (the "Effective Date"), by and between <u>Rockwell Mining, LLC</u>, . . . ("Sublessor") and <u>Blackhawk Land and Resources, LLC</u> . . . ("Sublessee").

Memorandum of Sublease at 1, Boone Cnty. Deed Book 297 at 524 (emphasis in original).

The Memorandum contains three whereas clauses, the last of which states its purpose as being to place on the county record a summary of certain terms of the sublease which is referred to in the second whereas clause as the "Intercompany Sublease dated effective as of the Effective Date," which as noted above is December 21, 2015.  The Memorandum then sets forth (1) a definition of the Subleased Premises, consisting as it does of a portion of the Powellton A seam, (2) the Sublease term of service of five years, plus one year renewals, and (3) an incorporation of all terms and provisions of the Sublease without otherwise stating what they are.  The first whereas clause defines the term "Pocahontas Land Lease" as follows:

> **Whereas**, by virtue of that certain Lease
> Assignment and Assumption Agreement dated
> October 22, 2015, . . . Rockwell Mining, LLC
> took assignment of and became the current
> lessee under an Indenture of Lease dated July
> 1, 1937 between Pocahontas Land Corporation
> and The Koppers Coal Company . . . (the
> "Pocahontas Land Lease"); . . . .

Memorandum of Sublease at 1 (emphasis in original).

The Memorandum was signed on January 20, 2016, on behalf of each Rockwell and Blackhawk Land by Chad Salyers, who signed as "SVP" for Rockwell and as President for Blackhawk Land.  Indeed, Salyers signed all three agreements, either on behalf of Rockwell or Blackhawk Land, or both, as the case may be.

It is apparent from the Memorandum of Sublease, executed by and on behalf of the plaintiffs Rockwell and Blackhawk Land, that the term "Pocahontas Land Lease" as used in the Intercompany Lease means the entirety of the 1937 Lease and all the coal lands it embraces, including the Powellton A seam.

Turning to the Blackhawk Land-Coronado Sub-Sublease, it is "entered into effective as of this 21st day of December, 2015 ('Effective Date')" and signed that same day on behalf of Blackhawk Land by Chad Salyers, as President.  The document contains the first twenty-two whereas clauses similar to the first twenty-two in the 2015 Consent and Amendment, which it mentions.  Of the remaining whereas clauses, the one comparable

to the one quoted above from the 2015 Consent and Amendment reads as follows:

> Whereas, the 1937 Lease, as amended, supplemented, renewed and assigned is referred to herein as the "Pocahontas Land Lease"; . . . .

Sub-Sublease at 4 (emphasis in original).  As set forth here, the term "Pocahontas Land Lease" is unqualified and refers to the 1937 Lease and all the provisions it embraces.  Further on, the Sub-Sublease provides that the "Sublessee" — Coronado — "acknowledges receipt of a copy of the Pocahontas Land Lease." Sub-Sublease at 6.  The Sub-Sublease necessarily speaks of the only existing Pocahontas Land Lease, being the 1937 Lease, as amended, relating to all of the properties therein described, including the Subleased Reserves.

Thus, the 2015 Consent and Amendment, alongside the Intercompany Sublease and Blackhawk Land-Coronado Sub-Sublease, all signed by the same officer as of the same effective date on behalf of Rockwell and Blackhawk Land, can only be read to mean that the Pocahontas Land Lease and the 1937 Lease, as amended, are one and the same.  There is only one lease, which covers the entirety of the coal lands therein described, and that lease was amended by the 2015 Consent and Amendment to require, inter alia, that Rockwell obtain Pocahontas Land's consent in the event of a change of control of the company.

4.   <u>Whether the Merger Breached the 1937 Lease</u>

Since the court finds the 2015 Consent and Amendment
to unambiguously amend the entire 1937 Lease, it must be
determined whether the consent provision in the 1937 Lease
carries forward to the current lessees and, if so, whether the
Sev.en Energy Merger actually breached the lease.  First, the
court addresses plaintiffs' final affirmative defense, that the
merger was not an assignment requiring consent because it was
structured as a reverse triangular merger.

a.   <u>Plaintiffs' Affirmative Defense: Reverse
Triangular Merger</u>

Plaintiffs argue that because the Sev.en Energy Merger
was structured as a reverse-triangular merger, no consent right
of Pocahontas Land was implicated as a matter of law and there
was thus no breach.  <u>See</u> Pls.' Mem. Law 28.

BH Mining Merger was created with the sole purpose of
completing this merger.  BH Mining Merger merged into Blackhawk
Mining, with Blackhawk Mining being the surviving company.  As
Mr. Parrish recounts, the outstanding shares of BH Mining Merger
were converted into shares of Blackhawk Mining and the shares of
stock of Blackhawk Mining outstanding immediately before the
effective time of the merger were converted into securities of
Sev.en Energy for cash, which resulted in Blackhawk Mining

becoming a wholly-owned subsidiary of Sev.en Energy.  See
Parrish Aff. ¶ 13; see generally Binder, 184 F. Supp. 2d at 772;
Morgan v. Powe Timber Co., 367 F. Sup. 2d 1032, 1038 (S.D. Miss.
2005).

        The Parrish Affidavit explains that the compensation
for the Blackhawk Mining shares in this case was that, at the
effective time of the merger, "membership interests in the
Merger Sub [BH Mining Merger] were converted into and became
100% of the membership interests in Reorganized Blackhawk, and
the pre-merger holders of membership interests in Reorganized
Blackhawk received merger consideration in the amount of $0.01
per cancelled membership unit."  Parrish Aff. ¶ 13.  While
lacking necessary detail to allow the court to track how this
merger was executed without being considered an assignment or
sale, the court accepts the parties' contention that this merger
occurred as the parties' claim.

        Plaintiffs' argument is fatally flawed, however,
because it does not account for the fact that the 2015 Consent
and Amendment broadened the definition of "assignment" to
include a transfer of control, including a transfer of the type
contemplated in reverse triangular mergers.  The 2015 Consent
and Amendment explicitly says that "a transfer of control of the
lease . . . shall be an event of assignment requiring

Poca[hontas] Land's consent, and shall be deemed to have
occurred whenever 50.1% or more of the lessee's capital stock or
membership interests" changes hands.  2015 Consent & Amend. at
7.  Plaintiffs' arguments simply do not address the updated
definition and are based only on the original language of
Article Sixteen.  The lease as amended provides that a transfer
of control constitutes an assignment of the lease, and
plaintiffs do not contend that such a transfer of control did
not occur here.  Thus, this defense is without merit.

### b.  Easley and the Rule in Dumpor's Case

Plaintiffs vigorously argue, regardless of the
application of the 2015 Consent and Amendment, that the consent
provision in Article Sixteen of the 1937 Lease applied only to
the original lessee and did not carry through to subsequent
lessees.  This contention is based primarily upon the West
Virginia Supreme Court of Appeals' holding in Easley Coal
Company v. Brush Creek Coal Company, 112 S.E. 512 (W. Va. 1922).
See Pls.' Mem. Supp. 3.

In Easley, a coal lease was entered into by lessor
Coal River Mining Company and lessees Dalton and Butts, and
contained a consent provision stating "[t]his lease shall not be
assigned or mortgaged by the lessees, or any part thereof
sublet, except by consent of the lessor in writing."  112 S.E.

at 513.  Dalton and Butts assigned the lease, with the consent
of Coal River, to Brush Creek Coal Company.  Id.  The deed of
assignment stated that Brush Creek "hereby assumes and will
faithfully fulfill all of the terms and conditions imposed upon
the said [Dalton and Butts] in the lease agreements hereby
assigned."  Id.  However, when Brush Creek later assigned the
lease to Easley Coal Company, Coal River, still the lessor,
sought termination of the lease on the grounds that Brush Creek
has failed to obtain Coal River's consent.  Id. at 514.

In determining the outcome, the West Virginia Supreme
Court of Appeals applied the Rule in Dumpor's Case, Dumpor v.
Syms, 4 Coke 119, b (1578), which it described thusly:

> When there is a condition in a lease against
> the assignment of the term without the consent
> of the lessor, and such consent is given to
> one assignment without any restriction as to
> future assignments, the condition is waived
> altogether and the assignee may assign the
> term without the consent of the lessor.

Id. at 516 (quoting Reid v. Wiessner & Sons Brewing Co. of
Baltimore, 40 A. 877 (Md. 1898)) (internal quotation marks
omitted).[21]  The language in the lease that the provisions,

---

[21] The court noted that there may be some inclination to not
apply the Rule in Dumpor's Case, but that

> [I]t is so well forfeited in precedents and
> judicial opinion that its genuineness cannot
> be judicially denied nor its consequences
> avoided.  Being a part of the common law, it
> is made effective here by the Constitution,

including the consent provision, extended to all successors and assigns, was insufficient to save the provision and defeat the Rule in Dumpor's Case, as was the language in the deed of assignment that the new lessee assumed "all the terms and conditions" in the original lease.  <u>Id.</u> at 516—18.  The court stated:

> Under the Rule in Dumpor's Case, the assent to the assignment destroyed the condition in the lease, unless it was saved by some provision of the assignment and assent, considered as parts of one composite agreement.  <u>It was not specifically saved, nor was any like condition specifically imposed upon the assignee</u>.

<u>Id.</u> at 518 (emphasis added).  Because the language in the deed of assignment was vague and general, the court could not find any intent to insert or continue the assignment-consent provision.  <u>Id.</u> at 518—19.

Critical to the application of <u>Easley</u> to the present action is a deeper understanding of the old common law rule the court was applying.  The so-called Rule in Dumpor's Case arose from the 1578 case of the same name in which the English court held that a lease condition restricting alienation was dissolved

---

> and there being no repugnance between it and the constitutional provision, it must "Continue the law of the State until altered or repealed by the Legislature." Constitution, art. 8, sec. 21.

<u>Easley</u>, 112 S.E. at 516.

if consent was given to a single alienation, and any assumption
of the lease thereafter did not include that restriction.  See
Landlord's consent to one assignment or sublease as obviating
necessity of consent to subsequent assignment or sublease, 31
A.L.R. 153 § II.a (originally published in 1924).  In 1807, the
Rule in Dumpor's Case was continued in Brummel v. Macpherson, 14
Ves. Jr. 173 (1807), with the Lord Chancellor commenting:
"Though Dumpor's Case has always struck me as extraordinary, it
is the law of the land at this day."  31 A.L.R. 153 § II.a
(1924).  The Rule in Dumpor's Case thus was integrated into
American common law.  See, e.g., Easley, 112 S.E. 512.  The rule
was abolished in England in 1859, and has been similarly
discarded in some American jurisdictions through both judicial
and legislative action.  See 22 & 23 Vict. ch. 35 §§ 1–3; N.C.
Gen. Stat. § 41-6.4 (2012); Kendis v. Cohn, 265 P. 844 (Cal. Ct.
App. 1928).

     In 1922, West Virginia affirmed in Easley that the
Rule in Dumpor's Case was part of West Virginia common law.  112
S.E. at 512.  Yet the rule is not often used; only three times
have West Virginia courts referenced the Rule in Dumpor's Case:
first, in Guffrey v. Hukill, 11 S.E. 754 (W. Va. 1890), the
court referenced, but did not discuss, the rule; second, in
Easley, the court affirmed that the rule was part of West
Virginia common law and applied the rule; and third, in Miller

<u>v. Fredeking</u>, 133 S.E. 375 (W. Va. 1926), the court mentioned the rule but did not reach the issue.  West Virginia has not, through legislative action or judicial decree, abolished the Rule in Dumpor's Case from state jurisprudence.

Normally, "[a] restraint on alienation will be narrowly construed to keep the restraint as limited as is consistent with the language describing the restraint." Restatement (Second) of Property, Land. & Ten. § 15.2 (1977), <u>cmt.</u> <u>e</u>.  The Rule in Dumpor's case extends this skepticism of restraints on alienation by "terminat[ing] the prohibition against assignment when the landlord consents to an assignment unless [the landlord] specifically reserves the right to prohibit future assignments." <u>Id.</u> § 16.1, <u>cmt.</u> <u>g</u>.  Thus, in <u>Easley</u>, the West Virginia Supreme Court of Appeals found that the restriction on future assignment in the original lease did not transfer to a subsequent assignee after the lessor consented to that initial assignment.  112 S.E. at 512; <u>see</u> <u>also</u> <u>German-Am. Sav. Bank v. Gollmer</u>, 102 P. 932, 934 (Cal. 1909) ("The assignee of a leasehold estate takes it subject to all the obligations imposed by the lease, except that, where there is a condition against assignment without consent (which is necessarily single in its nature), such condition is wholly discharged by the consent or waiver.").  Further, "[t]he rule is applicable notwithstanding that the lease was assigned with all

its covenants, terms, and conditions," 31 A.L.R. 153 (1924)
(citing Reid, 40 A. 877), and "[t]he fact that the consent is
given to assign to a specified person does not alter the rule."
Id. (citing Pennock v. Lyons, 118 Mass. 92 (1875); Brummell v.
Macpherson, 33 Eng. Reprint 487 (1807)).

Consequently, whether the assignment-consent provision
extends to Rockwell can be determined by a straightforward
reading of the documents assigning the 1937 Lease to determine
whether the restriction was maintained or dissolved. Under the
Rule in Dumpor's case, the initial assignment-consent provision
applies only to the initial lessee, and a continuation of that
restriction must be re-established in subsequent assignment
agreements.

The 1941 Deed of Assignment and Consent wherein Loup
Creek consented to assignment of the lease from Koppers Coal to
Eastern Gas continued the consent-assignment restriction to the
new lessee when it stated that the new lessee was bound by all
the terms of the original lease "including . . . the covenant
against assignment contained in Article Sixteen of Original
Lease." 1941 Deed of Assignment & Consent at 4, Def.'s Mot.
Partial Summ. J. Ex. 3, ECF No. 102-2 (emphasis in original).

The 1966 Deed of Assignment and Consent wherein
Pocahontas Land consented to the assignment of the lease from

Eastern Gas to Eastern Associated also continued the restriction, stating: "this consent shall not be construed as consenting to any subsequent assignment of any or all of the [1937 Lease]." 1966 Deed of Assignment & Consent at 6, Def.'s Mot. Partial Summ. J. Ex. 4, ECF No. 102-3. This language, though not as direct as that of the 1941 Deed, establishes under Easley and the doctrine of the Rule in Dumpor's Case that the parties agreed to a continuance of the restriction on assignment to the new lessee.

Then comes the October 22, 2015 assignment from Eastern Associated to Rockwell. As this assignment was a process of the bankruptcy court, Eastern Associated's consent was not required and the lack of consent did not violate the lease. Thus, Rockwell received the lease with the same conditions that bound Eastern Associated, including the consent provision.

The 2015 Consent and Amendment again continued the December 21, 2015 consent-assignment restriction when Pocahontas Land consented to the sublease by Rockwell and sub-sublease by Blackhawk Land of a portion of the Powellton A seam. In stating that "Poca[hontas] Land's consent hereby given shall neither constitute nor be construed as a waiver or relinquishment of any rights of Poca[hontas] Land to insist upon consent to further

subleases . . . nor . . . shall such consent be construed to modify the provisions of Article Sixteen of the Pocahontas Land Lease," the parties agreed to a continuance of the assignment restriction in Article Sixteen of the 1937 Lease.  2015 Consent & Amend. at § 2.

The parties have thus carried the consent-assignment clause forward into the Rockwell-Blackhawk Mining-Pocahontas Land relationship through the language of each of the various assignments, including the 2015 Consent and Amendment wherein Rockwell, Blackhawk Mining, and Pocahontas Land all agreed to the continuance of the terms of Article Sixteen.  Regardless of whether the West Virginia Supreme Court of Appeals chooses to continue the Rule in Dumpor's Case when next it is confronted with such a case, the rule does not bar the assertion of the assignment restriction here, where the parties have explicitly reasserted the restriction in every consent and assignment of the lease, including between the current lessor, lessee, sublessee, and sub-sublessee.

      c.   <u>Application of Easley to the 1937 Lease</u>

Rockwell's contention that Article Sixteen does not apply to it because of the terms of the 2015 Assignment and Assumption Agreement has already been addressed.  Nevertheless, Rockwell argues that Article Sixteen of the 1937 Lease cannot

apply to it because, following the dictates of <u>Easley</u>, the assignment-consent provision ended with the first assignment of the lease and did not carry through to present.  In particular, Rockwell says there was no specific assumption of the assignment-consent provision in the 2015 Assignment and Assumption Agreement wherein Eastern Associated assigned it the leasehold.  This, too, has already been addressed, as that transfer was pursuant to an order of the bankruptcy court, which does not effect the assignment-consent provision.

Since the court has determined that the 2015 Consent and Amendment amended the entirety of the 1937 Lease, the court examines whether the Sev.en Energy Merger actually violated the amended consent provision.

To reiterate, Article Sixteen of the 1937 Lease states:

> The Lessee further covenants and agrees that it will not mortgage, nor will it assign, convey, lease, under-let, sublet, or set over any of its estate, interest, or term, in whole or in part, in the hereby leased premises or their appurtenances, or any part thereof to any person or persons whatsoever, or corporation whatsoever, without the license or consent of the Lessor, its successor or assigns in writing under seal for that purpose being first had and obtained, and in case of such assignment or transfer, the transferee shall assume in writing all obligations of the Lessee hereunder in a form satisfactory to the Lessor.

1937 Lease at 15.  The 2015 Consent and Amendment amends Article

Sixteen such that:

> a transfer of control of the lessee therein
> shall be an event of assignment requiring
> Poca[hontas] Land's consent, and shall be
> deemed to have occurred whenever 50.1% or more
> of the lessee's capital stock or membership
> interests shall become subject to the direct
> or indirect control of persons or entities,
> some or all of whom are different than those
> persons or entities which directly or
> indirectly control that portion of the
> lessee's capital stock or membership interests
> as of the effective date of this Consent.
> Notwithstanding this amendment to the
> Pocahontas Land Lease, Poca[hontas] Land
> hereby acknowledges and agrees that it shall
> not unreasonably withhold its consent to an
> assignment of the Pocahontas Land Lease or the
> [Blackhawk Mining]-Coronado Sub-Sublease
> where a transfer of control as set forth above
> occurs provided the assignee has reasonable
> coal mining experience and reasonable
> financial standing.

2015 Consent & Amend. at § 5.

The facts, as represented by all parties, show that

control over lessees Blackhawk Mining and Rockwell changed after

the 2015 Consent and Amendment was entered into, as a result of

the 2020 Sev.en Energy Merger.  The corporations controlling

those entities changed, and the persons actually controlling

them changed.  After the 2015 Consent and Amendment up to the

2019 bankruptcy, Blackhawk Mining, through subsidiary Blackhawk

DRE, owned Rockwell and Blackhawk Land.  The control group at

that time consisted of John Mitchell Potter and entities

controlled by John Mitchell Potter, which in total held 83.36%
voting control; and two unrelated parties holding the remaining
16.64% voting control.  After the Blackhawk Mining bankruptcy
and reorganization, neither the John Mitchell Potter nor the
other two control group entities had an interest in Blackhawk
Mining, as that control had transferred to lienholders.  The
change from John Mitchell Potter to the lienholders did not
affect the consent-amendment provision as it occurred as a
function of the bankruptcy proceedings.  As a result of the
Sev.en Energy Merger, however, Blackhawk Mining was no longer
controlled by those lienholders, but had a new parent company
and a new principal, being Sev.en EC, a.s. and Pavel Tykac, the
Czech investor and owner of Sev.en Energy, respectively.  <u>See</u>
Parrish Aff. 171:6.  Clearly, then, this was a transfer of
control, occurring after the 2015 Consent and Amendment which
stated that Pocahontas Land's consent was necessary for a
transfer of control, and for which Pocahontas Land's consent was
not acquired.

Pocahontas Land rests its argument on a simple, plain-
meaning reading of the text, saying that Article Sixteen
requires the lessor's consent for any assignments; the 2015
Consent and Amendment expands the definition of "assignment" to
include transfers of control; and the Sev.en Energy Merger
resulted in a change of control of Blackhawk Mining and Rockwell

to Sev.en Energy, which was done without the consent of
Pocahontas Land.  Thus, they conclude, the Sev.en Energy Merger
violated the 1937 Lease.

Plaintiffs formulate further arguments as to why the
Sev.en Energy Merger was not a breach of the 1937 Lease.  First,
plaintiffs strongly assert that the transfer of control
provision in the 2015 Consent and Amendment was by its very
nature restricted to one "deemed assignment."  According to this
argument, that one assignment was "used up" during the 2019
bankruptcy when the control group changed pursuant to the
bankruptcy reorganization of Blackhawk, and thus was not a
barrier to the 2020 Sev.en Energy Merger.  Second, plaintiffs
argue that the transfer of high-level parental control, many
parent-subsidiary relationships removed from the lessees, did
not violate the transfer of control provision.  This argument
again has no basis in the text of the 1937 Lease or the 2015
Consent and Amendment.  Finally, plaintiffs contend that even if
Pocahontas Land's consent was required, it had no reasonable
basis to withhold that consent.  See Compl. ¶ 49.

Plaintiffs' various arguments that the transaction did
not violate the lease are unconvincing; none of them account for
all of the factual background in this action.  Plaintiffs' first
argument, that the deemed assignment occurred during the 2019

bankruptcy, is misplaced; while the control group changed pursuant to the 2019 bankruptcy and reorganization, that reorganization occurred pursuant to court-supervised bankruptcy proceedings, where consent-assignment provisions are inapplicable.  See Miller v. Fredeking, 133 S.E. 375, 376 (W. Va. 1926) ("It is quite generally held that, where such transfer or assignment of the lease is made through involuntary bankruptcy proceedings, there is no violation of the covenant not to assign without the written consent of the lessor.") (citing Doe v. Smith, 1 Marsh 359; Gazlay v. Williams, 147 F. 678 (6th Cir. 1906); Gazlay v. Williams, 210 U.S. 41 (1908)). This was an assignment by process of law that neither lessor nor lessee controlled, and thus neither could the lessee request consent, nor could the lessor give it.  Thus, Pocahontas Land cannot be faulted for failing to exercise a right it was barred from exercising.

For their argument that the transfer occurred at a high-parental level, plaintiffs cite no caselaw and no language in the 2015 Consent and Amendment that exempts such high-level transactions from the assignment restriction.  The restriction states that such a transfer of control, as defined therein, is an assignment and requires consent.  It places no limitations on what "level" the transfer must occur to be considered an

assignment, but rather says that any transfer of control is an assignment.  Thus, this argument is without merit.

A plain-language reading of the terms of Article Sixteen, in light of the 2015 amendment, shows that the Sev.en Energy Merger violated the 1937 Lease by failing to obtain Pocahontas Land's consent, absent a reasonable basis for withholding that consent.  Indeed, plaintiffs contend that even if the merger was an assignment that required Pocahontas Land's consent, Pocahontas Land had no reasonable basis for withholding that consent.  This argument is suspect considering Pocahontas Land was notified of the planned merger one day before the merger was undertaken and eight days before the merger closed.  Plaintiffs never explicitly asked for consent, but merely attached a consent form to an email notifying Pocahontas Land of the transfer.  The fact that Rockwell notified Pocahontas Land of the pending transaction and offered a consent form indicates that they had the same understanding of the consent provision at the time of the merger and transfer of control.

While at first blush the court may be inclined to find notice was not genuinely given to Pocahontas Land, there is insufficient evidence at this stage of the case for the court to resolve the issue of whether consent was unreasonably withheld, dependent as it is on the adequacy of the notice given and

whether Sev.en Energy or those controlling it had reasonable coal mining experience and reasonable financial standing for an operation of the magnitude of the 1937 Pocahontas Land Lease. The issue requires further factual and legal development.

C.   Mortgaging the Leasehold

        The parties, as previously mentioned, have cross-moved for summary judgment on Count III of Pocahontas Land's counterclaim, which seeks a declaration that the 1937 Lease's prohibition against mortgages is enforceable and that Rockwell breached the lease by failing to obtain Pocahontas Land's consent before pledging the leasehold as security under two deeds of trust dated January 22, 2020.  Rockwell contends that it is entitled to summary judgment as to the matter of mortgaging inasmuch as (1) per Easley, it is not bound by the restrictions of Article Sixteen; (2) the savings clause in the deeds of trust protect it from the alleged default, inasmuch as "the savings clause avoids any possible default by avoiding the lien;" (3) Pocahontas Land has waived all arguments related to the consent provisions at issue; (4) Pocahontas Land ratified the 1937 Lease by treating it as continuing after the alleged breach and (5) Pocahontas Land has failed to assert any cognizable damage arising from the allegations in Count III of the counterclaim.

1.   <u>Background</u>

"As part of Plaintiffs' acquisition of the 1937 Lease
during the Patriot Bankruptcy, on March 16, 2016, the parties
[(Pocahontas Land, Blackhawk Mining, and Deutzche Bank)]
executed a Consent to Leasehold Mortgages ('2016 Consent [to
Mortgages]'), whereby Poca[hontas] Land granted Blackhawk Mining
[] consent to pledge a portion of the 1937 Lease . . .
collateral to specific financing described therein." Def.'s
Mem. Supp. 5.  The consent provision in the 2016 Consent to
Mortgages states the following:

> Lessor hereby consents to Lessee granting
> Deeds of Trust pledging the rights, title and
> interest of the Lessee in the Leases to
> Collateral Agent to secure the Lessee's
> indebtedness and other obligations
> (collectively, the 'Indebtedness') to the
> First Lien Term Secured Parties, ABL Credit
> Secured Parties, Second Lien Term Loan Secured
> Parties, and any successor secured party in
> connection with any assignment of such
> indebtedness and acknowledges Collateral
> Agent's right to exercise the remedies to
> which Collateral Agent is entitled under the
> Leasehold Mortgages, subject to the terms,
> conditions, and limitations in this Consent.
> Lessor acknowledges and agrees that Lessee's
> grant of the Leasehold Mortgages to Collateral
> Agent and the exercise of Collateral Agent's
> rights thereunder, subject to the terms,
> conditions, and limitations set forth in this
> Consent, do not and will not constitute a
> default or event of default under the Leases.

2016 Consent to Mortgages.  The Consent to Mortgages is limited
to "a small subsection of the 1937 Lease that was '[a]ssigned to

Eastern Royalty, LLC by Rhino Eastern LLC by Assignment and
Assumption Agreement . . . dated January 1, 2015 . . . .'"
Def.'s Mem. Supp. 5 (quoting 2016 Consent to Mortgages Ex. A,
ECF No. 102-6; citing Parrish Dep. at 48).  This limitation is
made in Exhibit A to the 2016 Consent to Mortgages which, in
describing each of the two leases subject to the mortgage, says
they are the Eastern-Rhino assignments.  2016 Consent to
Mortgages Ex. A.  While there is not much description given as
to the extent of these leaseholds, Pocahontas Land describes it
as the "Peachtree Sublease," Def.'s Mem. Supp. 5, which
plaintiffs do not contest.

       About three years later, in July 2019, Blackhawk
Mining and twenty-one affiliated debtors voluntarily filed for
Chapter 11 bankruptcy.  Def.'s Mem. Supp. 5 (citing Parrish Dep.
119–20).  Blackhawk Mining funded the bankruptcy by obtaining
debtor-in-possession financing and, as part of the exit
financing, entered into the 2019 Senior Secured Term Loan Credit
Agreement and the 2019 Senior Secured ABL Credit Agreement.
Id.  Critically, in connection with this debtor-in-possession
financing, Rockwell pledged the entirety of the 1937 Lease
(along with numerous others) under two Leasehold Credit Line
Deeds of Trust as collateral: the first, subject to the 2019
Senior Secured Term Loan Credit Agreement, was for the benefit
of Cantor Fitzgerald Securities, LLC ("Cantor Fitzgerald"); the

second, subject to the 2019 Senior Secured ABL Credit Agreement, was for the benefit of MidCap Financial Trust and MidCap Funding IV Trust.  See Id. at 7; Counterclaim ¶¶ 65–69.  Both deeds of trust were recorded in Boone and Wyoming Counties.  See Counterclaim ¶¶ 65–69.  The deeds of trust secured an additional eighty-five million dollars of financing.  See Parrish Dep. at 122–23.

Pocahontas Land contends that Rockwell never requested its consent to the credit agreements or deeds of trust, despite the assignment-consent and anti-mortgaging provisions in Article Sixteen.  See Def.'s Mem. Supp. 6.

The first and third notices of default sent by Pocahontas Land concerned this alleged mortgaging of the leasehold.  The first notice, dated March 11, 2020, asserted that Rockwell's mortgaging of the leasehold under the two deeds of trust without the consent of Pocahontas Land triggered a default of Rockwell's rights under the 1937 Lease.  Mar. 11, 2020 Notice of Default at 1–2.  The notice of default further stated Pocahontas Land's intention to terminate the lease if Rockwell did not cure the default within sixty days of receipt of the notice.  Id. at 2–3.  The notice explicitly stated that the demand therein was not a waiver or release of its right to "further default Rockwell for such other circumstances as may

94

exist and also without waiving any of the rights and/or remedies of Pocahontas [Land] available at law or in equity." Id. at 2.

Blackhawk Mining responded to the March 11 Notice of Default by email on May 5, 2020, denying that the deeds of trust violated the 1937 Lease. Email from C. Salyer to G. Wooten et al., May 5, 2020, ECF No. 104-3. The email raised several defenses to the allegation of default: (1) only a small portion of the leasehold was implicated and thus the entire leasehold was not in default,[22] (2) Pocahontas Land's 2016 Consent to Mortgages served as a consent to subsequent mortgages, and (3) the "savings clause" contained in each deed of trust prevented default. Id. In its briefing for this action, Rockwell continues to argue that the 2016 Consent to Mortgages and "savings clauses" prevent any default; and instead of arguing that the implication of only a small portion of the leasehold prevented default of the whole, Rockwell now argues that Easley prevents the anti-mortgage provision of Article Sixteen from applying to Rockwell.

---

[22] Rockwell's first contention, that there was no default because only a small portion of the leasehold was implicated, is not repeated in its briefing, likely because there is no legal basis that default as to part of the leasehold does not cause a default to the lease as a whole. The argument that default on a limited portion of a leasehold somehow precludes default as to the lease as a whole is unsupported and unsound.

Pocahontas Land has since notified the court that, on November 12, 2021, Rockwell again pledged the entire 1937 leasehold under the deeds of trust.  See Def.'s Supplemental Mem. Supp. 1, ECF No. 153.  Rockwell characterizes this event as an amendment and restatement of the deeds of trust, rather than a new lien.  Pls.' Resp. 5.  In response, Pocahontas Land sent Rockwell a third notice of default on September 15, 2023, reasserting its claims from the March 11, 2020 notice of default.  Id.  Sept. 15, 2023 Notice of Default, ECF No. 153-4.

2.  Damages

First, Rockwell contends that the mortgage claim must fail because Pocahontas Land failed to allege the specific amount of damages, which, Rockwell maintains, is an essential element for a breach of contract claim.  See Pl.'s Resp. 20.

Plaintiffs brought their complaint and Pocahontas Land brought its counterclaim pursuant to the West Virginia Declaratory Judgment Act, which permits any interested individual under a written contract to "have determined any question of construction or validity arising under . . . the contract . . . and obtain a declaration of rights, status or legal relations thereunder."  W. Va. Code § 55-13-2.  The Act further permits a contract to "be construed either before or after there has been a breach thereof."  W. Va. Code § 55-13-3.

The Act does not specify any requirement that an interested
party must assert damages when seeking a declaration pursuant to
the Act on a question of contract construction or validity,
precisely as Pocahontas Land does here.  Thus, Rockwell's
contention is without merit.

   3.   <u>Applicability of the Consent Provision to the
        Mortgages</u>

        Pocahontas Land's argument as to the mortgaging of the
leasehold is straightforward: Article Sixteen of the 1937 Lease
expressly states that the lessee cannot, among other things,
mortgage the leasehold, without the lessor's consent; Rockwell
did not obtain Pocahontas Land's consent when it mortgaged the
leasehold in 2020, and thus, Rockwell breached the lease.
Rockwell does not dispute that the 1937 Lease was mortgaged and
assigned by way of the deeds of trust, nor does it appear to
dispute that Pocahontas Land's consent was not sought.  Instead,
Rockwell argues that the prohibition against mortgaging does not
apply to it because of the <u>Easley</u> doctrine and that, even if it
did require Pocahontas Land's consent to mortgage the leasehold,
the consent obtained in the 2016 Consent to Mortgages applied to
the later deeds of trust.

        Rockwell's <u>Easley</u> argument is a restatement of the
earlier argument already considered and disposed of by the

court.  Rockwell says the consent provision in Article Sixteen
of the 1937 Lease was exhausted long ago and thus does not apply
to Rockwell.  As discussed above, the dictates of Article
Sixteen have been reasserted and thus maintained during all
subsequent assignments of the 1937 Lease and, as such, Rockwell
is still subject to the anti-mortgage provision in that article.

Rockwell's assertion that Pocahontas Land's 2016
Consent to Mortgaging provided the necessary consent for the
2020 mortgaging under the deeds of trust is similarly flawed, as
the 2016 Consent to Mortgaging specifically limits that consent
to the singular instance being considered by that document.
This assertion is based on the 2016 Consent to Mortgage's
language that the agreement may be "amended, amended and
restated, supplemented, or otherwise modified from time to
time," and there may be a "successor secured party in connection
with any assignment of such Indebtedness."  Email from C. Salyer
to G. Wooten et al., May 5, 2020, Def.'s Mot. to File Under Seal
Ex. 12, ECF No. 104-3.  This argument is unconvincing, as the
new mortgage is not a refinancing of or supplement to the first
mortgage, but rather an entirely new mortgage.

The debt secured by the 2020 mortgaging and the size
of the leasehold mortgaged are entirely different from that of
the 2016 and 2020 mortgaging.  As Pocahontas Land correctly
notes, "[t]he additional financing obtained in 2019 was not an

'assignment' of the 2016 indebtedness, but rather included new and additional indebtedness with new lenders under new loan documents." Def.'s Mem. Supp. 10 (citing <u>Boarman v. Boarman</u>, 556 S.E.2d 800, 803 (W. Va. 2001)). Pocahontas Land goes on to note that this argument is precluded by the specific and restricting language in the 2016 Consent to Mortgage, which it aptly characterizes as follows:

> [T]he 2016 Consent [to Mortgages] provided Blackhawk [Mining] with authority to pledge a portion of the 1937 Lease as collateral for specific indebtedness incurred with specific lenders, or to any successor secured parties in connection with an assignment of the specific indebtedness. . . . [It] did not provide Blackhawk [Mining] authority to pledge the 1937 Lease as collateral for new indebtedness."

<u>Id.</u> at 12 (citing 2016 Consent to Mortgages). The court agrees with Pocahontas Land's characterization; the 2020 was a new mortgage for a substantially greater sum of money[23] to different parties, not a continuation of the 2016 mortgage. Thus, regardless of <u>Easley</u>, Pocahontas Land's consent to the limited mortgage in 2016 cannot be considered consent to the subsequent mortgage.

Relatedly, Rockwell cites the bankruptcy court's Chapter 11 Confirmation Order, arguing that order automatically

---

[23] The 2020 mortgaging provided access to an additional eighty-five million dollars in financing. Def.'s Mem. Supp. 12–13.

applied Pocahontas Land's consent to the previous mortgage to the 2020 mortgage: "Any consent or waiver granted by any party to the grant or perfection of a Lien under the Credit Documents . . . shall apply to the New First Lien Loan Documents and Exit ABL Facility Documents to the same extent so long as such consent or waiver was not specifically limited to the granting or perfection of a Lien under such Credit Documents." Id. However, Rockwell does not explain how the 2016 mortgage relates to this byzantine list of documents, nor does it show that the 2016 mortgage, which was associated with the conclusion of the Patriot Bankruptcy, relates to the 2019 Blackhawk Bankruptcy indebtedness.

Regardless, the 2016 Consent to Mortgages contains the type of limiting language referred to by the confirmation order; the consent granted is specifically limited to mortgaging the Peachtree Sublease described therein.  Thus, whether or not the 2016 mortgaging consented to by the 2016 Consent to Mortgages is part of the Credit Documents referred to in the bankruptcy order, by the terms of the consent order and the 2016 Consent to Mortgages, the consent is limited to the Peachtree Sublease and is not extended by the bankruptcy court to any other mortgaging.

4.   <u>The Savings Clauses</u>

Rockwell next contends that the savings clauses in the deeds of trust, which it calls "standard and customary in the commercial industry," operate to save any purported assignment of the 1937 Lease from becoming a default under the lease. Pls.' Resp. 11.  The Cantor Fitzgerald and MidCap Funding deeds of trust have identical savings clauses, which provide as follows, in their entirety:

> Section 15.4. <u>No Assignment or Encumbrance</u>. Notwithstanding anything to the contrary contained herein, this Mortgage shall not constitute an assignment or encumbrance on or of any Mortgaged Leases within the meaning of any provision thereof prohibiting its assignment or encumbrance and Beneficiary [Cantor Fitzgerald/MidCap Funding] shall have no liability or obligation thereunder by reason of its acceptance of this Mortgage. Beneficiary shall be liable for the obligations of the tenant arising out of any Subject Lease for only that period of time for which Beneficiary is in possession of the premises demised thereunder or has acquired, by foreclosure or otherwise, and is holding all of Grantor's right, title and interest therein.

Cantor Fitzgerald Deed of Trust 29; MidCap Funding Deed of Trust 29.

The 1937 Lease expressly provides that the lessee "will not mortgage, nor will it assign . . . any of its estate, interest, or term, in whole or in part, in the . . . leased premises . . . to any person or persons whatsoever, or

101

corporation whatsoever, without the license or consent of
[Pocahontas Land]." 1937 Lease at 15. In the deeds of trust,
Rockwell agreed to "grant[], convey[], mortgage[], bargain[],
sell[], transfer[], assign[], and pledge[] to the Trustee, its
successors and assigns, in trust, with power of sale, for the
use and benefit of the Beneficiary, a deed of trust lien on and
a security interest in and upon" all of Rockwell's "estate,
right, title and interest in, to and under" the 1937 Lease.
Cantor Fitzgerald Deed of Trust 5; MidCap Funding Deed of Trust
5. Momentarily setting aside the savings clauses, Rockwell
violated the 1937 Lease by pledging the leasehold as collateral
in the deeds of trust.

        The question, then, is whether the savings clauses in
the deeds of trust can save Rockwell from default where it has
blatantly violated the terms of the 1937 Lease. The court is
unaware of any West Virginia authority addressing the type of
savings clauses at issue. Caselaw on the subject is limited and
scattered, and primarily deals with usury savings clauses. See,
e.g., Soaring Pine Cap. Real Estate & Debt Fund II, LLC v. Park
St. Grp. Realty Servs., LLC, 999 N.W.2d 8 (Mich. 2023); Jersey
Palm-Gross, Inc. v. Paper, 658 So.2d 531 (Fla. 1995); First
State Bank v. Dorst, 843 S.W.2d 790 (Tex. App. 1992). In many
of these cases, such usury savings clauses are either

unenforceable on public policy grounds or, at the very least, do
not permit the savings clause to allow loans that are otherwise
usurious.  See, e.g., Swindell v. Fed. Nat'l Mortg. Ass'n, 409
S.E.2d 892 (N.C. 1991) (holding that allowing a usury savings
clause to shield a lender from liability for charging usurious
rates is contrary to public policy); NV One, LLC v. Potomac
Realty Cap., LLC, 84 A.3d 800 (R.I. 2014) (holding the usury
savings clause at issue unenforceable on public policy grounds);
First State Bank, 843 S.W.2d at 793 (holding that, while
generally permissible, a savings clause is ineffective to cure
usury if "directly contrary to the explicit terms of the
contract"); Jersey Palm-Gross, 658 So.2d at 535 (holding usury
savings clauses cannot "absolutely insulate a lender from a
finding of usury"); Soaring Pine Cap. Real Estate, 999 N.W.2d at
119–20 (holding that usury savings clauses are unenforceable
"when they nullify the statutory remedies for usury").

Rockwell avers that the savings clauses "avoid any
default by ensuring that only valid assignments convey, and void
assignments do not," Pls.' Resp. 12, and asserts that any lack
of consent to the exit financing deeds of trust "would not
constitute a default because of the presence of the aforesaid
'savings clause' . . . because the clause specifically disallows
the assignment of anything that is non-assignable." Id. at 14.
Rockwell further notes that "[t]hose are the terms that Rockwell

and [Cantor Fitzgerald and MidCap Funding] agreed to," and was "a risk they bore with open eyes."  Id.  Rockwell asserts that the court "may decide whether the assignments are valid or not, but the presence of the savings clause certainly protects Poca[hontas] Land — and Rockwell — to the extent necessary under the law."  Id.

Pocahontas Land responds with several arguments. First, it says that the circumstances surrounding the deeds of trust demonstrate that Rockwell intended to use the 1937 Lease as collateral for new financing and did just that without its consent.  Next, Pocahontas Land contends that the plain language of the savings clauses provides protection solely to the beneficiaries of the deeds of trust (i.e., Cantor Fitzgerald and MidCap Funding) and not to Rockwell as the grantor, and is limited so as to contain "no restriction or qualification of the assignment that was in fact made;" in other words, "[n]othing in the words 'saved' the deeds of trust from making the substantive assignment and mortgages.  Def.'s Mem. Supp. 15; Def.'s Reply 11.  Then, it says that the clauses impermissibly attempt to dictate the meaning of Article Sixteen of the Lease, and raises again the argument that third parties cannot contract away Pocahontas Land's rights under the 1937 Lease.  See Def.'s Reply 11.  Finally, Pocahontas Land notes that Rockwell had the opportunity to seek release of the deeds of trust after

receiving the March 11, 2020 notice of default.  It contends that, "[i]f the 'savings clauses' had any real meaning" the default could have been cured, but "[c]learly, by their terms the [clauses] had no effect on the assignments made and Rockwell could not, even had it attempted, forced a release."  Id. at 12. Pocahontas Land thus asserts that the savings clauses do not "nullify or alter the assignment and mortgages made in the Deeds of Trust."  Id. at 9.

In support of its argument that the savings clauses "save" it and are enforceable, Rockwell cites cases purporting to show that savings clauses are frequently enforced by bankruptcy courts and in non-bankruptcy contexts alike.  In the bankruptcy context, Rockwell cites In re Residential Capital, LLC, No. 12-12020, 2012 WL 12906668 (Bankr. S.D.N.Y. Nov. 21, 2012), and In re Dura Automotive Systems, Inc., No. 06-11202, 2007 WL 7728109 (Bankr. D. Del. Aug. 15, 2007).  In the non-bankruptcy context, Rockwell cites Illinois Tool Works, Inc. v. Commerce and Industry Insurance Co., 962 N.E.2d 1042 (Ill. App. Ct. 2011), Woodcrest Associates v. Commonwealth Mortgage Corp., 775 S.W.2d 434 (Tex. App. 1989), and First State Bank v. Dorst, 843 S.W.2d 790 (Tex. App. 1992).

The two bankruptcy cases and one of the non-bankruptcy cases cited by Rockwell, Illinois Tool Works, 962 N.E.2d 1042,

are irrelevant.  The two bankruptcy cases wherein Rockwell says
the court "approved" similar clauses are simply asset purchase
agreements that the bankruptcy courts okayed.  In re Residential
Capital, LLC, No. 12-12020, 2012 WL 12906668 (Bankr. S.D.N.Y.
Nov. 21, 2012); In re Dura Auto. Sys., Inc., No. 06-11202, 2007
WL 7728109 (Bankr. D. Del. Aug. 15, 2007).  The courts did not
otherwise discuss those clauses.  As to Illinois Tool Works,
while Rockwell describes the case as "analyzing and upholding
nearly identical savings clauses," what the court actually says
is that such a savings clause is acceptable as it relates to the
assignment of an insurance policy: "[N]otwithstanding the
existence of an anti-assignment or consent provision, a policy
may be assigned after a loss without notice to or consent of the
insurer, unless such is required by statute."  Id. at 1054.
This context is not comparable to the one at issue.

     The two Texas cases cited, Woodcrest and First State
Bank, address only usury savings clauses, not savings clauses in
any comparable context to those at issue in this action.
Woodcrest, 775 S.W.2d 434; First State Bank, 843 S.W.2d 790.
Pocahontas Land also cites to these two cases.  Texas courts
have perhaps the longest history concerning usury savings
clauses and are generally more supportive of the clauses than
other states.  Cf. Soaring Pine Cap. Real Estate, 999 N.W.2d at
119-20; Jersey Palm-Gross, 658 So.2d 531 (Fla. 1995).  Usury

savings clauses are valid in Texas generally, but will still be
ineffective if it is "directly contrary to the explicit terms of
the contract."  First State Bank, 843 S.W.2d at 793 (emphasis in
original).  In First State Bank, the court quoted Nevels v.
Harris, wherein the Texas Supreme Court explained: "Of course we
do not mean to hold that a person may exact from a borrower a
contract that is usurious under its terms, and then relieve
himself of the pains and penalties visited by the law upon such
an act by merely writing into the contract a disclaimer of any
intention to do that which under his contract he has plainly
done."  First State Bank, 843 S.W.2d at 793 (quoting Nevels v.
Harris, 102 S.W.2d 1046, 1050 (Tex. 1937)).

     The court is unpersuaded that the savings clause
"saves" Rockwell from this violation.  The cases provided by
Rockwell are not comparable to the savings clauses presently at
issue.  Further, Rockwell seems to use those cases to argue that
the savings clause is valid, which the court does not
necessarily dispute, but that is not the same as upholding the
savings clause in all settings or affirming Rockwell's
interpretation of the clause, which the court declines to do.

     Despite Rockwell's assertions, the clause's express
language does not rescue Rockwell from the clear requirement
that Pocahontas Land's consent be obtained prior to any

mortgaging of the 1937 Lease.  Any purported protection offered
by the savings clauses at issue limit only the liability of the
beneficiaries, Cantor Fitzgerald and MidCap Funding, by way of
accepting the mortgage, while exposing Pocahontas Land to
litigation to resolve the potential cloud on its title[24] and
rights.  The savings clause, designed as it is to protect the
beneficiary, does not function automatically.  Rather, it
operates only insofar as "this Mortgage shall not constitute an
assignment or encumbrance on or of any Mortgaged Leases within
the meaning of any provision thereof prohibiting its assignment
or encumbrance."  Ascertainment of the "meaning" of any such
provision inevitably embroils the lessor in potential disputes
and expensive litigation as is reflected in this very case.

        The court thus declines to permit Rockwell to use the
savings clauses, included as a form of protection for the
lenders, to abrogate the bargained-for consent provision in the
agreement between Rockwell and Pocahontas Land.  Indeed, to do
so would, in essence, excuse Rockwell from a knowing violation
of Article Sixteen's consent requirement.

---

[24] The lien loans that Rockwell acquired where the leasehold
serves as collateral and the impropriety of Rockwell using the
leasehold thusly, going as it does against the provisions in the
lease, raise the issue of whether Rockwell's actions have
created a cloud on the title of Pocahontas Land's property.  Cf.
Gardner v. Buckeye Sav. & Loan Co., 152 S.E. 530 (W. Va. 1930).

The court thinks it well-taken that, as decreed in several other jurisdictions addressing usury savings clauses, that a savings clause cannot exempt a party from conduct in blatant violation of other contractual duties.  See Soaring Pine Cap. Real Estate, 999 N.W.2d 8; Jersey Palm-Gross, 658 So.2d 531.  The court refuses to read the savings clauses in such a way as to allow Rockwell to baldly violate rights of Pocahontas Land under the 1937 Lease by hiding behind vague language in a contract to which Pocahontas Land was not a party.  The lease requires Rockwell to obtain Pocahontas Land's consent prior to mortgaging the leasehold, and the savings clauses cannot allow Rockwell to escape liability for failing to do so; it cannot permit Rockwell to violate the contractual rights of Pocahontas Land, which was not a party to the deeds of trust and did not consent to them.

5.   Waiver and Ratification

Finally, plaintiffs assert that even if the mortgaging was impermissible and not saved by the savings clauses, Pocahontas Land nonetheless waived their right to object to the breach or ratified the breach by continuing to accept royalty payments after the mortgaging.  These arguments are essentially the same as those asserted with respect to the issue of assignment subsequent to the Sev.en Energy Merger, and the

court's determination of the matter is the same, namely, that there was no waiver on the part of Pocahontas Land, which has aggressively asserted its rights under the 1937 Lease prior to and during litigation.

## IV. CONCLUSION

Based on the foregoing, it is ORDERED that:

1. Pocahontas Land's Motion for Partial Summary Judgment (which relates only to its Count III counterclaim) (ECF No. 102) be, and it hereby is, GRANTED; and

2. Plaintiffs' Motion for Summary Judgment (ECF No. 105) be, and it hereby is, GRANTED as to Count I of Pocahontas Land's counterclaim and DENIED as to Count II except as to whether consent was unreasonably withheld and DENIED as to Count III of Pocahontas Land's counterclaim.

Remaining is the issue, under Count I of plaintiffs' one-count complaint and Count II of Pocahontas Land's counterclaim, whether Pocahontas Land unreasonably withheld consent to the Sev.en Energy Merger, and the ultimate entry of declaratory judgment.

The Clerk is directed to transmit copies of this order to all counsel of record and any unrepresented parties.

ENTER: March 27, 2024

John T. Copenhaver, Jr.
Senior United States District Judge