UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

ROCKWELL MINING, LLC and
BLACKHAWK LAND AND RESOURCES,
LLC,

        Plaintiffs,

v.                                Civil Action No. 2:20-cv-00487

POCAHONTAS LAND LLC,

        Defendant.

<u>MEMORANDUM OPINION AND ORDER</u>

      Pending is defendant Pocahontas Land LLC's ("Pocahontas Land") Motion for Leave to Amend its Counterclaim (ECF No. 168), filed May 22, 2024; Pocahontas Land's Motion for Summary Judgment on Count II of Pocahontas Land's Counterclaim, and Clarification of Relief Sought (ECF No. 169), filed May 22, 2024; and plaintiffs Rockwell Mining, LLC ("Rockwell") and Blackhawk Land and Resources, LLC's ("Blackhawk Land") (collectively, "plaintiffs") Second Motion for Summary Judgment (ECF No. 171), filed May 22, 2024.

<u>I. BACKGROUND</u>

      As this matter primarily concerns the history and current status of a 1937 coal lease and the rights and duties of

the parties thereunder, it is appropriate to begin by recounting the relevant history of the leasehold.  For a more detailed account of the history of the lease, see the court's Memorandum Opinion and Order, ECF No. 155, entered March 27, 2024 (hereinafter, the "March Order").

A.   The 1937 Lease

On July 1, 1937, Loup Creek Colliery Company leased approximately ten thousand acres for coal mining purposes in Wyoming and Boone County to The Koppers Coal Company by way of an Indenture of Lease ("1937 Lease").[1]  See March Order at 2; Indenture of Lease, July 1, 1937, Stip. Ex. 1, ECF No. 163-1 (hereinafter "1937 Lease").  The lease provides for unilateral twenty-year renewals of the lease term by the lessee and flat-rate royalties for mined coal with a minimum annual rental fee.  See March Order at 2; 1937 Lease, Arts. 3, 4, 23.  The lease has been continuously renewed since its inception in 1937; the current lease term expires in 2037.  See March Order at 2–3; Notice of Acceptance & Renewal, Def.'s Mot. to File Under Seal Ex. 2, ECF No. 104-1.

Central to much of the current litigation is Article Sixteen of the 1937 Lease, which prohibits the assignment,

---

[1] The lease now covers 34,905 acres.  See Second Blackburn Aff. ¶ 3, Def.'s Resp. Ex. 1, ECF No. 182-1.

mortgage, conveyance, sublet, or underlet of the lease without the consent of the lessor.  See March Order at 3-4; 1937 Lease Art. 16.

The current lessor under the 1937 Lease is defendant Pocahontas Land, which is the modern surviving entity of a 1964 merger between Pocahontas Land Corporation and The Wandle Company.  See March Order at 4.  Prior to the events contested in this and the previous round of summary judgment briefing, the 1937 Lease was assigned to a new lessee three times.  See March Order at 5.  In 2011, Patriot Coal Corporation ("Patriot Coal"), the parent of then-lessee Eastern Associated Coal, LLC ("Eastern LLC"), filed for bankruptcy.  See March Order at 6.  In 2015, as a result of the Patriot Coal bankruptcy, the assets of Eastern LLC, including the 1937 Lease, were sold in an asset purchase agreement with Blackhawk Mining LLC ("Blackhawk Mining") to Rockwell, one of the plaintiffs in this action and a subsidiary of Blackhawk Mining.  See March Order at 6.  The transfer of the lease was effectuated by a Lease Assignment and Assumption Agreement effective October 26, 2015.  See March Order at 6; Stip. ¶ 13.

On December 21, 2015, Pocahontas Land, Rockwell, and plaintiff Blackhawk Land (another subsidiary of Blackhawk Mining) entered into a Consent and Amendment Agreement ("2015

3

Consent and Amendment") whereby Pocahontas Land consented to the sublease by Rockwell of a portion of the 1937 Lease property to third-party Coronado Coal II, LLC ("Coronado").  See March Order; Consent and Amendment Agreement, Dec. 21, 2015, Stip. Ex. 2, ECF No. 163-2 (hereinafter "2015 Consent & Amend."). Critically, the 2015 Consent and Amendment amended Article Sixteen of the 1937 Lease, expanding the scope of the anti-assignment provision to require the lessor's consent, which is not to be unreasonably withheld, when "50.1% or more of the lessee's capital stock or membership interests" change control, directly or indirectly, to persons or entities other than those who control that stock or interest at the time the contract was made.  2015 Consent & Amend. at 7; see March Order at 85–86.

On March 16, 2016, by agreement between Pocahontas Land, Blackhawk Mining, and Deutsche Bank AG New York Branch ("Deutsche Bank"), Pocahontas Land consented to Blackhawk Mining's mortgaging of the leasehold to Deutsche Bank as collateral agent for certain creditors.  See March Order 8-9; Consent to Leasehold Mortgages, Mar. 16, 2016, Stip. Ex. 3, ECF No. 162-3 (hereinafter "2016 Consent to Mortgages").

Blackhawk Mining, parent company of plaintiffs Rockwell and Blackhawk Land, filed for bankruptcy in July 2019. See March Order at 9.  Blackhawk Mining was reorganized

4

(sometimes, "Reorganized Blackhawk") and its prior lien loans were satisfied.  <u>See</u> March Order at 9.  On January 22, 2020, as part of the bankruptcy exit financing, plaintiffs entered into two credit agreements pledging the 1937 Lease as collateral under two different Leasehold Credit Line Deeds of Trust, one for the benefit of Cantor Fitzgerald Securities, LLC ("Cantor Fitzgerald"), and the other for MidCap Funding IV Trust ("MidCap Funding").  <u>See</u> March Order at 10–11; Leasehold Credit Line Deed of Trust by Rockwell to Cantor Fitzgerald at 7–8, Stip. Ex. 14, ECF No. 163-14 (pp. 2–45) (hereinafter "2020 Cantor Fitzgerald Deed of Trust"); Leasehold Credit Line Deed of Trust by Rockwell to MidCap Funding at 7–8, Stip. Ex. 14, ECF No. 163-14 (pp. 46–90) (hereinafter "2020 MidCap Funding Deed of Trust").  Pocahontas Land's consent was neither requested nor obtained. <u>See</u> March Order at 11.  On March 11, 2020, Pocahontas Land sent Rockwell a notice of default for its mortgaging of the leasehold under the two deeds of trust without Pocahontas Land's consent. <u>See</u> March Order at 11–12.

On June 1, 2020, Blackhawk Mining merged with BH Mining Merger Sub, LLC ("BH Mining"), a wholly-owned subsidiary of Sev.en US Met Coal Inc. ("Sev.en Energy") (this event hereinafter, "Sev.en Energy Merger").  <u>See</u> March Order at 12. The transaction, structured as a reverse-triangular merger, resulted in Blackhawk Mining, the surviving entity, being

wholly-owned by Sev.en Energy.  See March Order at 12-13.

Blackhawk Mining notified Pocahontas Land of the planned merger

by email on May 23; the merger was signed the next day, May 24,

and closed on June 1.  See March Order at 13; Email from C.

Salyer to K. Xia & J. Jeffries, May 23, 2020, Stip. Ex. 19, ECF

No. 163-19.  Pocahontas Land did not grant consent for the

merger and on June 11, 2020, sent a second notice of default to

both Rockwell and Blackhawk Mining because of the merger.  See

March Order at 14; Notice of Default, June 11, 2020, Stip. Ex.

24, ECF No. 163-24.

On July 17, 2020, plaintiffs initiated this action.

Rockwell again pledged the 1937 Lease under three

deeds of trust in 2021 and 2022, all three of which appear to

replace the 2020 Cantor Fitzgerald Deed of Trust.  See March

Order at 15; Stip. ¶ 47.  They are all titled "Amended and

Restated Leasehold Credit Line Deed of Trust," are all for the

benefit of Cantor Fitzgerald, and increase the total debt from

the original amount of $85,000,000 to $350,000,000.  See March

Order at 15; Amend. & Restated Leasehold Credit Line Deed of

Trust from Rockwell to Cantor Fitzgerald, Nov. 12, 2021, Stip.

Exs. 27, ECF No. 163-27; Amend. & Restated Leasehold Credit Line

Deed of Trust from Rockwell to Cantor Fitzgerald, Nov. 21, 2021,

Stip. Exs. 28, ECF No. 163-28; Amend. & Restated Leasehold

Credit Line Deed of Trust from Rockwell to Cantor Fitzgerald, Nov. 12, 2021, Stip. Exs. 29, ECF No. 163-29.  These three new deeds of trust are dated November 21, 2021; one was recorded in Boone County on February 9, 2022 (ECF No. 163-28); two were recorded in Boone and Wyoming Counties on January 25, 2022 (ECF Nos. 163-27, 163-29).  See March Order at 15; Stip. ¶ 47.  The 2020 Deed of Trust to MidCap Funding appears to remain unaltered.  See March Order at 15.  On September 15, 2023, in response to these three 2022 Deeds of Trust, Pocahontas Land sent Rockwell a third notice of default.  See March Order at 16; Notice of Default, Sept. 15, 2023, Stip. Ex. 30, ECF No. 163-30.

Pocahontas Land continued to accept monthly royalty payments from Rockwell after the notices of default and initiation of this action, and there is no evidence that it has since refused any of these payments.  See March Order at 16.

B.  Procedural History

Plaintiffs filed their single-count complaint (ECF No. 1) on July 17, 2020, seeking a declaratory judgment that "the 1937 Lease is still valid and Poca[hontas] Land does not have the right to terminate the 1937 Lease" on account of the Sev.en Energy Merger.  Compl. ¶ 42.  Pocahontas Land filed its answer and three-count counterclaim (ECF No. 11) on October 2, 2020, seeking a declaration that: (I) the 1937 Lease's flat-rate

royalty provision is unconscionable and subject to reformation or termination of the lease; (II) the 1937 Lease's consent provision is enforceable and Rockwell's failure to obtain Pocahontas Land's consent to the Sev.en Energy Merger breached the lease; and (III) the 1937 Lease's prohibition against mortgages is enforceable and Rockwell's failure to obtain Pocahontas Land's consent when mortgaging the leasehold for the benefit of Cantor Fitzgerald and MidCap Funding breached the lease.  Counterclaim ¶¶ 75, 90, 102.  The counterclaim also contained a fourth count regarding another entity, Hampden Coal, LLC, but Pocahontas Land has since voluntarily dismissed this count and third-party claim.  See Counterclaim ¶ 109; Stipulation of Voluntary Dismissal, ECF No. 29.

There followed the first round of summary judgment briefings.  Pocahontas Land moved for partial summary judgment as to Count III of its counterclaim regarding the January 2020 deeds of trust that mortgaged the leasehold.  See Def.'s Mot. Partial Summ. J., ECF No. 102.  Plaintiffs moved for summary judgment on all outstanding claims, which consisted of Pocahontas Land's three counterclaims (unconscionability of the lease, whether the merger breached the lease, and whether the deeds of trust breached the lease), and plaintiffs' claim seeking a declaration that the Sev.en Energy Merger did not

require Pocahontas Land's consent and did not breach the lease.
See Pls.' Mot. Summ. J., ECF No. 105.

In a memorandum opinion and order entered March 27,
2024 ("March Order"), the court granted Pocahontas Land's Motion
for Partial Summary Judgment (relating to mortgages under Count
III of the counterclaim), granted plaintiffs' Motion for Summary
Judgment as to Count I of Pocahontas Land's counterclaim
(relating to royalty rate), and denied plaintiffs' Motion for
Summary Judgment as to Counts II and III of Pocahontas Land's
counterclaim, except as to the Count III issue of whether
consent to the Sev.en Energy Merger was unreasonably withheld by
Pocahontas Land.  See March Order at 110.

The following is a brief summary of the court's
conclusions in the March Order: The 1937 Lease is not
unconscionable.  March Order at 21–41.  Pocahontas Land did not
waive any claims as to plaintiffs' breaches, nor did it ratify
any breaches.  Id. at 48–64.  The 2015 Consent and Amendment
amends the entirety of the 1937 Lease and those two documents
are to be read in conjunction.  Id. at 68–74.  The Sev.en Energy
Merger is an assignment for which Pocahontas Land's consent is
required under the 1937 Lease as amended by the 2015 Consent and
Amendment, though such consent is not to be unreasonably
withheld; that the merger was structured as a reverse triangular

9

merger does not change this fact.  <u>Id.</u> at 75–91.  The 2020 Deeds of Trust were mortgages that required Pocahontas Land's consent under the 1937 Lease as amended by the 2015 Consent and Amendment.  <u>Id.</u> at 91–100.  The purported "savings clauses" did not prevent the deeds of trust from being treated as mortgaging the 1937 Lease.  <u>Id.</u> at 101–109.  Finally, Pocahontas Land did not waive its right to object to the breach or ratify the breach by continuing to accept royalty payments after the mortgaging. <u>Id.</u> at 109–110.

The only issue remaining after the March Order is whether "under Count I of plaintiffs' one-count complaint and Count II of Pocahontas Land's counterclaim . . . Pocahontas Land unreasonably withheld consent to the Sev.en Energy Merger." March Order at 110.  That this was the sole remaining issue was restated by the court during the in-person conference in chambers on April 12, 2024, wherein a timeline for proceeding with the remaining issue was set.  As anticipated in the conference, the parties filed a joint Stipulation of Facts (ECF No. 163) on May 1, 2024.  The parties proceeded to file their dispositive motions, and three motions are now pending.

First, Pocahontas Land filed its Motion for Leave to Amend its Counterclaim (ECF No. 168), on May 22, 2024, with attached Proposed Amended Counterclaim (ECF No. 168-1) ("Def.'s

Mot. Amend."), which sought to add a claim for slander of title and a declaration that forfeiture is the appropriate remedy. Plaintiffs filed a response (ECF No. 179) on June 5, 2024 ("Pls.' Resp. to Mot. Amend."), and Pocahontas Land filed a reply (ECF No. 183) on June 12, 2024 ("Def.'s Reply Mot. Amend.").

Second, Pocahontas Land filed a motion for summary judgment entitled "Motion for Summary Judgment on Count II of Pocahontas Land's Counterclaim, and Clarification of Relief Sought" (ECF No. 169) on May 22, 2024 ("Def.'s Mot. Summ. J."), with accompanying supporting memorandum (ECF No. 170) ("Def.'s Mem. Supp."). Plaintiffs filed a response (ECF No. 180) on June 5, 2024 ("Pls.' Resp."), and Pocahontas Land filed a reply (ECF No. 182) ("Def.'s Reply") on June 12, 2024.

Third, plaintiffs filed their own Motion for Summary Judgment (ECF No. 171) ("Pls.' Mot. Summ. J.") on May 22, 2024, with accompanying supporting memorandum (ECF No. 176) ("Pls.' Mem. Supp."). Pocahontas Land filed a response (ECF No. 181) ("Def.'s Resp.") on June 5, 2024, and plaintiffs filed a reply (ECF No. 184) ("Pls.' Reply") on June 12, 2024.

11

## II. MOTION TO AMEND COUNTERCLAIM

The court first considers Pocahontas Land's Motion for Leave to Amend its Counterclaim, made pursuant to Federal Rule of Civil Procedure 15(a), and filed nearly four years after its initial counterclaim.

Pocahontas Land's reliance on Rule 15(a) for the governing standard for its motion is insufficient; the good cause standard of Rule 16(b), which governs modification of the scheduling order, must also be met.  See <u>Nourison Rug Corp. v. Parvizian</u>, 535 F.3d 295, 298 (4th Cir. 2008); <u>Faulconer v. Centra Health, Inc.</u>, 888 F. App'x 148, 152 (4th Cir. 2020); <u>CBX Techs., Inc. v. GCC Techs., LLC</u>, 533 F. App'x 182, 183 (4th Cir. 2013) (per curiam); <u>Marcum v. Zimmer</u>, 163 F.R.D. 250, 254 (S.D.W. Va. 1995); <u>Stewart v. Coyne Textile Servs.</u>, 212 F.R.D. 494, 495 (S.D.W. Va. 2003).  Rule 16(a) provides that where, as here, "the deadlines provided by a scheduling order have passed, the good cause standard must be satisfied to justify leave to amend the pleadings." <u>Nourison Rug</u>, 535 F.3d at 298; <u>see also</u> <u>Attkisson v. Holder</u>, 925 F.3d 606, 626 (4th Cir. 2019), <u>as amended</u> (June 10, 2019).  The Fourth Circuit has noted that, generally, "'a motion to amend should be made as soon as the necessity for altering the pleading becomes apparent.'" <u>Deasy</u>

<u>v. Hill</u>, 833 F.2d 38, 41 (4th Cir. 1987) (quoting 6 Wright &

Miller, <u>Federal Practice & Procedure</u> § 1488 (1971)).

　　　　"The touchstone of 'good cause' under Rule 16(b) is

the diligence of the party seeking amendment." <u>Morris v.</u>

<u>Mullins</u>, No. 2:23-cv-00039, 2023 WL 8241549, at *2 (S.D.W. Va.

Nov. 28, 2023) (Copenhaver, J.) (citing <u>Felman Prod., Inc. v.</u>

<u>Indus. Risk Insurers</u>, Civ. No. 3:09-0481, 2010 WL 3119338, at *2

(S.D.W. Va. July 28, 2010) (Chambers, J.)); <u>see</u> <u>Stewart</u>, 212

F.R.D. at 495-96.  The court in <u>Marcum</u> explained:

> The district court may modify the pretrial
> schedule "if it cannot reasonably be met
> despite the diligence of the party seeking the
> extension."  Moreover, carelessness is not
> compatible with a finding of diligence and
> offers no reason for a grant of relief. . . .
> Although the existence or degree of prejudice
> to the party opposing the modification might
> supply additional reasons to deny a motion,
> the focus of the inquiry is upon the moving
> part's reasons for seeking modification.

163 F.R.D. at 254; <u>see</u> <u>also</u> <u>Bhambhani v. Neuraxis, Inc.</u>, No. 22-

1764, 2024 WL 2815063, at *2 (4th Cir. June 3, 2024) ("Only

diligent efforts to comply with the scheduling order can satisfy

Rule 16's good cause standard.") (citing <u>Kmak v. Am. Century</u>

<u>Cos., Inc.</u>, 873 F.3d 1030, 1034 (8th Cir. 2017)); <u>Faulconer</u>, 888

F. App'x at 182 ("'[I]f a movant has not been diligent in

meeting the scheduling order's deadlines,' then other factors –

including the presence of absence of prejudice to the other

party – generally will not be considered." (quoting Kmak, 873
F.3d at 1034) (alteration in original)).

       Pocahontas Land's counterclaim was filed on October 2,
2020.  The initial scheduling order in this case (ECF No. 35),
entered January 14, 2021, set the deadline to amend the
pleadings as February 26, 2021.[2]  The parties then engaged in
discovery and, on November 22, 2021, filed the first round of
summary judgment motions.  The court ruled on those summary
judgment motions on March 27, 2024.  Now, pursuant to a motion
filed in May 2024, Pocahontas Land seeks to amend its
counterclaim, filed three and a half years prior, to include a
slander of title claim and a claim seeking a declaration that
Pocahontas Land is entitled to terminate the 1937 Lease as a
remedy for plaintiffs' breaches of the lease.  See Def.'s Mot.
Amend at 2; Proposed Amend. Counterclaim ¶¶ 108, 110–113.

       Pocahontas Land asserts that the bases for its motion
to amend its counterclaim are (1) the court's March Order ruling
that the deeds of trust violated the 1937 Lease and exposed
Pocahontas Land to a potential cloud on its title, (2) the three
additional deeds of trust entered into by plaintiffs in November

_____

[2] Additional scheduling orders were entered, all after the
February 26 deadline, and none extended time to amend the
pleadings.

14

2021, and (3) the additional notice of default sent by Pocahontas Land to plaintiffs in 2023.  <u>See</u> Def.'s Mot. Amend at 2.  Pocahontas Land argues that it has acted diligently in pursuing its rights, the amendment is not futile, and it does not unfairly prejudice the plaintiffs.  <u>See</u> Def.'s Amend Reply at 2–4.  It argues that justice so requires the amendment because it is necessary to "put an end to Plaintiffs' overt contempt," and that if Pocahontas Land is unable "to pursue this relief, there will be no end to Plaintiffs' violations of Poca[hontas] Land's rights, rendering the terms of the Lease meaningless [], maintaining Plaintiffs' hold on the land through perpetual renewal, and leaving Poca[hontas] Land without any recourse."  Def.'s Mot. Amend at 4–5.

Plaintiffs respond that Pocahontas Land's motion to amend fails to demonstrate good cause, that Pocahontas Land did not act diligently in pursuing the additional claims, and, further, the amendment is both prejudicial and futile.  <u>See</u> Pls.' Resp. Mot. Amend at 1–2.  Plaintiffs emphasize that the deadline to amend the pleadings expired over three years ago and that because Pocahontas Land knew of the underlying conduct on which it bases the proposed slander of title claim when the case began, Pocahontas Land cannot establish good cause for its motion.  <u>See</u> <u>id.</u> at 4–5.

The scheduling order deadline for amending the pleadings having long since passed, Pocahontas Land must satisfy Rule 16(b)'s good cause standard to be granted leave to amend its counterclaim.  The court finds that it has not.  Although Pocahontas Land points to developments in the case subsequent to the scheduling order as reasons for the amendment — specifically the March Order and the additional deeds of trust — the underlying facts on which the proposed slander of title claim is based occurred before the case was filed.  The proposed slander of title claim is largely based on the same facts as the originally filed counterclaim; the additional deeds of trust do not change this, as there were deeds of trust prior to the filing of the case that provided the same basis for that claim. Similarly, the March Order made judicial determinations but did not create new causes of action.  The court cannot find any reason why Pocahontas Land could not have raised the slander of title claim when it first filed its counterclaim, and can only conclude that it did not make this claim because it did not realize that such a claim may have been available.

Mere failure to identify or argue a theory of recovery — for such a lengthy period — is not an adequate reason to amend the scheduling order, return to the pleading stage, and potentially return to discovery proceedings long after the time for such things has passed.  Indeed, this is comparable to the

facts in Nourison Rug, where, on appeal, appellant challenged, among other things, the district court's denial of a motion to amend the pleadings so as to add a defense.  535 F.3d at 298. The only reason counsel provided for his failure to amend the pleading in a timely manner was that he had not previously realized that the defense was available.  Id.  The court upheld the denial of leave to amend, writing that counsel's explanation for his failure to raise the defense in a timely manner "is far short of what is required to satisfy the good cause standard." Id.  There, as in this case, a motion for leave to amend the pleadings long after the deadline for amending the pleadings had passed, based only on the fact that the movant did not think to raise the issue previously, does not meet Rule 16(b)'s good cause standard.

As to Pocahontas Land's fears that it will be unable to enforce its rights without the amendment seeking a declaration that the remedy for the breach is forfeiture of the lease, this concern is without merit.  Based on the current counterclaim, Pocahontas Land has all remedies available to it under the law for breach of the 1937 Lease – it cannot claim it is without recourse.  Thus, Pocahontas Land's motion to amend the counterclaim is denied.

## III. MOTIONS FOR SUMMARY JUDGMENT

### A.   Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Courts at this stage do not resolve disputed facts, weigh evidence, or make determinations of credibility. See Russell v. Microdyne Corp., 65 F.3d 1229, 1239 (4th Cir. 1995); Sosebee v. Murphy, 797 F.2d 179, 182 (4th Cir. 1986). Material facts are those necessary to establish the elements of a party's cause of action.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also The News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth., 597 F.3d 570, 576 (4th Cir. 2010).  A dispute of material facts is genuine if, in viewing the record and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-moving party.  See Anderson, 477 U.S. at 248.  The moving party is entitled to summary judgment if the record, as a whole, could not lead a trier of fact to find for the non-moving party.  See Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly

supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson, 477 U.S. at 247-48 (emphasis in original). "[A] party opposing a properly supported motion for summary judgment '"may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial."'" Id. at 248 (quoting First Nat'l Bank of Ariz v. Cities Serv. Co., 391 U.S. 253 (1968) (quoting Fed. R. Civ. P. 56(e))) (ellipses in original); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 584 (1986) (the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts"). A non-movant who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" will lose at summary judgment because "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

"When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (quoting Philip Morris Inc. v. Harshbarger, 122

19

F.3d 58, 62 n. 4 (1st Cir. 1997)).  Additionally, under West
Virginia law "it is well recognized that '[t]he interpretation
of [a] contract, including the question of whether the contract
is ambiguous, is a legal determination . . . .'"  <u>Bruce McDonald</u>
<u>Holding Co. v. Addington, Inc.</u>, 825 S.E.2d 779, 784 (W. Va.
2019) (alterations in original) (quoting Syl. Pt. 2, <u>Riffe v.</u>
<u>Home Finders Assocs., Inc.</u>, 517 S.E.2d 313 (W. Va. 1999)).

B.   <u>Request for Reconsideration</u>

     A number of highly contested issues were briefed by
the parties in the first round of summary judgment briefings and
were ruled upon by the court in its March Order.  The parties
argued whether the 1937 Lease was unconscionable due to its
royalty rate that is far below what would be agreed to in a
modern coal lease; the court found it was not unconscionable and
refused to order that the lease be reformed on that ground.  <u>See</u>
March Order at 41.  The parties argued whether the terms of the
2015 Consent and Amendment applied to the entirety of the 1937
leasehold or only the limited portions of the leasehold
described therein; the court determined that the 2015 Consent
and Amendment applied to, and thus amended, the entirety of the
1937 leasehold.  <u>See</u> <u>id.</u> at 74.  The parties argued whether the
Sev.en Energy Merger breached the consent term of the 1937 Lease
as amended by the 2015 Consent and Amendment; the court held

that the merger, if consent was not obtained and not
unreasonably withheld, breached the lease.  See id. at 90-91.
And the parties argued whether the mortgaging of the 1937 Lease
in various deeds of trust breached the lease; the court ruled
that it did.  The court also rejected the plaintiffs'
affirmative defenses to the counterclaims of waiver and
ratification.  See id. at 47-64.

     In this second round of summary judgment briefing,
plaintiffs present evidence and legal argument on matters
already ruled upon by the court in its March Order.  Plaintiffs
argue that they are not seeking reconsideration, but instead are
offering legal arguments that they did not make in the first
round of summary judgment briefing.  Regardless of how
plaintiffs frame it, they are requesting that the court return
to issues already addressed and ruled upon by the court with the
hope that there will be a different outcome.  The court thus
considers this as a motion for reconsideration.

     It is within the court's discretion to grant or deny
such a request.  See Am. Canoe Ass'n v. Murphy Farms, Inc., 326
F.3d 505, 515 (4th Cir. 2003).  This is not a true motion for
reconsideration pursuant to Federal Rule of Civil Procedure
59(e), as the court has not yet entered final judgment in this
case, due to the remaining issues of consent and damages that

the parties were asked to brief in this second round.  **See generally** Fed. R. Civ. P. 59(e); **Am. Canoe Ass'n**, 326 F.3d at 514–15.  The Fourth Circuit has written that "a district court retains the power to reconsider and modify its interlocutory judgments, including partial summary judgments, at any time prior to final judgment when such is warranted." **Am. Canoe Ass'n**, 326 F.3d at 514–15 (citing **Fayetteville Invs. v. Com. Builders, Inc.**, 936 F.2d 1462, 1469 (4th Cir. 1991); Fed. R. Civ. P. 54(b)).

Yet the caselaw on Rule 59(e) remains a useful guideline for the court.  It provides that such a motion may be granted in one of three circumstances: (1) to accommodate an intervening change in controlling law, (2) to account for new evidence not available at trial, or (3) to correct a clear error of law or prevent manifest injustice." **Projects Mgmt. Co. v. DynCorp Int'l, LLC**, 17 F. Supp. 3d 539, 541 (E.D. Va. 2014), **aff'd**, 584 F. App'x 121 (4th Cir. 2014) (citing **Hutchinson v. Staton**, 994 F.2d 1076, 1081 (4th Cir. 1993)).  It is inappropriate to use such a motion to "relitigate old matters," **Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co.**, 148 F.3d 396, 403 (4th Cir. 1998), or to "reargue a previous claim," **United States v. Smithfield Foods, Inc.**, 969 F. Supp. 975, 977 (E.D. Va. 1997).  A motion for reconsideration of a judgment is an "extraordinary

remedy which should be used sparingly." Pac. Ins. Co., 148 F.3d at 403.

The court, in its discretion, is not inclined to delve back into the complex matters which it has already spent much time evaluating. Taking guidance from the Rule 59(e) circumstances in which the court will grant relief from a final judgment, plaintiffs do not argue that there has been any intervening change in controlling law or that new evidence has presented itself. Nor, having reviewed the plaintiffs' briefing, does the court believe there is a clear error of law or that a manifest injustice will befall the plaintiffs as a result of the decision. Despite plaintiffs' exquisite effort, the fact of the matter is that the deed of trust in issue did mortgage the 1937 Lease. These matters are adequately examined in the court's March Order. Plaintiffs seek reconsideration on grounds not previously advanced, which involves neither a miscarriage of justice nor a change in the law.

Much like Pocahontas Land and its motion to amend the counterclaim, plaintiffs ought to have raised these arguments at the proper time. The court stands by its March Order and will not reconsider those conclusions already made.

C.   <u>Motion to Partially Strike Affidavit</u>

In plaintiffs' reply to Pocahontas Land's response to their motion for summary judgment, plaintiffs include a subsection entitled "Motion to partially strike affidavit: 'Sham' or self-serving affidavit," referring to the affidavit of Greg Wooten attached to Pocahontas Land's response as exhibit 1. <u>See</u> Pls.' Reply at 15; <u>see also</u> Wooten Aff., Def.'s Resp. Ex. 1, ECF No. 181.  Plaintiffs argue that parts of the affidavit ought not to be considered because they contradict his deposition testimony but plaintiffs do not provide a legal argument for striking those parts of the affidavit beyond that statement. Pls.' Reply at 15–16.  Insofar as this matter is before the court for summary judgment proceedings and the court may also consider the transcript of Greg Wooten's deposition, supplied by the parties, it is unnecessary to strike any portion of the Wooten Affidavit.

D.   <u>Whether Consent Was Unreasonably Withheld</u>

Turning to the issues that the court asked the parties to brief, the court first considers the question of whether Pocahontas Land unreasonably withheld consent to the Sev.en Energy Merger.  If it did, then the merger did not breach the lease.  If Pocahontas Land's withholding of consent was reasonable, or if it was not given adequate time to consider the

24

request, then, per the court's March Order, the merger was a
breach of the 1937 Lease.

    1.    Background

        On January 22, 2020, plaintiffs executed two Leasehold
Credit Line Deeds of Trust, which the court has already
determined breached the 1937 Lease's provision prohibiting the
mortgaging of the leasehold without the lessor's consent.  See
Stip. ¶ 26; March Order at 100, 109.  On March 11, 2020, in
response to the deeds of trust, Pocahontas Land sent a Notice of
Default to Rockwell.  See Stip. ¶ 28; Stip. Ex. 15.  The sixty-
day cure period provided for in the March 2020 Notice of Default
expired without resolution.  See Wooten Aff. ¶ 13.

        On May 22, 2020, shortly after the expiration of the
cure period for the March default notice, Kai Xia, Executive
Vice President of Pocahontas Land, sent a letter to plaintiffs
regarding the Sev.en Energy Merger.  See Stip. ¶ 35; Stip. Ex.
18.  The letter references a telephone conversation in which
plaintiffs made Pocahontas Land aware of the proposed merger,
but does not provide a date for the telephone call, nor do the
parties do so in any of the briefings.  See Stip. Ex. 18.  Thus,
the earliest the court can assume Pocahontas Land knew of the
proposed merger was May 22.  That letter quotes the 2015 Consent
and Amendment provision that amends Article Sixteen of the 1937

Lease and advises that Pocahontas Land's consent is required for
the merger.  See id.  It closes by acknowledging the short time
frame for the proposed merger but reiterates that Pocahontas
Land requires "all of the details and documentation concerning
the transaction in order to properly evaluate the transaction
and to determine whether it meets the requirements of the above
Amendment to the Pocahontas Land Lease."  Id.  To that end, the
letter says Pocahontas Land will "shortly" send a diligence list
requesting the information necessary to make that determination.
See id.

        The next day, May 23, Chad Salyer of Reorganized
Blackhawk sent an email to Kai Xia and John Jeffers, also of
Pocahontas Land, with several documents relating to the merger:
a draft "Form Change in Control Consent," Stip. Ex. 20; a PDF
file titled "Sev.en Energy Group Profile 2020," Stip. Ex. 21;
and a PDF file titled "SEAG Group Introduction Project Bird,"
Stip. Ex. 22.  See Stip. ¶ 36; Stip. Ex. 19.  The email
explained that while Blackhawk's ultimate parent would change,
existing management of Blackhawk would remain the same.  See
Stip. Ex. 19.  The Sev.en Energy Group Profile 2020 maps out the
organization's global operations, none of which were in North
America.  See Stip. Ex. 21 at 22.  It shows three gas power
plants in the United Kingdom; headquarters and officers in
Liechtenstein and the Czech Republic; two lignite mines, a power

26

plant, and two "CHP Plants" in the Czech Republic; and two power plants in Queensland, Australia.  See id.  The Sev.en Energy Group Introduction states that it is targeting assets, "rang[ing] from coal-fired power plants to low-carbon technologies" in the United States, Central and Western Europe, and Australia, but it does not appear from the document that Sev.en Energy owned any assets in the United States or North America at the time.  See Stip. Ex. 22, ECF No. 164-2.

Also on May 23, Jesse Parrish, CEO of Blackhawk Mining, emailed a form Non-Disclosure Agreement to several executives at Pocahontas Land, including Kai Xia and John Jeffers.  Stip. ¶ 39; see Stip. Ex. 23, ECF No. 164-3.  Four days later, on May 27, John Jeffers replied to the email with a marked-up version of the non-disclosure agreement with some minor revisions.  Stip. ¶ 40; see Stip. Ex. 23.  The May 27 email also stated that Pocahontas Land's "financial advisor will separately provide a due diligence request list for its financial review," Stip. Ex. 23, which Jesse Parrish says was never provided to Blackhawk, see First Parrish Aff. ¶ 21, Pls.' Mot. Summ. J., ECF No. 171-2.

On May 31, Jesse Parrish emailed John Jeffers and others more information on Sev.en Energy, including an "Investor Meeting" deck, the merger agreement, Blackhawk's 2020

27

projections, and preliminary statements on Blackhawk's 2019 audited financials.  <u>See</u> Stip. ¶ 41; Stip. Ex. 23.

The Sev.en Energy Merger was signed on May 23, 2020, and closed on June 1, 2020.  Stip. ¶ 42.  In response to the merger, on June 11, 2020, Pocahontas Land sent plaintiffs a second notice of default.  Stip. ¶ 43; Stip. Ex. 24.

Plaintiffs have continued to request Pocahontas Land's consent after the execution of the merger.  On May 24, 2021, plaintiffs sent Pocahontas Land a letter again requesting Pocahontas Land's consent to the merger.  <u>See</u> Stip. ¶ 46; Stip. Ex. 26.  Blackhawk again requested that Pocahontas Land consent to the merger after the court entered its March Order, on April 11, 2024.  <u>See</u> Stip. ¶ 51; Stip. Ex. 36; First Parrish Aff. ¶ 24.

Blackhawk's Jesse Parrish explained that the reason there was such a short turnaround on the Sev.en Energy Merger, and thus such limited time to seek consent was due to conditions imposed by Sev.en Energy.  First Parrish Aff. ¶ 11.  Parrish says Blackhawk was in a bad financial position in the spring of 2020 due to market conditions caused by the Covid pandemic; the company "projected an operating deficit of over $50 million dollars ($50,000,000) and did not have sufficient liquidity or access to capital to continue doing business."  <u>Id.</u> at ¶ 6.  By

April 1, 2020, Blackhawk "had a debt maturity of approximately $36.3 million ($36,300,000)" and lacked the funds to pay that debt.  First Parrish Aff. ¶ 7.  That debt maturity was due on June 1, 2020.  Id. at ¶ 8.  Some at Blackhawk pushed for liquidation of the company to recoup funds, which would have resulted in the company shutting down and the layoff of all of its employees.  Id. at ¶ 9.  Another possibility was to seek additional sources of capital, which led to the introduction of Blackhawk to Sev.en Energy.  Id. at ¶ 10.

"After an approximately month-long due diligence process, on May 18, 2020, Sev.en Energy presented Reorganized Blackhawk with an offer to purchase the company's debt and equity that would be revoked after two weeks on June 1, 2020." Id. at ¶ 11.  The Agreement and Plan of Merger was executed on May 24, 2020, the majority shareholder vote approving the merger occurred on May 27, and the merger closed on June 1.  Id. at ¶¶ 14, 17, 18.  Parrish again emphasized the tight timeline: "If Reorganized Blackhawk did not close the Sev.en Energy Reverse Triangular Merger within Sev.en Energy's two-week timeframe, Reorganized Blackhawk would default on its debts maturity and would not have been able to continue operating and paying its employees."  First Parrish Aff. ¶ 20.

2.   Legal Standard

There is a dearth of West Virginia law on when withholding consent is reasonable, so the court turns to other jurisdictions and treatises.  Comment g to the Restatement (Second) of Property: Landlord & Tenant, section 15.2 (1977, June 2020 update), says, succinctly: "A reason for refusing consent, in order for it to be reasonable, must be objectively sensible and of some significance and not based on mere caprice or whim or personal prejudice."  Many courts have used what they refer to as a commercial reasonableness or reasonable businessperson standard.  See Cowan v. Chalamidas, 644 P.2d 528, 530 (N.M. 1982) (quoting Fernandez v. Vazquez, 397 So. 2d 1171 (Fla. App. 1981)) (referring to "general contract principles of good faith and commercial reasonableness"); Rowley v. City of Mobile, 676 So. 2d 316, 318–19 (Ala. Civ. App. 1995) (quoting Homa-Goff Interiors, Inc. v. Cowden, 350 So. 2d 1035, 1038 (Ala. 1977)) (applying a "reasonable commercial standard"); 1963 Jackson, Inc. v. De Vos, 436 S.W.3d 278 (Tenn. App. 2013) (citing First Am. Bank of Nashville, N.A. v. Woods, 781 S.W.2d 588, 590 (Tenn. App. 1989)) (applying "reasonable commercial standard").

Expanding on this, one court wrote of the commercial reasonableness standard:

> That standard is generally understood to
> include the elements of good faith and fair
> dealing. Id. The landlord cannot consent
> solely to extract economic concessions or
> improve its economic position. Dick
> Broadcasting Co.[ of Tenn.] v. Oak Ridge FM,
> Inc., No. E2010-01685-COA-R3-CV, 2011 WL
> 4954199, at *10 (Tenn. Ct. App. Oct. 19, 2011)
> (quoting 1010 Potomac Assocs. v. Grocery
> Manuf. of Am., Inc., 485 A.2d 199, 209-10
> (D.C. 1984)). The "primary factor in
> determining whether the landlord acted in good
> faith and in a commercially reasonable manner
> is the 'financial responsibility of the
> proposed subtenant.'" Woods, 781 S.W.2d at
> 590 (quoting Fernandez[], 397 So. 2d [at
> 1174]). To determine whether consent was
> unreasonably withheld, we focus on the
> reasonableness of the landlord's perception
> that the proposed assignee presents financial
> or other risks. Id.

1963 Jackson, 436 S.W.3d at 292.

The New Mexico Supreme Court wrote that "[a] lessor may refuse consent when the proposed assignment or sublease would injure or impair the lessor's interest in the leased property, such as by devaluing it." Econ. Rentals, Inc. v. Garcia, 819 P.2d 1306, 1317 (N.M. 1991) (citations omitted). A New York state appellate court found that consent was not unreasonably withheld where the tenant was in default of its rent obligation. NNA Rest. Mgmt. LLC v. Eshaghian, 815 N.Y.S.2d 499, 501 (N.Y. App. 2006). Another New York court held that withholding consent was not unreasonable where the tenant refused to pay the amount of rent stipulated in the most recent lease modification, thus short-changing the landlord on the rent

obligation.  <u>See</u> <u>Sayed v. Rapp</u>, 782 N.Y.S.2d 278, 281 (N.Y. App. 2004).

It is agreed that it is unreasonable to withhold consent for the purpose of securing an economic benefit.  <u>See</u> <u>Econ. Rentals</u>, 819 P.2d at 1316 (collecting cases).  In <u>Pantry, Inc. v. Mosley</u>, 126 So. 3d 152 (Ala. 2013), the court found that consent was unreasonably withheld where the predominant reason it was withheld, as determined by the trial court, was to improve the rent provisions: "we conclude that it is unreasonable for a landlord to withhold consent to an assignment of a lease in order that the landlord may extract higher rent than contracted for in the lease agreement."  126 So. 3d at 159 (collecting cases) (citing 29 <u>Williston on Contracts</u> § 74:22 (4th ed.) ("It is . . . unreasonable to deny consent in order that the landlord may charge a higher rent than originally contracted for . . . .")).

Courts that have addressed the issue seem to be in agreement that a lessor cannot be expected to consent to an assignment or sublease if the lessor is not given notice of the assignment, nor given information on the new lessee.  In <u>Rowley</u>, the Alabama appellate court wrote that "a landlord cannot reasonably be expected to consent to an assignment of a lease without knowing the identity of, and having pertinent

information about, a proposed assignee."  676 So. 2d at 319.

Thus, the court held, "a landlord does not unreasonably withhold

consent to an assignment unless the landlord is presented with –

and rejects – a prospective assignee who is ready to assume the

lease and who meets commercially reasonable standards."  Id.

The court added that, in this vein, "[a] lessor does not

unreasonably withhold consent by requesting further information

about the proposed sublessee."  Id. at 320 (citing McKeon v.

Williams, 799 P.2d 198 (Or. App. 1990), aff'd, 822 P.2d 699 (Or.

1991); Vranas & Assocs., Inc. v. Fam. Pride Finer Foods, Inc.,

498 N.E.2d 333 (Ill. App. 1986)).  Another court wrote that

"[t]he lessor is under no duty to seek out such information.  In

the absence of information concerning the proposed tenancy and

the tenant, the lessor is justified in withholding consent."

D'Oca v. Delfakis, 636 P.2d 1252, 1254 (Ariz. App. 1981).  It

has similarly been found that a landlord's withholding consent

"was reasonably based on . . . tenant's failure to provide

appropriate information about [the new lessee]."  NNA Rest.

Mgmt., 815 N.Y.S.2d at 501 (citing 200 Eighth Ave. Rest. Corp.

v. Daytona Holding Corp., 740 N.Y.S.2d 330 (N.Y. App. 2002)).

> 3.   Analysis

> Article Sixteen of the 1937 Lease states:

> The Lessee further covenants and agrees that
> it will not mortgage, nor will it assign,

> convey, lease, under-let, sublet, or set over
> any of its estate, interest or term, in whole
> or in part, in the hereby leased premises or
> their appurtenances, or any part thereof to
> any person or persons whatsoever, or
> corporation whatsoever, without the license or
> consent of the Lessor, its successors or
> assigns, in writing under seal for that
> purpose being first had and obtained; and in
> case of such assignment or transfer, the
> transferee shall assume in writing all the
> obligations of the Lessee hereunder in a form
> satisfactory to the Lessor. . . .

1937 Lease, Art. 16.

The 2015 Consent and Amendment amends Article Sixteen to provide that consent is required for transfers of control and provides that Pocahontas Land shall not unreasonably withhold its consent to such a transfer:

> With respect to Article Sixteen of the
> Pocahontas Land Lease, Poca[hontas] Land,
> B[lackhawk Land and Resources] and Rockwell
> agree that the Pocahontas Land Lease is
> amended hereby to provide that a transfer of
> control of the lessee therein shall be an
> event of assignment requiring Poca[hontas]
> Land's consent, and shall be deemed to have
> occurred whenever 50.1% or more of the
> lessee's capital stock or membership interests
> shall become subject to the direct or indirect
> control of persons or entities, some or all of
> whom are different than those persons or
> entities which directly or indirectly control
> that portion of the lessee's capital stock or
> membership interests as of the effective date
> of this Consent. Notwithstanding this
> amendment to the Pocahontas Land Lease,
> Poca[hontas] Land hereby acknowledges and
> agrees that it shall not unreasonably withhold
> its consent to an assignment of the Pocahontas
> Land Lease or the B[lackhawk Land and
> Resources]-Coronado Sub-Sublease where a

34

> transfer of control as set forth above occurs
> provided the assignee has reasonable coal
> mining experience and reasonable financial
> standing.

2015 Consent & Amend. at 7.

The 1937 Lease provides that notice may be given in

the following manner:

> The giving of any notice to or the making of
> any demand on the Lessee under the provisions
> hereof shall be sufficient, if in writing
> mailed postage prepaid, addressed to the
> Lessee at . . . any such . . . address as may
> hereafter be designated by the Lessee for the
> purpose by written notice given to the Lessor.
> . . . Except as otherwise herein expressly
> provided ten (10) days shall be considered a
> reasonable time for any notice or demand.

1937 Lease, Art. 21.  The 2015 Consent and Amendment does not

amend or otherwise add to this provision.

In the March Order, the court determined that the

consent requirements of Article Sixteen of the 1937 Lease and

the amendment in the 2015 Consent and Amendment apply to the

Sev.en Energy Merger.  Plaintiffs were required to obtain the

consent from Pocahontas Land for the Sev.en Energy Merger, which

constituted a change in control as contemplated by the 2015

Consent and Amendment, and for which consent is required.  It is

uncontested that plaintiffs did not obtain Pocahontas Land's

consent to the merger.  The questions, then, are twofold:

whether plaintiffs asked Pocahontas Land for consent in a

reasonable manner and, if so, whether consent was unreasonably withheld.

The court was already wary of the apparently inadequate amount of time given to Pocahontas Land to consent before the merger was executed, as noted in its March Order:

> While at first blush the court may be inclined to find notice was not genuinely given to Pocahontas Land, there is insufficient evidence at this stage of the case for the court to resolve the issue of whether consent was unreasonably withheld, dependent as it is on the adequacy of the notice given and whether Sev.en Energy or those controlling it had reasonable coal mining experience and reasonable financial standing for an operation of the magnitude of the 1937 Pocahontas Land Lease. The issue requires further factual and legal development.

March Order at 89–90.

The materials provided by the parties in this round of summary judgment briefing show that Pocahontas Land was notified of the contemplated merger no later than May 22, 2024. The Sev.en Energy Merger was signed the very next day, on May 23, and was closed nine days later, on June 1. There is little caselaw examining how much time must be provided to the party from whom consent is required prior to the transaction. However, it is plain that one day is insufficient here. Some instruction can be gleaned from the 1937 Lease itself, which provides that notice for any matter in the lease requiring such

36

is considered adequate if it is given at least ten days before
the event at issue.  1937 Lease, Art. 21.  Thus, plaintiffs'
failure to obtain Pocahontas Land's consent to the merger prior
to its execution breached the 1937 Lease.  Plaintiffs' argument
that Pocahontas Land unreasonably withheld consent is unavailing
where the merger was signed a mere day after Pocahontas Land was
informed of the transaction.

Plaintiffs argue that even if consent was not received
prior to the transaction, Pocahontas Land should still have
consented after the fact, and indeed have continued to request
Pocahontas Land's consent to the merger in the years since.
Plaintiffs make no compelling argument as to why they were not
required to obtain consent prior to the merger, and the court is
unpersuaded.  It seems apparent that consent would need to be
obtained before the transaction; furthermore, Article Sixteen of
the 1937 Lease says that consent to an assignment or other
transaction must be "first had and obtained."

Plaintiffs explain that they sought and obtained
consent from other affiliates of theirs from whom consent was
required for the merger after the merger was completed and that
this is a normal industry practice.  This has no impact on this
matter; the lease governing the consent required between these
parties is clear, and does not hinge upon how consent may have

been sought with other parties, and which was governed by other contracts.  Similarly, plaintiffs' explanation as to why they were on such a tight timeline to close the merger, thus limiting the time in which they could notice Pocahontas Land, is unavailing.  The governing agreement here is clear; plaintiffs were required to provide adequate notice to Pocahontas Land and obtain its consent prior to the merger, which they did not do. The only way to execute the merger without consent without violating the lease would be if Pocahontas Land received adequate notice and withheld consent unreasonably.

Plaintiffs further assert that if there is no reasonable reason to withhold consent then it is immaterial that consent is sought/given after the transaction.  This argument confuses the issue of breach – failure to obtain consent – with damages – the effect of failing to obtain consent in a timely manner.  The cases to which plaintiffs cite support this distinction; they deal with the effect of failing to obtain consent in a timely manner on the remedy available – particularly, on the materiality of breach – not on whether the failure constituted a breach in the first place.  See, e.g., Hess Energy, Inc. v. Lightning Oil Co., 276 F.3d 646 (4th Cir. 2002) (considering damages available based on materiality of breach); Triple 7 Commodities, Inc. v. High Country Mining, Inc., 857 S.E.2d 403 (W. Va. 2021) (examining whether first

breach by one party absolved the other party from performance); Com. Builders, Inc. v. McKinney Romeo Props., LLC, No. 1:20-cv-00062, 2022 WL 16706973 (N.D.W. Va. May 18, 2022) (Keeley, J.) (determining that one party's failure to perform certain contractual duties was not so material that it absolved other party of duty to pay for the rest of the work completed).

Having determined that Pocahontas Land did not unreasonably withhold consent because it did not have a reasonable time to consent in the first place, the court nonetheless considers whether Pocahontas Land could have reasonably withheld consent had it been given sufficient time to consider the merger, as this is relevant for the determination of damages, discussed below.

The one guideline in the governing documents as to whether Pocahontas Land is required to consent can be found in the 2015 Consent and Amendment, which provides that Pocahontas Land shall not unreasonably withhold consent "provided the assignee has reasonable coal mining experience and reasonable financial standing." While the issue of Sev.en Energy's financial standing does not appear contested, Pocahontas Land emphasizes Sev.en Energy's lack of coal mining experience and lack of any experience in North America. See Wooten Aff. ¶ 13. The materials provided on Sev.en Energy show that it operated

several power plants in the United Kingdom, the Czech Republic, and Australia. Its only mining operations were two lignite mines in the Czech Republic. Not only did Sev.en Energy have no coal mining experience, it had very little experience with mining any substance and had no experience in the North American market. Yet Blackhawk Mining was to, and did, retain control of the operations on the leasehold after the merger, and Blackhawk Mining is the "second largest producer of coal in the Central Appalachian Basin" and "one of the four largest producers of metallurgical coal in the United States." First Parrish Aff. ¶¶ 28-29. It could then be argued that Sev.en Energy would have reasonable coal mining experience once the merger was completed because it would own Blackhawk, which certainly has such experience.

        Beyond Sev.en Energy's lack of coal mining experience, Pocahontas Land has articulated both permissible and impermissible reasons for withholding consent to the leasehold. Pocahontas Land's Greg Wooten, in his deposition, explained that the damages suffered as a result of the lack of consent are twofold: (1) Pocahontas Land was not given sufficient information on Sev.en Energy to determine whether they would be an appropriate ultimate owner of plaintiffs, and (2) Pocahontas Land was deprived of the opportunity to discuss rewriting the 1937 Lease to modernize the royalty rate. See Wooten Dep. Tr.

116:17–118:5, Pls.' Second Mot. Summ. J. Ex. O, ECF No. 172-12.

In his affidavit, Greg Wooten explains the importance of knowing and approving who is controlling the leasehold:

> Given the nature of the operations on their properties, a core concern of the property owner, as lessor, is insuring that the lessee is a responsible and competent operator with the ability to conduct safe and efficient operations with the appropriate equipment, manpower and oversight to comply with all laws, including particularly environmental, safety and reclamation laws. . . .
>
> In order to protect their property and insure as much as possible that operators are responsible and will comply with laws and lease obligations, lessees are carefully selected and vetted and guarantees and other security for performance are often required . . . .

Wooten Aff. ¶¶ 4, 6.

The motive of increasing the royalty is an obviously impermissible reason for withholding consent, as has been made abundantly clear by courts deciding the issue. See, e.g., Econ. Rentals, 819 P.2d at 1316; Pantry, 126 So. 3d at 159. In his deposition, Greg Wooten also said the following in response to a question about the damages suffered by Pocahontas Land as a result of the merger: "[It] [d]oesn't give us the ability to talk about a commercially reasonable contract or lease . . . . It would have opened up a discussion on commercial terms. And, yes, the royalty would have been a part of that." Wooten Dep. Tr. 116:6–15.

This desire to negotiate modern lease terms, including an updated royalty provision, undoubtedly motivated and continues to motivate Pocahontas Land. Indeed, a major issue in the first round of summary judgment was whether the 1937 Lease was unconscionable due to the low royalty provision. Yet Pocahontas Land has also articulated legitimate reasons for its reluctance to consent to the merger, including a general lack of information on Sev.en Energy and Sev.en Energy's lack of coal mining experience, American or otherwise.

An additional consideration is the fact that plaintiffs had already breached the lease prior to the request for consent to the merger, which was received shortly after the cure period for the March Notice of Default, issued in response to the deeds of trust mortgaging the leasehold, had expired. See, e.g., NNA Rest. Mgmt., 815 N.Y.S.2d at 501; Paccar Inc. v. Elliot Wilson Capitol Trucks LLC, 923 F. Supp. 2d 745 (D. Md. 2013) (finding consent not unreasonably withheld where lessor and prospective assignee were "engaged in a lawsuit for trademark infringement, tortious interference with contractual relations, and unfair competition"). While the question of whether a lessor can reasonably deny consent where it is engaged in a legal battle with the current lessee, rather than the prospective lessee, is not before the court, the already-heated relationship between plaintiffs and Pocahontas Land provides

another potential reason for Pocahontas Land to have withheld consent.

If Pocahontas Land had been given an appropriate amount of time to consider the request for consent and had refused to consent, the court would undertake an analysis as to whether the predominant reason for the refusal was the permissible reasons of lack of knowledge and the fact that they had already declared plaintiffs in default of the lease, or whether it was done out of a desire to hold consent hostage so as to renegotiate the royalty provision.  If the former, then consent may have been reasonably withheld; if the latter, then consent would be unreasonably withheld.  See Econ. Rentals, 819 P.2d at 1317 (finding that although there were several permissible reasons for the lessor to have withheld consent, the actual reason consent was withheld was for an impermissible purpose, and thus the withholding breached the lease); see also Pantry, 126 So. 3d at 159 (finding that although lessor was not given much information on new assignee, the true reason they withheld consent was a desire to renegotiate the rental price). However, since Pocahontas Land was not given the opportunity to grant or withhold consent, it appears Pocahontas Land would have had a permissible reason to withhold consent.

The court concludes that plaintiffs did not provide adequate notice to Pocahontas Land prior to the Sev.en Energy Merger, and thus the merger violated the 1937 Lease as amended by the 2015 Consent and Amendment.  Further, even if notice had been properly given, Pocahontas Land has provided a plausible explanation for why consent may have been reasonably withheld, being the lack of information on Sev.en Energy, its financials, and its coal mining experience.

E.   Damages

Pocahontas Land argues that forfeiture of the leasehold is the only adequate remedy for plaintiffs' breaches. See Def.'s Mem. Supp. Summ. J. at 12–13.  "It is well recognized in West Virginia jurisprudence that the law does not favor the forfeiture of estates."  McKenzie v. Cherry River Coal & Coke Co., 466 S.E.2d 810, 818 (W. Va. 1995); see also Bethlehem Steel Corp. v. Shonk Land Co., 288 S.E.2d 139, 142 (W. Va. 1982).  In 1892, the West Virginia Supreme Court of Appeals wrote, "[t]he elementary books on equity jurisprudence state the rule as almost an axiom, that equity never enforces a penalty or forfeiture."  Craig v. Hukill, 16 S.E. 363, 364 (W. Va. 1892) (citations omitted).  As early as 1933, the Court acknowledged that this abhorrence "may not be so extreme as in former years," but that "forfeitures still remain so obnoxious to judicial

44

minds that 'slight circumstances are eagerly sieved to avoid their enforcement, when the substantial rights of the parties insisting thereon can otherwise be adequately protected.'" McCartney v. Campbell, 171 S.E. 821, 822 (W. Va. 1933) (quoting Geffert v. Geffert, 157 P. 384, 185 (Kan. 1916)).

It is hornbook law that equitable remedies will not lie when legal remedies are available, and this is true also for forfeiture: "Equity will relieve from a forfeiture when a party benefited by the forfeiture can be made whole by monetary damages." Syl. Pt. 2, Bethlehem Steel, 288 S.E.2d 139; see also Easley Coal Co. v. Brush Creek Coal Co., 112 S.E. 512, 514–15 (W. Va. 1922) ("Such breaches are usually compensable in damages, and, if a forfeiture has not been stipulated for, it is presumed that the injured party intended to be content with such right as conferred by the ordinary remedies.").

Furthermore, even if forfeiture is provided for in the lease or contract, West Virginia law very narrowly construes such a provision:

> The broken covenant or condition relied upon for forfeiture must be found not only in the instrument, by clear and definite expression, but also within the forfeiture clause, by such expression. A covenant or condition merely implied or an express one not clearly within the forfeiture clause, will not sustain a claim of forfeiture by reason of its breach.

Easley Coal, 112 S.E. at 514−15.  The Court in Bethlehem Steel
explained this passage in Easley Coal to "require[] that a
covenant relied upon for raising forfeiture be clearly and
definitively expressed in a forfeiture clause."  288 S.E.2d at
143.  In sum, "[a] catchall, dragnet forfeiture clause for
breach of any contractual covenant is inadequate."  Id.

      The forfeiture provision in the 1937 Lease is quite
comparable to the provision in Bethlehem Steel that the court
found unacceptable.  There, the forfeiture clause read that
"[i]f . . . default shall be made by Lessee in the performance
of any other covenant or condition herein contained . . . then
Lessor, at its option may . . . (a) declare a forfeiture . . .
."  Id.  Yet the court found that this "nonspecific reference to
breached covenants does not meet the strict standards for valid
forfeiture clauses in Easley Coal."  Id.  The forfeiture
provision in the 1937 Lease is similarly broad; Article
Nineteen, which provides the remedies available, reads, in
relevant part:

> In case the Lessee shall fail in the
> performance or observance of any of the terms,
> conditions, covenants and agreements herein
> continued to be performed or observed by it,
> or shall use the leased premises contrary to
> the limitations hereof, . . . at the election
> of the Lessor, the term and leasehold interest
> hereby created and all rights of the Lessee
> under this indenture shall forthwith cease and
> determine, and the Lessor shall be entitled .
> . . to re-enter the leased premises and to

> exclude the Lessee therefrom and to hold the
> leased premises as of its former estate. . .
> .

1937 Lease, Art. 19.  In light of <u>Bethlehem Steel</u>, this reference generally to forfeiture for any conditions of the leasehold is insufficient to permit Pocahontas Land to terminate the lease for a breach of Article Sixteen's assignment-consent clause.  The 1937 Lease would have to specifically state that violation of the assignment-consent provision gives rise to the remedy of forfeiture.  <u>See</u> <u>Bethlehem Steel</u>, 288 S.E.2d at 143; <u>see also</u> <u>Christian Land Corp. v. C. & C. Co.</u>, 422 S.E.2d 503, 507 (W. Va. 1992); <u>McKenzie</u>, 466 S.E.2d at 818–19.  The lease is not so explicit, either in Article Nineteen, which provides remedies, or Article Sixteen, which lays forth the assignment-consent clause;[3] nor does this explicit, direct language appear in the 2015 Consent and Amendment.  Thus, Pocahontas Land is not entitled to termination of the 1937 Lease as remedy for plaintiffs' breaches.

The question, then, is what remedy <u>is</u> available to make Pocahontas Land whole for plaintiffs' breaches?  The plaintiffs have violated the rights of Pocahontas Land under the

---

[3] Other articles in that lease do provide specific remedies for the breach of that article; Article Twelve, for example, which deals with mine surveys and maps, provides that if the lessee fails to comply with the provisions of that section, "the Lessor may at its option cancel and annul this lease."

1937 Lease in a way that is not readily quantifiable, but the equitable remedy – forfeiture – is plainly unavailable under West Virginia law.

The usual rule is that equitable remedies will only be awarded where legal remedies are insufficient. That leaves the question of whether Pocahontas Land can present any quantifiable monetary damages, but Pocahontas Land itself recognizes that it cannot. Pocahontas Land says in its memorandum in support of its motion for partial summary judgment that forfeiture is the appropriate remedy because monetary damages are not available. See Def.'s Mem. Supp. Summ. J. at 13. Additionally, in Greg Wooten's deposition, when asked to articulate any financial damages suffered by Pocahontas Land, he refers only to the potential loss from an updated royalty provision and the general loss of the legal right to consent, but is unable to articulate any specific financial damages. See Wooten Dep. Tr. at 113:6–118:5.

Indeed, plaintiffs argue that Pocahontas Land has benefitted from the merger because Sev.en Energy has benefited the leasehold. See Pls.' Mem. Supp. at 3–4. Plaintiffs say that, among other benefits, environmental compliance has improved and workplace injuries have decreased, both substantially, since the merger. See First Parrish Aff. ¶ 27.

They also cite to the approximately $9,359,655.81 spent by
Blackhawk "on mine development for mines under the 1937 Lease"
between 2020 and 2024, and approximately $46,901,941.49 spent by
Blackhawk on capital expenditure for those mines during that
same time, for a total expenditure of approximately
$56,261,597.30.  See Second Parrish Aff. ¶¶ 5–8, Pls.'s Resp.
Ex. 1, ECF No. 179-1.  Although there are no comparative numbers
available to allow the court to compare these numbers to that
spent at other mines or prior to the merger, certainly
Pocahontas Land cannot complain that Sev.en Energy is without
adequate financial means, nor that it has failed to engage those
with coal mining experience.  While this ex post facto view of
the improved position of the plaintiffs is of limited value in
determining whether consent should have been granted, it is
appropriate in considering Pocahontas Land's damages.

     As with the merger, Pocahontas Land does not
articulate any cognizable damage for the deeds of trust that
impermissibly mortgaged the leasehold.  Additionally, since the
court's March Order, plaintiffs filed documents with the
appropriate clerks' offices stating that the deeds of trust did
not place an encumbrance on the 1937 Lease, as it was one of the
leaseholds that the savings clauses attempted to protect.  See
Stip. ¶ 50.  The purpose of these "confirmatory filings" was to
make clear that the 1937 Lease is "not Trust Property pursuant

to, or mortgaged or otherwise encumbered by, the Deeds of Trust." Stip. Exs. 31–35.  Thus, as with the merger, Pocahontas Land had a legal right conferred on it by the 1937 Lease as amended by the 2015 Consent and Amendment violated, but can articulate no legal damages.

The equitable remedy in this case, forfeiture, is plainly unavailable under the above-cited line of West Virginia cases.  Thus, unsatisfactory as it may seem, all that are available to Pocahontas Land are nominal damages.[4]

### IV. CONCLUSION

Based on the foregoing, it is ORDERED that:

1.    Pocahontas Land's Motion for Leave to Amend its Counterclaim (ECF No. 168) be, and it hereby is, DENIED;

2.    Pocahontas Land's Motion for Summary Judgment on Count II of Pocahontas Land's Counterclaim (ECF No. 169) be, and it hereby is, GRANTED in that the Sev.en Energy Merger occurred without adequate notice and constituted a breach of the 1937

---

[4] Punitive damages are not available in this breach of contract action as Pocahontas Land does not allege "an independent, intentional tort" that would allow for such a recovery.  Corder v. Antero Res. Corp., 322 F. Supp. 3d 710, 724 (N.D.W. Va. 2018) (Keeley, J.), aff'd, 57 F.4th 384 (4th Cir. 2023).

Lease as amended by the 2015 Consent and Amendment, and DENIED as to the relief requested;

    3.    Plaintiffs' Motion for Summary Judgment (ECF No. 171) is DENIED;

    4.    In lieu of forfeiture, Pocahontas Land shall be awarded nominal damages of $1.00; and

    5.    It is hereby DECLARED that:

        a.    The 1937 Lease is valid;

        b.    The prohibition against assignment set forth in the 1937 Lease, as amended by the 2015 Consent and Amendment, is enforceable;

        c.    The prohibition against mortgages contained in the 1937 Lease is enforceable;

        d.    The Sev.en Energy Merger as described herein was a transfer of control for which Pocahontas Land's consent was required and plaintiffs' failure to adequately notice or obtain Pocahontas Land's consent to that merger constituted a breach of the 1937 Lease as amended by the 2015 Consent and Amendment;

e.   Plaintiffs' failure to obtain Pocahontas Land's consent to the pledging of the 1937 Lease as security under the above-described deeds of trust constituted a breach of the 1937 Lease;

f.   Pocahontas Land does not, by virtue of the harms addressed in this action, have the right to terminate the 1937 Lease.

The Clerk is directed to transmit copies of this order to all counsel of record and any unrepresented parties.

ENTER: September 18, 2024

John T. Copenhaver, Jr.
Senior United States District Judge